## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

LUMINATI NETWORKS LTD.

      Plaintiff,

      v.

TESO LT, UAB; OXYSALES, UAB;
METACLUSTER LT, UAB;

      Defendants.

Case No.

**JURY TRIAL DEMANDED**

### COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff, Luminati Networks Ltd. ("Luminati" or "Plaintiff") brings this action under the patent laws of the United States, Title 35 of the United States Code, and makes the following allegations against Teso LT, UAB, also known as UAB Teso LT ("Teso") and sister companies metacluster lt, UAB, also known as UAB metacluster lt and metacluster, UAB ("Metacluster") and oxysales, UAB ("Oxysales") (collectively "Defendants"):

### THE PARTIES

1.     Plaintiff Luminati is an Israeli company having a principal place of business at 3 Hamahshev St., Netanya 42507, ISRAEL.

2.     Upon information and belief, Defendant Teso, previously known as UAB Tesonet ("Tesonet"), is a Lithuanian corporation located at A. Goštauto g. 40A, LT-03163, Vilnius, Lithuania.  Upon information and belief, Tesonet underwent a corporate restructuring in late 2018, after the filing of Luminati's complaint in this Court against Tesonet on July 18, 2018 (Case No. 2:19-cv-299-JRG, "First Action"), resulting in the creation of the following sister companies to

Teso: Metacluster; Oxysales; code200, UAB; and coretech, UAB, UAB. Upon information and belief, each of the sister companies share common ownership and control.  Upon information and belief, since the restructuring in late 2018, Teso has and continues to use, offer to sell, and/or sell and/or import into the United States the patented inventions of the Asserted Patents within the United States, specifically including the "Oxylabs Residential Proxy Service" provided previously by Tesonet and as now provided and/or sold by Defendants.

3.      Upon information and belief, Defendant Metacluster is a Lithuanian corporation related to Teso that was incorporated as the result of a corporate restructuring of Tesonet, its predecessor-in-interest.  Upon information and belief, Metacluster is located at A. Goštauto g. 40A, LT-03163, Vilnius, Lithuania, the same location as Teso.  Upon information and belief, Defendants share common ownership and control.  Upon information and belief, since the restructuring in late 2018, Metacluster has and continues to use, offer to sell, and/or sell and/or import into the United States the patented inventions of the Asserted Patents within the United States, specifically including the "Real-Time Crawler" Residential Proxy Service, provided previously by predecessor in interest Tesonet.  Upon information and belief, Metacluster is a successor in interest in Teso's Real-Time Crawler residential proxy service.

4.      Upon information and belief, Defendant Oxysales is a Lithuanian corporation related to Teso that was incorporated as the result of a corporate restructuring of Tesonet, its predecessor-in-interest.  Oxysales is located at A. Goštauto g. 40A, LT-03163, Vilnius, Lithuania, the same location as the other Defendants.  Upon information and belief, Defendants share common ownership and control.  Upon information and belief, since the restructuring in late 2018, Oxysales has and continues to at least sell or offer to sell the residential proxy services provided

2

by Teso and Metacluster and previously provided by predecessor in interest Tesonet.  Upon information and belief, Oxysales is a successor in interest to Tesonet.

5.      Upon information and belief, Defendants have and continue to use, provide, sell, and offer to sell as well as import into the United States residential proxy services including Oxylabs Residential Proxy Service and Real-Time Crawler when it uses the Residential Proxy Service ("Accused Instrumentalities"), including through direct communication with customers including customers in the United States and, for example, through Defendants' website. https://oxylabs.io/.  Upon information and belief, Defendants share common shareholders and jointly provide, sell and offer to sell the Accused Instrumentalities through the same website.  As such, Defendants are jointly and severally liable for infringing the Asserted Patents.

## JURISDICTION AND VENUE

6.      This is an action for patent infringement under the patent laws of the United States of America, 35 U.S.C. § 1, *et seq*.

7.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1338, and 1367. Teso has not contested subject matter jurisdiction of this Court and accepted service of process in the First Action.

8.      This Court has personal jurisdiction over Teso because it, directly or through its subsidiaries, divisions, groups, or distributors, has sufficient minimum contacts with this forum as a result of business conducted within the State of Texas, and/or pursuant to Fed. R. Civ. P. 4(k)(2). On information and belief, Teso transacts substantial business in the State of Texas, directly or through agents, including: (i) at least a portion of the infringement alleged herein, and (ii) regularly does or solicits business in Texas, engages in other persistent courses of conduct, maintains continuous and systematic contacts within this Judicial District, purposefully avails itself of the

3

privilege of doing business in Texas, and/or derives substantial revenue from services provided in Texas.  For example, Teso embeds its software, which is the subject of the infringement alleged herein, in a number of software applications which are placed into the stream of commerce with the knowledge, understanding, and/or intention that they be downloaded and executed by devices located in the State of Texas, as well as this Judicial District, including the Marshall Division. Upon information and belief, the software effectively turns the devices on which it is installed into residential proxy devices that operate as part of the service of  residential proxy systems including the Accused Instrumentalities offered, operated and provided by Defendants.  Teso and its predecessor in interest Tesonet have previously been the subject of jurisdiction in this Court by the same actions accused herein in the First Action.

9.    This Court has personal jurisdiction over Metacluster because it, directly or through its subsidiaries, divisions, groups, or distributors, has sufficient minimum contacts with this forum as a result of business conducted within the State of Texas, and/or pursuant to Fed. R. Civ. P. 4(k)(2). On information and belief, Metacluster transacts substantial business in the State of Texas, directly or through agents, including: (i) at least a portion of the infringement alleged herein, and (ii) regularly does or solicits business in Texas, engages in other persistent courses of conduct, maintains continuous and systematic contacts within this Judicial District, purposefully avails itself of the privilege of doing business in Texas, and/or derives substantial revenue from services provided in Texas.  For example, Metacluster's Real-Time Crawler utilizes Teso's Residential Proxy Service, which embeds software, which is the subject of the infringement alleged herein, in a number of software applications which are placed into the stream of commerce with the knowledge, understanding, and/or intention that they be downloaded and executed by devices located in the State of Texas, as well as this Judicial District, including the Marshall Division,

4

causing these devices to serve as residential proxy devices for the Accused Instrumentalities, including Real-Time Crawler.  Metacluster and its predecessor in interest Tesonet have previously been the subject of jurisdiction in this Court by the same actions accused herein in the First Action.

10.     This Court has personal jurisdiction over Oxysales because it, directly or through its subsidiaries, divisions, groups, or distributors, has sufficient minimum contacts with this forum as a result of business conducted within the State of Texas, and/or pursuant to Fed. R. Civ. P. 4(k)(2).  On information and belief, Oxysales transacts substantial business in the State of Texas, directly or through agents, including: (i) at least a portion of the infringement alleged herein, and (ii) regularly does or solicits business in Texas, engages in other persistent courses of conduct, maintains continuous and systematic contacts within this Judicial District, purposefully avails itself of the privilege of doing business in Texas, and/or derives substantial revenue from services provided in Texas.  For example, Oxysales sells and offers for sale Defendants' Accused Instrumentalities, which includes Defendants' software, which is the subject of the infringement alleged herein, which is embedded in a number of software applications which are placed into the stream of commerce with the knowledge, understanding, and/or intention that they be downloaded and executed by devices located in the State of Texas, as well as this Judicial District, including the Marshall Division, causing these devices to serve as residential proxy devices for the Accused Instrumentalities.  Oxysales' predecessor in interest Tesonet has previously been the subject of jurisdiction in this Court by the same actions accused herein in the First Action.

11.     Upon information and belief, residential proxy devices with Defendants' embedded software are located throughout the United States, including Texas.  *See e.g.* https://www.privateproxyreviews.com/oxylabs/.  Defendants tout the use of millions of residential proxy devices in the United States, as shown in the image below.

## US proxy
## 3,589,769 IPs

Access any preferred website with either real residential IPs or data center proxies from United States of America. This way you'll be certain to reach your target fast and hassle-free.

✓ Data center IPs        ✓ Residential IPs

https://oxylabs.io/locations/united-states-of-america

12.     This Court has general jurisdiction over Defendants due to their continuous and systematic contacts with the State of Texas and this jurisdiction.  Further, Defendants are subject to this Court's jurisdiction because they committed patent infringement in the State of Texas and this jurisdiction.

13.     Following *Brunette Machine Works v. Kockum Industries, Inc.*, 406 U.S. 706 1972), venue is proper in this Court pursuant to 28 U.S.C. §§ 1391 and 1400(b) at least because, upon information and belief, Defendants are foreign entities.

## FACTUAL ALLEGATIONS

14.     Derry Shribman and Ofer Vilenski are the sole inventors of a number of patents, including U.S. Patent Nos. 10,469,614 (Exhibit A, "'614 Patent") issued on April 9, 2019, 10,257,319 (Exhibit B, "'319 Patent") issued on November 5, 2019, and U.S. Patent No. US 10,484,510 (Exhibit C, "'510 Patent") (collectively the "Asserted Patents") issued on November 19, 2019.  Each of the Asserted Patents were issued after the filing of the complaint resulting in the First Action.

15.    The '319 Patent and '510 Patent are divisionals sharing the same specification and are both titled "System Providing Faster and More Efficient Data Communication." The'614 Patent shares the same inventors with the '319 Patent and '510 Patent, but it has a different specification and is titled "System and Method for Improving Communications by Using Intermediate Nodes."    Luminati identifies its patents including on its website at https://luminati.io/patent-marking#system-and-method-for-streaming-content-from-multiple-servers.  Luminati is the assignee and sole owner of the Asserted Patents.

16.    Luminati, formerly known as Hola Networks Ltd. ("Hola"), provides a cloud service connecting tens of millions of devices over the Internet through a proxy-based network. Each participating device allows the service to utilize a fraction of that device's idle time for the network.  Luminati utilizes this network to provide proxy-based services to its customers.

17.    Since 2014, Luminati has offered proxy-based services relying on its "Residential Proxy Network" that practice one or more claims of the Asserted Patents.  Luminati permits its business customers to utilize its residential proxy network to gather data over the Internet using residential proxy devices from various localities as required by the customers.  Because each of these residential proxy devices has its own residential IP address, web servers receiving requests from these proxy devices do not recognize such requests as originating from the actual user making the request.  Instead, the server identifies the request as coming from a residential device based upon the residential IP address of the proxy device.  These residential proxy devices provide businesses with a number of advantages.  For example, online retailers may anonymously use these residential proxy devices to gather information from web servers (such as for comparative pricing), businesses may utilize these devices to test their web sites from any city in the world, and cyber security firms may employ these devices to test web sites for malicious code.

18.     Prior to and separate from the technology at issue in this case, Hola provided a virtual private network ("VPN") service called HolaVPN.  Between November 2015 and June 2018, Hola had a business relationship with Tesonet as well as a Tesonet-related company and service called NordVPN.

19.     On May 22, 2017, during a meeting between Hola Chief Executive Officer Ofer Vilenski and Teso co-founder Tomas Okmanas, Mr. Vilenski informed Mr. Okmanas that Luminati had become aware Tesonet was taking measures to enter the residential proxy business, that Luminati had patents in this field, and that Tesonet should not infringe Luminati's patents by providing residential proxy service.  Mr. Vilenski sent an email to Mr. Okmanas that same day confirming that Luminati would send a letter identifying Luminati's intellectual property in this field.

20.     On June 1, 2017, outside counsel for Hola sent Mr. Okmanas and copied others at Defendants' company a letter (Exhibit D) identifying Hola patents covering a proprietary claim scope in the field of peer-to-peer based routing. The identified Hola patents - U.S. Patent Nos. 8,560,604 ("'604 Patent") and 9,241,044 ("'044 Patent") – are in the same patent families with the same substantive specifications as the Asserted Patents, with the '319 Patent and '510 Patent being divisionals of the '604 Patent and the '614 Patent being a divisional of the '044 Patent.

21.     On February 14, 2018, Luminati sent a second letter to Mr. Okmanas, copying others at Defendants' company referencing the June 1, 2017 letter, further informing Tesonet of Hola's name change to Luminati and the issuance of additional patents in the field of IP VPN services using peer-to-peer technology (Exhibit E).  This letter also notified Defendants that products and services offered under Teso's Oxylabs brand infringed the '044 Patent.

22.  On June 20, 2018, counsel for Defendants sent a letter to Luminati's counsel acknowledging receipt of the February 14, 2018 letter but denying that Teso's Oxylabs product practiced the claims of the patents in the letter.  Upon information and belief, "Oxylabs" is the brand name for Defendants' former Tesonet businesses collectively and generally, including but not limited to their residential proxy services, including the Accused Instrumentalities as further identified below:



https://oxylabs.io

23.  On July 19, 2018, prior to the issuance of the Asserted Patents, Luminati filed a complaint for infringement of the '044 Patent and U.S. Patent No. 9,742,866 in the First Action in this Court.

24.  Upon information and belief, Defendants offer "large-scale web data extraction" products and services under the Oxylabs brand. https://oxylabs.io/ (Exhibit F).  Upon information

and belief, this includes a residential proxy network with over thirty million residential devices, each with its own IP addresses.  https://oxylabs.io/.  Defendants tout their residential proxy service as including "proxies in every country and every city in the world." https://oxylabs.io/locations. Upon information and belief, these residential proxies have IP addresses that are assigned from a standard Internet Service Provider (ISP) to a homeowner or other residential or mobile user. https://oxylabs.io/.  Upon information and belief, this residential proxy network is used to access content over the Internet, wherein that content is identified by a content identifier.  Upon information and belief, Defendants' residential proxy network supports the residential proxy services of "Residential Proxy Service" and "Real-Time Crawler," as shown in the images below. Upon information and belief Defendants have contractual relationships with one another related to at least the sale and use of the Accused Instrumentalities including a contractual relationship between Teso and related company Metacluster requiring Teso to provide residential proxy devices in support of Metacluster's "Real-Time Crawler" service (also known as "RTC"). *See e.g.* https://oxylabs.io/legal/rtc-acceptable-use-policy; *see also* https://tesonet.com/about/privacy-policy/;  https://oxylabs.io/legal/rpp-acceptable-use-policy;  and  https://oxylabs.io/legal/rtc-acceptable-use-policy.

**WHAT SOLUTIONS DO YOU OFFER?**

Here at Oxylabs, we offer data center IPs and residential proxies that support HTTP/HTTPS & Socks 4/5 protocols.
- A Residential Proxy is an IP address that is assigned from a standard Internet Service Provider (ISP) to a homeowner.
- A Data Center IP is an IP address that comes from a secondary corporation and is not owned by an ISP.

https://oxylabs.io/.

# Global Coverage Proxy Servers

We offer proxies in every country and every city in the world.

Get started

https://oxylabs.io/locations

# How does it work

Route your requests through millions of residential IPs and never get blocked.



https://oxylabs.io/proxies/residential-proxies. (Exhibit F)

## Residential Proxy Network

⊖ **WHY SHOULD I USE A RESIDENTIAL PROXY NETWORK?**

Residential proxies enable data collection without IP bans and ensure a high anonymity level. These IPs mostly belong to large internet and mobile service providers, that's why other websites don't block users with these kinds of IPs.

⊖ **HOW OFTEN ARE RESIDENTIAL PROXIES CHECKED FOR BEING UP?**

All of our residential proxies are being checked every 60 seconds.

⊖ **CAN I SELECT A PROXY FROM SPECIFIC COUNTRY OR CITY?**

Yes, you can specify in the authorization header which city IP to use to process the request.

# Real-Time Crawler for e-commerce

Track product pricing changes in the most popular retail marketplace. With Real-Time Crawler, you can extract data from product pages, product offer listing pages, reviews, questions & answers, search results or from any URL in general.

What about the residential proxy pool? These proxies enable data collection without IP bans, this way assuring anonymity as well. The same goes for the Real-Time Crawler as it uses both data center and residential proxies.

All localized domains and pagination are supported. Historical pricing data is stored as well.

https://oxylabs.io/products/real-time-crawler

12

https://oxylabs.io/faq. Upon information and belief, these residential proxies include residential proxy devices located in Marshall, Texas.

25. Upon information and belief, the Oxylabs residential proxy network of the Accused Instrumentalities is based upon numerous consumer devices or proxy devices, such as laptops and cell phones, each of which is a client device identifiable over the Internet by an identifier, such as (but not limited to) an IP address. Upon information and belief, these client devices become part of the network through the execution of Defendants' code, such as by implementation of a software development kit ("SDK") that is embedded in software applications downloaded on the client devices. Upon information and belief, these proxy devices are associated with at least an active state and dormant state. Upon information and belief, when the proxy device meets certain criteria, including for example sufficient battery power, sufficient available bandwidth, etc., the proxy device shifts or stays in an active state whereby it makes itself available to serve as a proxy device in the residential proxy system. However, upon information and belief, when the criteria are not met, such as for example when the device has low battery power or little available bandwidth, it enters a dormant state whereby it does not make itself available for use as a proxy device in the residential proxy service. Upon information and belief, when in the active state these devices send their identifier to a server, such as Oxylab's dedicated proxy servers, which store these identifiers. Upon information and belief, while in the active state, these proxy devices remain available to receive requests submitted through the Accused Instrumentalities and send the requests to a target web server, as well as sending any content received from the target web server to Defendants' requesting customer via an intermediary of the Accused Instrumentalities such as a supernode.

26. Upon information and belief, Defendants have developed or are developing Oxylabs embedded software for different platforms including but not limited to Google Android

and Microsoft Windows. Upon information and belief, while frequently renamed, the above Oxylabs embedded software that enables the residential proxy network includes embedded code named "genericexitnode," "winnerbot," "CoffeeService," "instantcoffee," and "ENService."

27.    Upon information and belief, the above Oxylabs embedded code has been integrated and is believed to be currently embedded in a number of applications via Defendants' application partners including at least the following software application(s) that may be downloaded by any user located anywhere having Internet access: Auslogic's "Auslogics Disk Defrag Free;" Hackdrip's "WallPixel;" Vagner Xavier's "Currency Converter X;" and "Screenshot Lite." See e.g. https://www.auslogics.com/en/eula/?product=disk-defrag; http://vsxapps.com/privacy/; https://snowlife01.com/ScreenshotLite/privacy_policy.html; and https://hackdrip.com/wallpixel-privacy-policy/.

28.    Defendants provide a residential proxy service through the Accused Instrumentalities allowing an Oxylabs service customer to utilize residential proxy devices in fetching content over the Internet.  Upon information and belief, Defendants' embedded code installed on the residential proxy devices causes the devices to perform the steps of at least claims 1, 2, 4, 7, 9, 11, 12, 15, 16, 17, and 29 of the '614 Patent, claims 1, 17, 24, 25 and 27 of the '319 Patent, and claims 1, 8, 13, 15, 16, 18, 20, 22, and 23 of the '510 Patent.  This embedded code is under the control of Defendants, either directly or via Defendants' contractual relationship with its software application partners, including partners integrating Defendants' SDK in their applications.  As this code is under the control of Defendants, Defendants cause each of these steps to also be performed.  In addition, given Defendants' contractual relationship with its customers, the customers utilization of the Accused Instrumentalities also causes each of the claimed steps to be performed.

14

29.    Specifically, upon information and belief, Defendants' residential proxy network comprises numerous proxy devices, each of which is a client device such as a laptop or smartphone identifiable by its own identifier, such as (but not limited to) an IP address, with Defendants' embedded code operating on that device.  Upon information and belief, the proxy devices of the Accused Instrumentalities send its identifier to a server of the Accused Instrumentalities, such as a supernode, following the proxy device connecting to the Internet and the proxy devices and server of the Accused Instrumentalities communicate periodically thereafter. Upon information and belief, each proxy device is associated with a first and second state ("first state" or "second state") according to a utilization of a resource, such as for example battery life, bandwidth usage or a threshold value associated with idleness. Upon information and belief, a periodic or continuous determination is made whether the device satisfies a criterion for resource utilization, and based upon that determination, such as for example when a threshold value associated with idleness is above or below that threshold, shifts the proxy device between a first state or second state.  Upon information and belief, when the criterion is satisfied and the proxy device is in the first state, the proxy device is responsive to receiving a request from the server of the Accused Instrumentalities. Upon information and belief, the determination of whether the device satisfies a criterion for resource utilization is made on the proxy device.  Upon receiving a request, the proxy device performs a task.  *See e.g.* https://learn.oxylabs.io/hc/en-us/articles/360012784812-How-often-are-residential-proxies-checked-for-availability; https://learn.oxylabs.io/hc/en-us/articles/360024814952-How-long-can-I-keep-the-same-residential-IP-for.

30.    Defendants' end user license agreement ("EULA") notifies end users that using an application containing Defendants' SDK allows Oxylabs to access and use the end user's device to "access and collect data on "publicly accessible data resources."  Exhibit G at 1.  The EULA

expressly states "We use your device resources when the device is idle and is on Wi-Fi connection (cellular data may be used only occasionally and restrictedly) …. To be able to do that we process a limited amount of your personal Information (such as your IP address, device type, network connection type and status, etc.)" as shown in the image below.

## INFORMATION FOR END USERS

Oxylabs is a tech company specializing in large-scale automated data gathering from various search engines and eCommerce websites, we also offer other services through our private network. We focus on helping companies extract essential business intelligence data. By implementing our SDK in the application, we also help App developers to monetize their apps.

By using the application that contains our SDK, you allow Oxylabs to access your device and to use some of your network connection and device's resources. We use your device resources when the device is idle and is on WIFI connection (cellular data may be used only occasionally and restrictedly). Your device resources and network connection are used to access and collect data on publicly accessible data resources, which basically means that we or our partners use your device to collect publicly accessible data from the Internet (not from you or your device).

To be able to do that we process a limited amount of your personal Information (such as your IP address, device type, network connection type and status, etc.). To find more about the way we process your personal data, please visit our publicly available privacy policy .

By clicking accept in the Oxylabs consent window you allow to use limited amount of your resources as described above.

This text was last updated on January 5, 2019.

https://luminati.io/legal/sdk-sla

31.    Upon information and belief, having received a request from a server of the Accused Instrumentalities, the proxy device is used to fetch content identified by a content identifier over the Internet from a web server, which stores the content.  Upon information and belief, the proxy device fetches content by (a) receiving a content identifier from the server of the Accused Instrumentalities; (b) sending the content identifier to the web server; (c) receiving the content from the web server in response to the sending of the content identifier to the web server; and (d) sending the content to the server of the Accused Instrumentalities.  Upon information and

belief, the above steps are executed including, for example, on the proxy device by Defendants' software installed on that device, which can be downloaded on that device from servers on the Internet.

32.     Upon information and belief, the content may include a part or whole files, text, numbers, audio, voice, multimedia, video, images, music, computer program, or a part or a whole of a web-site page.  Upon information and belief, the content may be identified by a uniform resource locator.

33.     Upon information and belief, web servers are or include Hypertext Transfer Protocol (HTTP) servers that respond to HTTP requests including both normal HTTP and HTTPS requests, and the proxy device may send an HTTP request comprising the content identifier to the web server.  Further, upon information and belief, the proxy device may establish Transmission Control Protocol (TCP) connections with the server of the Accused Instrumentalities and web server, with the content identifier and content sent over the established TCP connections to and from the proxy device.  Similarly, upon information and belief, the proxy device may establish a TCP connection with the web server.

34.     Upon information and belief, each proxy device stores, operates or uses a client operating system including but not limited to a mobile operating system such as Android version 2.2, 2.3, 4.0, 4.2, 4.4, and Microsoft Windows Phone version 7, 8, and 9.

35.     The use of the residential proxy network permits anonymity to Oxylabs customers, such as for engaging in activities like as web crawling, without disclosing its identity to the targeted web sites.

36.     Since the filing of a previous complaint in this Court in the First Action on July 19, 2018 (Exhibit H) Defendants have posted information on its website under the title of "Bust the

17

Bully: $100,000 for Prior Art" including allegations that Luminati (a) is "threatening companies for alleged patent infringement without any evidence," (b) "chooses to harass big and small companies alike" (c) "is also trying to disrupt its competitors' ability to compete on equal terms by sending lawsuit threats to clients of the competing companies," (d) "is using this unjustified business method to intimidate smaller market players," (e) is "engaged in deceptive behavior," and (f) "has no patent rights outside of the United States because their European applications for patents mentioned above have been withdrawn due to lack of novelty."  https://oxylabs.io/bounty. This webpage includes an offer of a "bounty" for "prior art that will be successfully used to invalidate Luminati's patents."

37.     Upon information and belief, Defendants have advertised the $100,000 bounty above on its own website as well as on other publicly accessible websites, including Google.  As shown in the first two images below, Defendants had placed an advertisement through its Oxylabs brand specifically targeting the Luminati brand that displays its bounty against Luminati upon a search of "luminati" in Google's webpage.  The Teso / Oxylabs hyperlink directs viewers to Teso's "Bust the Bully" webpage.  The below images are exemplary Defendants' advertisements posted since the filing of the original complaint.





🔒 https://www.google.com/search?q=luminati&oq=luminati&aqs=chrome..69i57j0l5.2328j0j8&sourceid=ch

**gle**    luminati                                                        🎤  🔍

**All**    Images    News    Videos    Maps    More              Settings    Tools

About 589,000 results (0.35 seconds)

### Invalidate Luminati.io patents | Alleged patent infringement
[Ad] www.oxylabs.io/bounty ▼
A financial reward for prior art that can be used to invalidate **Luminati**.io patents. Help us to prevent
**Luminati**.io from threatening companies for alleged patent infringement.

### Residential IP and Proxy Service for Businesses. Luminati
https://luminati.io/ ▼
World's largest proxy service with a residential proxy network of 36M IPs worldwide and proxy
management interface for zero coding. Start a 7-day free trial »
FAQ · About · Luminati SDK · Learning hub

Affordable price. Services. Rank Tracker API, SERP API, Keyword Data API.
Pricing · Docs · FAQ · APIs

### False claims by Luminati.io | $100,000 for Prior Art
[Ad] www.oxylabs.io/bounty ▼
A financial reward for prior art that can be used to invalidate **Luminati**.io patents. Help us to prevent
**Luminati**.io from threatening companies for alleged patent infringement.

19



38.    Upon information and belief, Defendants directed the above advertising toward Luminati's customers and prospective customers seeking to harm Luminati's business relationships.

39.    Upon information and belief, Defendants created a website designed to disparage and attack Luminati in response to the previous lawsuit filed against Teso. See http://www.darksideofluminati.com/ (Exhibit X).  This website lists an author, Marcus Jackson, which upon information and belief is a pseudonym for Teso. This webpage includes numerous falsehoods and rhetorical questions intended to disparage Luminati.



## Why Luminati is Shady?

In 2015, it was discovered that Hola, back then a popular free VPN, was selling the "idle resources" of its users via Luminati brand. By being a peer-to-peer VPN, Hola was turning its users' computers to exit nodes and using them to route traffic.

We're wondering, what was the main reason that led Mark Joseph and EMK Capital to make the decision and buy Luminati? Are there other ways how Luminati, and now EMK Capital, is exploiting Hola users' personal data? Does Hola at all care about the safety of their users and are they competent enough to develop the kind of software?

http://www.darksideofluminati.com/

40.    Luminati's SDK License includes the following terms:

## 1. Integration and grant of license

1.1 Following execution of this Agreement, Luminati shall provide to Partner a proprietary Luminati SDK (the "**SDK**"), which Partner shall integrate into the Partner Solution so as to enable Luminati to treat certain devices of users of the Partner Solution ("**Users**") as nodes in the Luminati network used to operate the Luminati service.

Luminati ensures a User's device is used by the network under strict rules which limits the bandwidth consumption. These rules consist of device battery level, maximum daily and weekly bandwidth usage cap per device, connection type(Wifi/Cellular) and others.

1.2 As part of the SDK integration, Partner allows its Users to elect to receive the Partner Solution free of charge or of ads in return for becoming nodes in the Luminati network. Partner shall ensure that only Users who have expressly agreed to become nodes will actually be marked by Partner as such (such marked Users, "Qualified Users") and shall unmark a Qualified User as such immediately upon such Qualified User electing to terminate its participation in the Luminati network through the SDK. Partner shall not in any way make changes to the SDK or interfere with its operation or the Luminati network's operation. Partner is required to make the following changes:

- To Partner's Terms of Service: "In return for some of the premium features of '[PUBLISHER'S APPS]', you may choose to be a peer on the Luminati network. By doing so you agree to have read and accepted the Terms of Service of the Luminati SDK SLA: http://luminati.io/legal/sdk_sla.
  You may opt out of the network from settings."
- On Android: Partner is required to add this statement to the Play Store description of Partner Solution: "Your use of [PUBLISHER'S APP] is free of charge in exchange for safely using some of your device's resources (WiFi and very limited cellular data), and only when you are not using your device. You may turn this off from the settings menu. Please see our TOS for further information. [Link to TOS]."
- On windows: Partner is required to add this statement to the FAQ of Partner Solution on his site: "Your use of [PUBLISHER'S SOFTWARE] is free of charge in exchange for safely sharing some of your device's idle resources for the benefit of others. You may turn this off from settings. Please see our TOS for further information. [Link to TOS]."

https://luminati.io/legal/sdk-license

22

41.     Luminati's SDK partners are contractually obligated to ensure that only their customers who expressly elect to be a peer on the Luminati network will be identified as such and only for as long as these users do not change their election.  Luminati similarly imposes rules restricting the usage of a peer device based on certain criteria including for example, device battery level, maximum daily and weekly bandwidth usage cap per device, and connection type (Wi-Fi/Cellular).

42.     Upon information and belief, at least since the filing of the previous complaint, Ms. Urtė Černiauskaitė, legal counsel at Defendants, contacted former Luminati employees seeking information.  Upon information and belief, Ms. Černiauskaitė has represented that Defendants are willing to pay former Luminati employees for assistance and allocated budget to do so.  Current and former Luminati employees are subject to a Personal Employment Agreement ("Employment Agreement"). The terms of the Employment Agreement include a confidentiality provision obligating the employee to keep in confidence Luminati's proprietary information.  In addition to other proprietary information, at least one former employee approached by Ms. Černiauskaitė has knowledge regarding Luminati's residential service architecture, and other confidential and proprietary information.

43.     Luminati protects various information as a trade-secret, and uses various means for protecting this data, such as confidentiality agreements with employees, partners, and providers, storing the protected information in a local secured computer system, as well as using a local secured communication network.

44.     Upon information and belief, Defendants have been seeking confidential information from former Luminati employees.

45.     Defendants sent communications to email addresses that were not public and were maintained as private on Luminati's private computers and not accessible to the public, including customer emails and test emails generated by Luminati for the purpose of testing Luminati's proxy service.   Upon information and belief, Defendants have contacted Luminati customers using proprietary Luminati information derived from at least Luminati's confidential customer lists. Upon information and belief, Defendants have acquired this information through unauthorized access to Luminati's secure computer system.

46.     Upon information and belief, Defendants have used Luminati's proprietary information to derive a competitive advantage interfering with Luminati's business relationships with its clients and causing Luminati to lose customers.

## COUNT I
(Infringement of the '614 Patent)

47.     Luminati repeats and re-alleges the allegations contained in paragraphs 1-46 of this Complaint as if fully set forth herein.

48.     The '614 Patent entitled "System and Method for Improving Internet Communication by Using Intermediate Nodes" was duly and legally issued by the U.S. Patent and Trademark Office on November 5, 2019, from Application No. 16/214,433 filed on December 10, 2018, a continuation of Application No. 16/140,785 which is a continuation of application No. 15/663,762, which is a continuation of application No. 14/930,894, now Pat. No. 9,742,866 ("'866 Patent"), which is a divisional of application No. 14/468,836, now Pat. No. 9,241,044 ("'044 Patent"), all of which claim priority to provisional applications 61/870,815 filed on August 28, 2013. A true and accurate copy of the '614 Patent is attached hereto as Exhibit A.

49.     Each and every claim of the '614 Patent is valid and enforceable, and each enjoys a statutory presumption of validity under 35 U.S.C. § 282.

24

50.     Luminati is the sole owner of the '614 Patent and has rights to past damages.  .

51.     Independent Claim 1 of the '614 Patent recites:

A method for use with a resource associated with a criterion in a client device that communicates with a first server over the Internet, the client device is identified in the Internet using a first identifier and is associated with first and second state according to a utilization of the resource, the method comprising:

initiating, by the client device, communication with the first server over the Internet in response to connecting to the Internet, the communication comprises sending, by the client device, the first identifier to the first server over the Internet;

when connected to the Internet, periodically or continuously determining whether the resource utilization satisfies the criterion;

responsive to the determining that the utilization of the resource satisfies the criterion, shifting to the first state or staying in the first state;

responsive to the determining that the utilization of the resource does not satisfy the criterion, shifting to the second state or staying in the second state,

responsive to being in the first state, receiving, by the client device, a request from the first server; and

performing a task, by the client device, in response to the receiving of the request from the first server;

wherein the method is further configured for fetching over the Internet a first content identified by a first content identifier from a web server that is distinct from the first server, and the task comprising:

receiving, by the client device, the first content identifier from the first server;

sending by the client device, the first content identifier to the web server;

receiving, by the client device, the first content from the web server in response to the sending of the first content identifier; and

sending, by the client device, the received first content to the first server.

52.    As described above, upon information and belief, the Accused Instrumentalities comprise numerous proxy devices ("client devices"), each of which is a client device identifiable by its own identifier ("first identifier").  Upon information and belief, upon connecting to the Internet, a client device initiates communication with a server ("first server") of the Accused Instrumentalities, such as a supernode, by sending information over the Internet to the first server, including the first identifier.   Upon information and belief, the proxy devices in Defendants' Oxylabs proxy residential network each have a first state and second state.  Upon information and belief, the Accused Instrumentalities determines whether the resource utilization of a proxy device satisfies a criterion as per claim 1 of the '614 Patent, and upon determining that the criterion is satisfied shifts the client device to a first state or upon determining that the criterion is not satisfied shifts the client device to a second state.

53.    As described above, upon information and belief, when a client device is in the first state it can receive a request from the first server and perform a task in response to receiving this request.  The client device can fetch content ("first content"), such as for example a website, identified by a content identifier ("first content identifier"), such as for example a URL, over the Internet from a web server ("web server"), such as (but not limited to) a server hosting a website, that is distinct from the first server.  Upon information and belief, the client device can (a) receive the first content identifier from the first server; (b) send the first content identifier to the web server;

26

(c) receive the first content from the web server in response to the sending of the first content identifier; and (d) send the received first content to the first server.

54.    The '614 Patent includes a number of dependent claims.  In addition to practicing the steps of independent claim 1, upon information and belief as discussed above, Defendants and others using Defendants' Accused Instrumentalities also practice the steps of at least the following dependent claims:

Claim 2: The method according to claim 1, wherein the determining is performed by the client device.

Claim 4: The method according to claim 1, wherein the communication by the client device with the first server is based on, or is according to, TCP/IP protocol or connection.

Claim 7: The method according to claim 1, wherein the steps are sequentially executed.

Claim 9: The method according to claim 1, wherein the client device is further storing, operating, or using, a client operating system.

Claim 11: The method according to claim 9, wherein the client operating system is a mobile operating system.

Claim 12: The method according to claim 11, wherein the mobile operating system is one out of Android version 2.2 (Froyo ), Android version 2.3 (Gingerbread), Android version 4.0 (Ice Cream Sandwich), Android Version 4.2 (Jelly Bean), Android version 4.4 (KitKat)), Apple iOS version 3, Apple iOS version 4, Apple iOS version 5, Apple iOS version 6, Apple iOS version 7, Microsoft Windows® Phone version 7, Microsoft Windows® Phone version 8, Microsoft Windows ® Phone version 9, and Blackberry® operating system.

Claim 15: The method according to claim 1, wherein the client device comprises, or consists of, a portable or mobile device.

Claim 16: The method according to claim 15, wherein the mobile device comprises a smartphone.

Claim 17: The method according to claim 1, for use with a set threshold value, and wherein the criterion is satisfied when the resource utilization is above or below the threshold.

Claim 29: The method according to claim 1, wherein the web server uses HyperText Transfer Protocol (HTTP) and responds to HTTP requests via the Internet, and wherein the sending of the first content identifier to the web server comprises a HTTP request, or wherein the communication with the web server is based on, or uses, HTTP persistent connection, and wherein the first content includes, consists of, or comprises, a part or whole of files, text, numbers, audio, voice, multimedia, video, images, music, or computer program, or wherein the first content includes, consists of, or comprises, a part of, or a whole of, a web-site page.

55.    This year and last year, as part of the First Action, Defendants have been in litigation with Plaintiff involving assertion of infringement of the '044 and '866 Patents, both of which are related to the '614 Patent.  Defendants have actual notice of the '614 Patent since at least the filing of the Complaint and know at least from the Complaint that implementation of the Accused Instrumentalities using residential proxy devices in the United States infringe at least claims 1, 2, 4, 7, 9, 11, 12, 15, 16, 17 and 29 of the '614 Patent.

56.    Upon information and belief Defendants sold, offered to sell, used, tested, and imported and continue to sell, offer to sell, use, test, and import the Accused Instrumentalities into the United States.  Defendants import their embedded code into the United States directly and/or

28

via Defendants' application partners, which is implemented on devices located in the United States. Defendants' embedded code enables devices to serve as residential proxy devices for the Accused Instrumentalities and is not used for other commercial services or products.  Defendants provide the residential service of the Accused Instrumentalities to their customers with the knowledge and intent that the customers' implementation of the service using residential proxies located in the U.S. would infringe the '614 Patent.

57.    Defendants have been and are now infringing at least directly, indirectly and/or contributorily, one or more claims including at least claims 1, 2, 4, 7, 9, 11, 12, 15, 16, 17 and 29 of the '614 Patent, both literally and/or under the doctrine of equivalents, by implementing the Accused Instrumentalities using residential proxy devices located in the United States without authority and/or license from Luminati, and Defendants are liable to Luminati under 35 U.S.C. § 271 *et seq.*, including but not limited to under Sections 271(a), (b), (c) and/or (g).  On information and belief, at least since the service of this Complaint, Defendants have been aware of the Asserted Patents yet have continued to infringe and cause proxies in the United States under Defendants' control to infringe claims of the Asserted Patents and have induced infringement.  On further information and belief, Defendants have developed, used, offered to sell and/or sold within the United States and imported into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, including as one non-limiting example the Defendants' SDK imported into and implemented in user devices in the United States as well as the API and/or any other instructions provided to Defendants' customers that result in

infringement.  On further information and belief, Defendants also import and sell as well as cause others to use within the United States a product which is made by a process patented in the United States whereby the importation, offer to sell, sale, and/or use of the product occurs during the term of such process patent.  Such products may include for example, the set of results sent to customers in the United States as created and assembled by the patented methods of the Asserted Patents.

58.     As a result of Defendants' infringement of the '614 Patent, Luminati has suffered and continues to suffer damages.  Thus, Luminati is entitled to recover from Defendants the damages Luminati sustained as a result of Defendants' wrongful and infringing acts in an amount no less than its lost profits and/or a reasonable royalty, together with interest and costs fixed by this Court together with increased damages up to three times under 35 U.S.C. § 284.

59.     Luminati has suffered damage because of the infringing activities of Defendants, their officers, agents, servants, employees, associates, partners, and other persons who are in active concert or participation therewith, and Luminati will continue to suffer irreparable harm for which there is no adequate remedy at law unless Defendants' infringing activities are preliminarily and permanently enjoined by this Court.  Luminati practices the Asserted Patents and, on information and belief, practicing the Asserted Patents is required for a competitive offering of residential proxy services, a technology and market that Luminati created. Non-exclusive examples of such damage include loss of market share, lowered prices and the inability of Luminati to obtain the revenues and profits it would have been able to obtain but for the infringement, lost sales in other services when customers did not purchase residential proxy services from Laminate as a result of the infringement, loss of convoyed sales of other related services that Luminati would have sold but for the infringement, and harm to Luminati's reputation as a result of Defendants' lower quality

and less protected offerings damaging the reputation and perception of the residential proxy service market that relies on the technology of the Asserted Patents.

60.     Defendants' infringement of the '614 Patent is and continues to be deliberate and willful because Defendants were and are on notice of the '614 Patent at least as early as the Complaint, yet Defendants continue to infringe the '614 Patent.  This case should be deemed an exceptional case under 35 U.S.C. § 285, and if so, Luminati is entitled to recover its attorneys' fees.

**COUNT II**
(Infringement of the '319 Patent)

61.     Luminati repeats and re-alleges the allegations contained in paragraphs 1-60 of this Complaint as if fully set forth herein.

62.     The '319 Patent entitled "System Providing Faster and More Efficient Data Communication" was duly and legally issued by the U.S. Patent and Trademark Office on April 9, 2019, from Application No. 15/957,945 filed on April 20, 2018, which is a continuation of application No. 14/025,109, which is a division of application No.  12/836,059, now Pat. No. 8,560,604, all of which claim priority to provisional application 61/249,624 filed on October 8, 2009. A true and accurate copy of the '319 Patent is attached hereto as Exhibit B.

63.     Each and every claim of the '319 Patent is valid and enforceable, and each enjoys a statutory presumption of validity under 35 U.S.C. § 282.

64.     Luminati is the sole owner of the '319 Patent and has rights to past damages.  .

65.     Claim 1 of the '319 Patent recites:

A method for use with a first client device, for use with a first server that comprises a web server that is a Hypertext Transfer Protocol (HTTP) server that responds to  HTTP requests, the

31

first server stores a first content identified by a first content identifier, and for use with a second server, the method by the first client device comprising:

receiving, from the second server, the first content identifier;

sending, to the first server over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier;

receiving, the first content from the first server over the Internet in response to the sending of the first content identifier; and

sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier.

66.    As described in the above paragraphs, upon information and belief, the Accused Instrumentalities comprise numerous proxy devices each of which is a client device ("first client device") and a server of the Accused Instrumentalities ("second server"), such as a supernode. An HTTP web server that responds to HTTP requests ("first server") stores content ("first content") identified by an identifier ("first content identifier"), such as for example an HTTP web server storing a webpage identified by a URL address. As described above, a first client device (a) receives a first content identifier from the second server of the Accused Instrumentalities; (b) sends an HTTP request comprising the first content identifier to the first server; (c) receives the first content from the first server over the Internet in response to the sending of the first content identifier; and sends the first content to the second server of the Accused Instrumentalities in response to receiving the first content identifier.

67.    The '319 Patent includes a number of dependent claims. In addition to practicing the steps of independent claim 1, upon information and belief as discussed above, Defendants and

32

others using Defendants' Accused Instrumentalities also practice the steps of the following dependent claims:

Claim 17: The method according to claim 1, further comprising periodically communicating between the second server and the first client device.

Claim 24: The method according to claim 1, further comprising establishing, by the first client device, a Transmission Control Protocol (TCP) connection with the second server using TCP/IP protocol.

Claim 25:  The method according to claim 1, wherein the first or second server is a Transmission Control Protocol/Internet Protocol (TCP/IP) server, wherein the first client device communicates over the Internet with the first or second server based on, or according to, using TCP/IP protocol or connection.

Claim 27:  The method according to claim 1, wherein the steps are sequentially executed.

68.     Defendants have actual notice of the '319 Patent since at least the filing of this Complaint and know at least from this Complaint that implementation of the Accused Instrumentalities using residential proxy devices in the United States would infringe at least claims 1, 17, 24, 25, and 27 of the '319 Patent.

69.     Upon information and belief Defendants sold, offered to sell, used, tested, and imported and continue to sell, offer to sell, use, test, and import the Accused Instrumentalities into the United States.  Defendants import their embedded code into the United States directly and/or via Defendants' application partners, which is implemented on devices located in the United States. Defendants' embedded code enables devices to serve as residential proxy devices for the Accused Instrumentalities and is not used for other commercial services or products.  Defendants provide the residential service of the Accused Instrumentalities to their customers with the

knowledge and intent that the customers' implementation of the service using residential proxies located in the U.S. would infringe the '319 Patent.

70.    Defendants have been and are now infringing at least directly, indirectly and/or contributorily, one or more claims including at least claims 1, 17, 24, 25 and 27 of the '319 Patent, both literally and/or under the doctrine of equivalents, by implementing the Accused Instrumentalities using residential proxy devices located in the United States without authority and/or license from Luminati and are liable to Luminati under 35 U.S.C. § 271 *et seq.*, including but not limited to under Sections 271(a), (b), (c) and/or (g).  On information and belief, at least since the service of this Complaint, Defendants have been aware of the Asserted Patents yet have continued to infringe and cause proxies in the United States under Defendants' control to infringe claims of the Asserted Patents and have induced infringement.  On further information and belief, Defendants have developed, used, offered to sell and/or sold within the United States and imported into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, including as one non-limiting example the Defendants' SDK imported into and implemented in user devices in the United States as well as the API and/or any other instructions provided to Defendants' customers that result in infringement.  On further information and belief, Defendants also import and sell as well as cause others to use within the United States a product which is made by a process patented in the United States whereby the importation, offer to sell, sale, and/or use of the product occurs during the term of such process

34

patent.  Such products may include for example, the set of results sent to customers in the United States as created and assembled by the patented methods of the Asserted Patents.

71.     As a result of Defendants' infringement of the '319 Patent, Luminati has suffered and continues to suffer damages.  Thus, Luminati is entitled to recover from Defendants the damages Luminati sustained as a result of Defendants' wrongful and infringing acts in an amount no less than its lost profits and/or a reasonable royalty, together with interest and costs fixed by this Court together with increased damages up to three times under 35 U.S.C. § 284.

72.     Luminati has suffered damage because of the infringing activities of Defendants, their officers, agents, servants, employees, associates, partners, and other persons who are in active concert or participation therewith, and Luminati will continue to suffer irreparable harm for which there is no adequate remedy at law unless Defendants' infringing activities are preliminarily and permanently enjoined by this Court.  Luminati practices the Asserted Patents and, on information and belief, practicing the Asserted Patents is required for a competitive offering of residential proxy services, a technology and market that Luminati created. Non-exclusive examples of such damage include loss of market share, lowered prices and the inability of Luminati to obtain the revenues and profits it would have been able to obtain but for the infringement, lost sales in other services when customers did not purchase residential proxy services from Laminate as a result of the infringement, loss of convoyed sales of other related services that Luminati would have sold but for the infringement, and harm to Luminati's reputation as a result of Defendants' lower quality and less protected offerings damaging the reputation and perception of the residential proxy service market that relies on the technology of the Asserted Patents.

73.     Defendants' infringement of the '319 Patent is and continues to be deliberate and willful because Defendants were and are on notice of the '319 Patent at least as early as the

35

Complaint, yet Defendants continue to infringe the '319 Patent. This case should be deemed an exceptional case under 35 U.S.C. § 285, and if so, Luminati is entitled to recover its attorneys' fees.

## COUNT III
### (Infringement of the '510 Patent)

74.     Luminati repeats and re-alleges the allegations contained in paragraphs 1-73 of this Complaint as if fully set forth herein.

75.     The '510 Patent entitled "System Providing Faster and More Efficient Data Communication" was duly and legally issued by the U.S. Patent and Trademark Office on November 19, 2019, from Application No. 16/278,107 filed on February 17, 2019, a continuation of Application No. 15/957,945, now Pat. No. 10,257,319, which is a continuation of application No. 14/025,109, now Pat. No. 10,069,936, which is a divisional of application No. 12/836,059, now Pat. No. 8,560,604, all of which claim priority to provisional application 61/249,624 filed on October 8, 2009. A true and accurate copy of the '510 Patent is attached hereto as Exhibit C.

76.     Each and every claim of the '510 Patent is valid and enforceable, and each enjoys a statutory presumption of validity under 35 U.S.C. § 282.

77.     Luminati is the sole owner of the '510 Patent and has rights to past damages.

78.     Claim 1 of the '510  Patent recites:

A method for use with a web server that responds to Hypertext Transfer Protocol (HTTP) requests and stores a first content identified by a first content identifier, the method by a first client device comprising:

establishing a Transmission Control Protocol (TCP) connection with a second server;

sending, to the web server over an Internet, the first content identifier;

receiving, the first content from the web server over the Internet in response to the sending of the first content identifier; and

sending the received first content, to the second server over the established TCP connection, in response to the receiving of the first content identifier.

79.    As described in the above paragraphs, upon information and belief, the Accused Instrumentalities comprise numerous proxy devices each of which is a client device ("first client device") and a server of the Accused Instrumentalities ("second server"), such as a supernode.  A web server that responds to HTTP requests ("web server") stores content ("first content") identified by an identifier ("first content identifier"), such as for example an HTTP web server storing a webpage identified by a URL address.  As described above, a first client device (a) establishes a TCP connection with a second server; (b) sends the first content identifier to the web server; (c) receives the first content from the web server over the Internet in response to the sending of the first content identifier; and (d) sends the received first content to the second server of the Accused Instrumentalities over the established TCP connection in response to the receiving of the first content identifier.

80.    The '510 Patent includes a number of dependent claims.  In addition to practicing the steps of independent claim 1, upon information and belief as discussed above, Defendants and others using Defendants' Accused Instrumentalities also practice the steps of the following dependent claims:

Claim 8: The method according to claim 1, further comprising periodically communicating over the TCP connection between the second server and the first client device.

Claim 13: The method according to claim 1, for use with a software application that includes computer instructions that, when executed by a computer processor, cause the

processor to perform the sending of the Hypertext Transfer Protocol (HTTP) request, the receiving and storing of the first content, the receiving of the first content identifier, and the sending of the part of, or the whole of, the stored first content, the method is further preceded by:

downloading, by the first client device from the Internet, the software application; and installing, by the first client device, the downloaded software application.

Claim 15:  The method according to claim 1, further comprising receiving, by the first client device from the second server over the established TCP connection, the first content identifier.

Claim 16:  The method according to claim 1, wherein the sending of the first content identifier to the web server over the Internet comprises sending a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier.

Claim 18:  The method according to claim 1, wherein the second server is a Transmission Control Protocol/Internet Protocol (TCP/IP) server that communicates over the Internet based on, or according to, using TCP/IP protocol or connection, and wherein the first client device is a Transmission Control Protocol/Internet Protocol (TCP/IP) client that communicates with the second server over the Internet based on, or according to, TCP/IP protocol.

Claim 20:   The method according to claim 1, wherein the first content comprises web-page, audio, or video content, and wherein the first content identifier comprises a Uniform Resource Locator (URL).

Claim 22:  The method according to claim 1, further comprising storing, operating, or using, a client operating system.

Claim 23: The method according to claim 1, wherein the steps are sequentially executed.

81.     Defendants have actual notice of the '510 Patent since at least the filing of the Complaint and know at least from the Complaint that implementation of the Accused Instrumentalities using residential proxy devices in the United States would infringe at least claims 1, 8, 13, 15, 16, 18, 20, 22 and 23 of the '510 Patent.

82.     Upon information and belief Defendants sold, offered to sell, used, tested, and imported and continue to sell, offer to sell, use, test, and import the Accused Instrumentalities into the United States.  Defendants import their embedded code into the United States directly and/or via Defendants' application partners, which is implemented on devices located in the United States. Defendants' embedded code enables devices to serve as residential proxy devices for the Accused Instrumentalities and is not used for other commercial services or products.  Defendants provide the residential service of the Accused Instrumentalities to their customers with the knowledge and intent that the customers' implementation of the service using residential proxies located in the U.S. would infringe the '510 Patent.

83.     Defendants have been and are now infringing at least directly, indirectly and/or contributorily, one or more claims including at least claims 1, 8, 13, 15, 16, 18, 20, 22 and 23 of the '510 Patent, both literally and/or under the doctrine of equivalents, by implementing the Accused Instrumentalities using residential proxy devices located in the United States without authority and/or license from Luminati and are liable to Luminati under 35 U.S.C. § 271 *et seq.*, including but not limited to under Sections 271(a), (b), (c) and/or (g).  On information and belief, at least since the service of this Complaint, Defendants have been aware of the Asserted Patents yet have continued to infringe and cause proxies in the United States under Defendants' control to infringe claims of the Asserted Patents and have induced infringement.  On further information

39

and belief, Defendants have developed, used, offered to sell and/or sold within the United States and imported into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, including as one non-limiting example the Defendants' SDK imported into and implemented in user devices in the United States as well as the API and/or any other instructions provided to Defendants' customers that result in infringement.  On further information and belief, Defendants also import and sell as well as cause others to use within the United States a product which is made by a process patented in the United States whereby the importation, offer to sell, sale, and/or use of the product occurs during the term of such process patent.  Such products may include for example, the set of results sent to customers in the United States as created and assembled by the patented methods of the Asserted Patents.

84.    As a result of Defendants' infringement of the '510 Patent, Luminati has suffered and continues to suffer damages.  Thus, Luminati is entitled to recover from Defendants the damages Luminati sustained as a result of Defendants' wrongful and infringing acts in an amount no less than its lost profits and/or a reasonable royalty, together with interest and costs fixed by this Court together with increased damages up to three times under 35 U.S.C. § 284.

85.    Luminati has suffered damage because of the infringing activities of Defendants, their officers, agents, servants, employees, associates, partners, and other persons who are in active concert or participation therewith, and Luminati will continue to suffer irreparable harm for which there is no adequate remedy at law unless Defendants' infringing activities are preliminarily and permanently enjoined by this Court.  Luminati practices the Asserted Patents and, on information

and belief, practicing the Asserted Patents is required for a competitive offering of residential proxy services, a technology and market that Luminati created. Non-exclusive examples of such damage include loss of market share, lowered prices and the inability of Luminati to obtain the revenues and profits it would have been able to obtain but for the infringement, lost sales in other services when customers did not purchase residential proxy services from Laminate as a result of the infringement, loss of convoyed sales of other related services that Luminati would have sold but for the infringement, and harm to Luminati's reputation as a result of Defendants' lower quality and less protected offerings damaging the reputation and perception of the residential proxy service market that relies on the technology of the Asserted Patents.

86.    Defendants' infringement of the '510 Patent is and continues to be deliberate and willful because Defendants were and are on notice of the '510 Patent at least as early as the Complaint, yet Defendants continue to infringe the '510 Patent. This case should be deemed an exceptional case under 35 U.S.C. § 285, and if so, Luminati is entitled to recover its attorneys' fees.

### COUNT IV
(Misappropriation of Trade Secret Under Federal Defense of Trade Secret Act Under 18 U.S.C. § 1836 *et sec.*)

87.    Luminati repeats and re-alleges the allegations contained in paragraphs 1-86 of this Complaint as if fully set forth herein.

88.    Luminati takes reasonable measures to protect the confidentiality of valuable trade secrets related to its residential proxy service, including automated and technical measures in addition to the requirement that its employees protect the confidentiality of Luminati trade secrets, including, for example, by Luminati's practice of having its employees enter into confidentiality

41

agreements.  This non-public information has actual independent economic value derived from Luminati's experience in the residential proxy service field.

89.   Luminati's residential proxy service is intended for use in interstate or foreign commerce, including commerce in the Eastern District of Texas.

90.   Upon information and belief, Defendants (including as successors in interest to Tesonet) misappropriated Luminati's trade secrets including but not limited to Luminati's customer list for the purpose of competing with Luminati's residential proxy service.

91.   Luminati has suffered damages and Teso has been unjustly enriched as Luminati lost business to Teso's competing Oxylabs service as a result of Teso's misappropriation of Luminati's trade secrets.

92.   Defendants' misappropriation of Luminati trade secrets was willful and malicious.

93.   Luminati is entitled to recover the actual loss suffered by Luminati, any additional damages to account for Defendants' unjust enrichment, and exemplary damages as a result of Defendants' misappropriation of its trade secrets under 18 U.S.C. § 1836(b)(3)(B) and (C) *et sec*.

## COUNT V
(Intentional Unauthorized Access of Protected Computer Under 18 U.S.C. § 1030(g) *et sec.*)

94.   Luminati repeats and re-alleges the allegations contained in paragraphs 1-93 of this Complaint as if fully set forth herein.

95.   Upon information and belief, Defendants (including as successors in interest to Tesonet) intentionally accessed Luminati's computer system without authorization and misappropriated Luminati's trade secrets, including Luminati's customer list relating to Luminati's residential proxy service which is used interstate and foreign commerce, including commerce in the Eastern District of Texas.

96.     Luminati suffered damage through the misappropriation of data on its computer system.  Luminati also suffered loss in excess of $5,000 in value within the last year through the expense of investigating the intrusion in Luminati's computer system.

97.     Luminati is entitled to recover compensatory damages and an injunction against the use of Luminati's confidential information under 18 U.S.C. § 1030(g).

## COUNT VI
### (False Advertising Under 15 U.S.C. § 1125(a) *et sec.*)

98.     Luminati repeats and re-alleges the allegations contained in paragraphs 1-97 of this Complaint as if fully set forth herein.

99.     Upon information and belief, since the filing of the original complaint and in retaliation thereto, Defendants (including as successors in interest to Tesonet) have engaged in false advertising against Luminati under 15 U.S.C. § 1125(a) by making false advertisements to the public at large, including Luminati's customers. Through these false advertisements, Luminati believes and thus avers that Defendants have materially represented Luminati's business practices, the basis for Luminati's complaint against Teso, the value of Luminati's intellectual property rights, and the nature and characteristics of Teso's own residential proxy service.

100.    Defendants caused its false advertising to enter interstate commerce, including upon information and belief in the Eastern District of Texas.  Defendants' false advertising has at been distributed through at least Internet communications and advertisements including, but not limited to, advertisements placed with Google responsive to queries regarding Luminati.

101.    Defendants' actions have deceived, or are likely to deceive, a substantial segment of Luminati's customers who have purchased or would otherwise purchase Luminati's residential proxy service.

43

102.    Defendants' actions have caused Luminati injury to a commercial interest in both its business reputation and its sales by its customers.  Luminati's commercial injuries are a direct result of Defendants' false statements directed to Luminati's customers regarding Luminati's intellectual property and business practices.

103.    Luminati is entitled to a judgment that Defendant has engaged in false advertising against Luminati, which is the direct cause of Luminati's injuries to its commercial interests in its reputation and sales under 15 U.S.C. 1125(a), and damages pursuant to 15 U.S.C. § 1117.

104.    This case is exceptional, given Teso's extensive targeting of Luminati customers and prospective customers through its disparaging and deceptive online advertising campaign. Luminati is entitled to an award of attorneys' fees as this case is exceptional under 15 U.S.C. § 1117(a).

**COUNT VII**
(Tortious Interference with Luminati's Business Relationships)

105.    Luminati repeats and re-alleges the allegations contained in paragraphs 1-104 of this Complaint as if fully set forth herein.

106.    Luminati has contractual relationships with numerous customers, including customers that are registered in the Eastern District of Texas and/or use Luminati's residential proxy service in the Eastern District of Texas.

107.    Upon information and belief, Defendants (including as successors in interest to Tesonet) have used Luminati proprietary information to intentionally and willfully contact Luminati customers and interfere with Luminati's relationship with these customers.

108.    Luminati has suffered damages and Defendants have been unjustly enriched as Luminati lost business to Teso's competing Oxylabs service.  Teso's interference with Luminati's customer relationships was the proximate cause of this lost business.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Luminati respectfully requests that this Court enter:

A. A judgment in favor of Luminati that the Defendants have and are infringing the Asserted Patents;

B. A judgment declaring Defendants' infringement to be willful;

C. A judgment declaring that this case is exceptional within the meaning of 35 U.S.C. § 285;

D. A permanent injunction enjoining Defendants, their officers, directors, agents, servants, employees, associates, partners including SDK partners, and other persons who are in active concert or participation with Defendants including the officers, directors, agents, servants, employees and associates of Defendants' partners, from infringing the Asserted Patents and/or such other equitable relief the Court determines is warranted in this case;

E. A judgment and order requiring the Defendants to pay to Luminati its damages, enhanced damages, costs, expenses, prejudgment and post-judgment interest, and attorneys' fees, if applicable, for the Defendants' infringement of the Asserted Patents as provided under 35 U.S.C. §284 and/or §285, and an accounting of ongoing post-judgment infringement;

F. A judgment in favor of Luminati that Defendants misappropriated Luminati's trade secrets under 18 U.S.C. § 1836(b);

G. A judgment and order for damages under 18 U.S.C. § 1836(b)(3)(B);

H. A judgment and order for exemplary damages under 18 U.S.C. § 1836(b)(3)(C);

I. A judgment in favor of Luminati that Defendants accessed Luminati computer systems under 18 U.S.C. § 1030(a)(5)(B);

J. A judgment and order for compensatory damages under 18 U.S.C. § 1030(g);

K. A permanent injunction requiring Defendants to destroy all proprietary information gathered through the unauthorized access of Luminati's computer system under 18 U.S.C. § 1030(g);

L. A judgment in favor of Luminati that Defendants had engaged in false advertising against Luminati, and order requiring Defendants to pay monetary relief to Luminati, including (i) profits received by Defendants and/or damages sustained by Luminati as a result of Defendants' false advertising and (ii) damages in the form of money to be spent on corrective advertising, to dispel any actual confusion that may have already occurred among relevant consumers and in the marketplace by virtue of Defendants' false advertising;

M. That Defendants be found to have acted willfully in its false advertising, and that monetary relief for Defendants' false advertising be increased due to the willful nature of Defendants' false advertising pursuant to 15 U.S.C. § 1117;

N. A permanent injunction enjoining Defendants, their officers, employees, agents, representatives, attorneys and others acting on its or their behalf, from committing further acts of false advertising described herein;

O. A declaration that this is an exceptional case within the meaning of 35 U.S.C. § 285, 15 U.S.C. § 1117(a) and/or other applicable laws, and that Luminati is entitled to recover its reasonable attorney's fees and costs upon prevailing in this action;

46

P.  A judgment in favor of Luminati that the Defendants tortiously interfered with Luminati's business relationships;

Q.  Disgorgement of the amount by which Defendants have been unjustly enriched; and

R.  Any and all other relief, at law or in equity that this Court deems just or proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Luminati hereby demands a trial by jury of all issues so triable.

Dated: December 6, 2019                    Respectfully submitted,

*/s/ Korula T. Cherian*

S. Calvin Capshaw
State Bar No. 03783900
Capshaw DeRieux, LLP
114 E. Commerce Ave.
Gladewater, TX 75647
Telephone: 903-845-5770
ccapshaw@capshawlaw.com

Korula T. Cherian
Robert Harkins
RuyakCherian LLP
1936 University Ave, Suite 350
Berkeley, CA  94702

Amadou Kilkenny Diaw
Corrine Saylor Davis
Ronald Wielkopolski
RuyakCherian LLP
1700 K St. NW, Suite 810
Washington, DC 20006

**ATTORNEYS FOR PLAINTIFF**

47

**LUMINATI NETWORKS LTD.**