# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

|  |  |
|---|---|
| **Luminati Networks Ltd.,**<br><br>    **Plaintiff,**<br><br>    v.<br><br>**Teso LT, UAB, Oxysales, UAB, and Metacluster LT, UAB,**<br><br>    **Defendants.** | **Civil Action No.**<br>**2:19-cv-00395-JRG**<br><br>**Lead Case** |

## <u>OXYLABS' RESPONSIVE CLAIM CONSTRUCTION BRIEF</u>

SIEBMAN, FORREST,
BURG & SMITH LLP

MICHAEL C. SMITH

CHARHON CALLAHAN
ROBSON & GARZA, PLLC

STEVEN CALLAHAN
CRAIG TOLLIVER
GEORGE T. "JORDE" SCOTT
MITCHELL SIBLEY

*Counsel for Teso LT, UAB, Oxysales, UAB, and Metacluster LT, UAB*

October 13, 2020

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     DISPUTED CLAIM CONSTRUCTION TERMS ............................................... 1

    A.   Client Device ('319 and '510 Patents)......................................................... 1

    B.   First Server ('319 Patent)............................................................................ 8

    C.   Second Server ('319 and '510 Patents)........................................................ 8

    D.   Client Device ('614 Patent) ........................................................................ 9

    E.   First Server ('614 Patent)........................................................................... 13

III.    INDEFINITENESS............................................................................................. 13

    A.   Indefiniteness of "the first IP address" / "the first client IP address".................... 14

    B.   Indefiniteness of "determining, by the first client device, that the received first content, is valid" ....................................................................... 17

    C.   Indefiniteness of "the determining is based on the received HTTP header according to, or based on, IETF RFC 2616" ............................................ 20

    D.   Indefiniteness of "periodically communicating" .................................................. 21

    E.   Indefiniteness of "in response to the receiving of the first content identifier" ....... 23

    F.   Indefiniteness of claim 13 of the '510 patent................................................... 26

    G.   Indefiniteness of "the steps are sequentially executed" ....................................... 29

IV.     CONCLUSION.................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Andersen Corp. v. Fiber Composites,*
  474 F.3d 1361 (Fed. Cir. 2007)................................................................................10

*Apple, Inc. v. Ameranth, Inc.,*
  842 F.3d 1229 (Fed. Cir. 2016)..................................................................................8

*Chef Am., Inc. v. Lamb-Weston, Inc.,*
  358 F.3d 1371 (Fed. Cir. 2004)................................................................................17

*Dow Chem. Co. v. Nova Chemicals Corp. (Canada),*
  803 F.3d 620 (Fed. Cir. 2015)..................................................................................14

*Energizer Holdings, Inc. v. Int'l Trade Comm'n,*
  435 F.3d 1366 (Fed. Cir. 2006)................................................................................13

*GE Lighting Sols., LLC v. AgiLight, Inc.,*
  750 F.3d 1304 (Fed. Cir. 2014).............................................................................6, 12

*Nautilus, Inc. v. Biosig Instruments, Inc.,*
  572 U.S. 898 (2014)................................................................... 1, 13-14, 17, 21, 25

*Schindler Elevator Corp. v. Otis Elevator Co.,*
  593 F.3d 1275 (Fed. Cir. 2010)................................................................................11

*Teva Pharm. USA, Inc. v. Sandoz, Inc.,*
  789 F.3d 1335 (Fed. Cir. 2015)................................................................................19

Defendants Teso LT, UAB, Oxysales, UAB, and Metacluster LT, UAB (collectively, "Oxylabs") file this Responsive Claim Construction Brief:

## I.     INTRODUCTION

Luminati's patents-in-suit are plagued by sloppy claim drafting. As discussed below in Section III concerning indefiniteness, Luminati asserts multiple patent claims that purport to rely on antecedent support that simply does not exist. Luminati now asks the Court to redraft the claims to avoid its prosecution mistakes. But these are not errors that the Court can fix—the errors instead preclude a POSA from understanding the claim scope with reasonable certainty. Luminati must bear the burden of its claim drafting, and the Court should not allow Luminati to rush its claims through prosecution, file suit and then hope that the Court will rewrite the claims to save them from indefiniteness. As the Supreme Court has stated, "a patent must be precise enough to afford clear notice of what is claimed, thereby 'appris[ing] the public of what is still open to them.'" *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 909 (2014) (quotations omitted). "The patent drafter"—not the Court and not the defendant—"is in the best position to resolve the ambiguity" in the patent claims. *Id.* at 910 (quotations omitted).

Luminati also improperly attempts to redefine "client" to allegedly require specialized "consumer" device equipment. As Oxylabs explains below in Section II, Luminati's attempted redefinitions are at odds with the patent specification, Luminati's admissions, a POSA's general knowledge, and a prior claim construction order by this Court interpreting "client device" in another Luminati patent. Instead, "client" and "server" are used in their plain and ordinary sense, and therefore refer to computer equipment serving in a standard "client" or "server" role.

## II.    DISPUTED CLAIM CONSTRUCTION TERMS

### A.     Client Device ('319 and '510 Patents)

Luminati concocts a new definition of "client device"—a "consumer computer"—that

1

stands in contrast with (i) the specification of the '319 and '510 patents, (ii) Luminati's earlier admissions in this case, (iii) the common understanding of a "client device," and (iv) the Court's construction of "client device" in a prior case between the parties. A POSA[1] would understand, as confirmed by the patent specification, that a "client device" has a plain and ordinary meaning of a device operating in the role of a "client" (as in the client-server context). "Client device" does not refer to any specialized equipment, whether a "consumer computer" or otherwise. And as discussed below, it is not even clear what Luminati means by "consumer" in this context or how Luminati would use that term to alter the disclosure in the patent specification.

**First**, the patents[2] confirm that "*each communication device may serve as a client, peer, or agent*" in a portion of the specification quoted and emphasized by Luminati on page 11 of its brief.[3] '319 pat. at 4:48-50; Lum. Claim Constr. Brief ("Br.") at 11. Luminati, however, did not emphasize the next sentence of the specification stating that "a *detailed description of a communication device* is provided with regard to the description of FIG. 4." *Id.* at 4:51-53. The corresponding description of Figure 4 describes the "communication device" in detail and confirms that the "communication device" "contains *general components of a computer*" and "may serve as a client, agent, or peer." *Id.* at 5:52-57.

"[T]he communication device 200 includes a processor 202, memory 210, [and] at least one storage device 208 . . ." *Id.* at 5:59-60. The specification also confirms other standard features of the "communication device," including that its memory may include "ROM, hard drive,

---

[1]    A person of ordinary skill (POSA) would have at least a bachelor's degree in Computer Science or related field (or equivalent experience), as well as two or more years of experience working with and programming networked computer systems. Freedman Decl., ¶ 18.

[2]    The '319 patent and '510 patent share a common specification. Citations herein are to the '319 patent unless otherwise noted.

[3]    Unless otherwise noted, all emphases in quotations herein have been added.

tape, CDROM, etc." and that its input/output devices may include "a keyboard, mouse, scanner, microphone, etc." or a printer. *Id.* at 6:18-20, 6:61-7:3. The communication device also includes "an operating system (O/S)." *Id.* at 6:31-33.

The '319 and '510 patents therefore disclose general purpose computers, such as those with standard computing processors, operating systems, memory, and storage devices such as hard drives, that serve in the claimed roles shown in Figure 3—client, peer, or agent. The specification does not suggest that the "client device" is comprised of special computer equipment— "consumer" or otherwise—and it instead it is crystal clear that it is made up of "general components" of a standard computer.

Further, the specification explains that a "client module," "peer module" or "agent module" of an application on a communication device may "come[] into play *according to the specific role* that the communication device 200 is partaking in the communication network 100 at a given time." *Id.* at 9:22-25. The "client module" provides functionality, for example, "when the communication device 200 is requesting information from the Web server" and the "peer module" provides functionality, for example, that is "required by the communication device 200 when answering other clients within the communication network 100." *Id.* at 9:27-39, 9:37-39.

**Second**, Luminati has already admitted that the general computer equipment described in the specification, and discussed above, may interchangeably serve as a client or server, thereby conceding that whether something is a "client" or "server" depends on the role it performs at a given time. Luminati, in fact, earlier filed a brief in this case where Luminati argued, using color coding, that the "first client device" (for which Luminati uses red font in its brief) of the '319 Patent is depicted by the "agent" box and the "second server" (for which Luminati uses green font in its brief) is depicted by the "client" box in Figure 3.

3



FIG. 3

ECF No. 28 at 14-15.

Luminati therefore understands that a "server" and "client" are broad enough to encompass the same equipment, particularly given that the "client" and "agent" functionality of Figure 3—discussed above—is performed by the standard computer equipment discussed in the patent.

Even in the "Background" section of its claim construction brief, Luminati states that the "client devices are modified to function as a client, peer or agent and serve as a proxy in the system, permitting 'any number of agents and peers.'" Br. at 2. Luminati cites to the '319 patent at 4:43-64 which, as discussed above, confirms that the client device is a "communication device" explained in conjunction with the Figure 4 description, and is standard computer equipment.

**Third**, the points discussed above merely confirm what would already be known to a POSA—namely that "client" or "server" terminology defines a role and not a special type of equipment. **Luminati's own citations of extrinsic evidence readily establish this point**, making it difficult to understand how Luminati can now contest the issue. Among other things, Luminati cited the following in its Patent L.R. 4-2 disclosures for "client device":

- "RFC 1983 at 11: Definition of 'client': A computer system or process that *requests* a service of another computer system or process.  A workstation *requesting* the contents of a file from a file server is a client of

4

the file server."

- "W3 Glossary of Terms for Device Independence at 2: Definition of 'Client': The *role* adopted by an application when it is retrieving and/or rendering resources or resource manifestations."

- "IEV ref 732-01-12 definition of 'client': '*functional* unit that *requests and receives* services from a server.'"

Ex. 1 (attached hereto) at 1-2 (citations to page numbers of chart). These definitions proffered by Luminati confirm that a "client" device refers to the *role* of the device, not to special equipment.

Oxylabs' expert, Dr. Freedman, agrees that a "client" refers to a role in a specific protocol or application, such that an application playing the role of a client may request services or content from an application playing the role of a server. Freedman Decl., ¶¶ 21-33. As Dr. Freedman notes, the '319 and '510 patents also refer in claim 1 to the use of the HTTP protocol, which is defined by the protocol RFC 2616 (HTTP/1.1) released by the Internet Engineering Task Force in 1999. *Id.* at ¶¶ 31-32. Further, the patents expressly cite to RFC 2616. '319 pat. at 16:22. RFC 2616 confirms the role-based usage of "client" and "server." For example, RFC 2616 defines a "client" as "[a] program that establishes connections for the purpose of sending requests," while a "server" is defined as "[a]n application program that accepts connections in order to service requests by sending back responses." Ex. 2 (attached hereto) (RFC 2616) at §1.3. RFC 2616 also confirms that "client" and "server" refer to roles, and that "[a]ny given program may be capable of being both a client and a server; our use of these terms refers *only to the role being performed* by the program for a particular connection." *Id.* at §1.3.

**Fourth**, in the prior case between the parties (*Tesonet*, 18-cv-00299-JRG) the Court construed "client device" to mean "a device that is operating in the role of a client by requesting ser-

vices, functionalities, or resources from other devices." ECF No. 126-7 (Ex. F) at 51.[4] In so do-ing, the Court noted that Luminati "submitted a technical definition of 'client' as meaning '[a] computer system or process that requests a service of another computer system or process.'" *Id.* at 50. As discussed above, Luminati resubmitted the same definition in this case. But the con-struction Luminati seeks here is inconsistent with the Court's prior construction in *Tesonet*.

In contrast to the sheer weight of the evidence discussed above, Luminati points to three lines of the patent specification at 2:44-46 that refer in passing to "computers of consumers" re-lated to prior art. That portion of the specification fails to redefine the plain meaning of "client device" and, in any event, is misconstrued by Luminati. Specifically, the '319 patent at various places refers to a *prior art* peer-to-peer network. For example, patent Figure 2, which refers to the network 50, "provid[es] a prior art example of a peer-to-peer file transfer network." '319 pat. at 4:1-2. The patent at 2:44-46 discusses the network 50 of a "peer-to-peer file transfer network" such as BitTorrent which is mentioned as an example of such a network at 2:43. The patent then states that, in the prior art "network 50, files are stored on computers of consumers, referred to herein as client devices 60." '319 pat. at 2:44-46.

Therefore, the files in the prior art network 50 of the "peer-to-peer" system are stored on computers of consumers. Such consumer computers from the prior art may indeed fall within the scope of "client devices" further discussed in the '319 patent, but this does not indicate to a POSA that "client device" has been clearly redefined to mean a "consumer computer" of the pri-or art. *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("To act as

---

[4]    Oxylabs has proposed that "client device" receive a plain and ordinary meaning. To avoid confusion, Oxylabs contends that the plain and ordinary meaning of "client device" is the same as what the Court earlier construed. Oxylabs agrees to "client device" being construed as the Court earlier construed "client device," if the Court believes a construction is necessary.

its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term, and clearly express an intent to define the term.") (quotations omitted); Freedman Decl., ¶ 26. Nor does the '319 patent otherwise redefine "client device" in such a manner. Instead, as discussed herein, the '319 patent's specification, the extrinsic evidence, and Luminati's statements are consistent with "client device" having its plain and ordinary meaning of a device in the role of a client.

Luminati's assertion that Oxylabs wants "client device" to "be a 'general purpose computer'" that "includes servers" is confusing. Br. at 12-13. As Oxylabs shows above, "client" and "server" refer to two different roles—they do not define specific equipment. Dr. Freedman agrees that "[a] POSA would understand that the usage of 'client' or 'server' defines a role in a specific protocol or application, such that an application playing the role of a client may request services or content from an application playing the role of a server." Freedman Decl., ¶ 25. He opines that "client device" would "refer to the plain and ordinary meaning of 'client device,' or a device in the role of a client." *Id.* at ¶ 33. Luminati's arguments to the contrary are meritless.

It is noteworthy that Luminati does not seek to reconstrue "server" to be a specific type of equipment, and instead proposes that a "second server" is "a server that is not the client device or first server." Br. at 13. Luminati therefore appears to understand that a "server" is a "server" (i.e., with the plain and ordinary meaning of a device providing a service to another). Luminati should treat "client" the same way, without attempting to reconstrue "client device" to be a "consumer computer."

Finally, Luminati's attempt to rewrite "client device" as "consumer computer" introduces significant ambiguity. Luminati does not explain what a "consumer" computer is, to the extent that it is different from the general-purpose computer equipment discussed above that the patents

describe as providing the functionality of a "client device." "Consumer" means "one that utilizes economic goods," and does not appear to define any specific type of computer.[5] The Court should reject Luminati's proposed re-definition.

### B.  First Server ('319 Patent)

Luminati seeks to re-write "first server," in claim 1 of the '319 patent, as "web server." There is no need for this, because claim 1 of the '319 patent recites in the preamble "a first server that comprises a web server." The claim language therefore makes clear the relationship between the "first server" and "web server," which is that the "first server" comprises a "web server." It would be unnecessary and confusing to re-write the language as proposed by Luminati to effectively claim "a web server that comprises a web server." *See Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1237 (Fed. Cir. 2016) ("Construing a claim term to include features of that term already recited in the claims would make those expressly recited features redundant.")

Further, claim 1 of the '510 patent recites a "web server" rather than "first server." Equating the claim terms "web server" and "first server that comprises a web server" would cause confusion because the claim language is not the same.

For these reasons, "first server" does not need construction, and should receive a plain and ordinary meaning of "first server."

### C.  Second Server ('319 and '510 Patents)

Luminati seeks to construe "second server," as found in claim 1 of the patents, to mean "a server that is not the client device or [first/web] server." As with "first server," "second server" does not need construction. The claim does not recite that the "second server" is not the client device or web server, and the Court should not incorporate such a limitation into the claim.

---

[5]  *See, e.g.*, https://www.merriam-webster.com/dictionary/consumer.

Luminati's new proposed limitation is further flawed because, at least in the '319 patent, there is no "web server" claimed. In claim 1 of the '319 patent, the term "web server" is mentioned only once, where the preamble recites that the "first server comprises a web server." Claim 1 of the '319 patent does not otherwise recite a "web server" in the method steps. There is simply no basis—and Luminati provides none—to rewrite the claims so that the second server (like the first server) cannot also comprise a web server. Instead, a "server" has a plain and ordinary meaning of a device in the role of a server. *See* Section II.A above; Freedman Decl., ¶ 36.

The Court should reject Luminati's attempt to import a limitation into "second server."

### D.    Client Device ('614 Patent)

Luminati seeks to construe "client device"—the same term discussed above in Section II.A—very differently for the '614 patent as compared to Luminati's proposed construction for the '319 and '510 patents. For the '614 patent, Luminati proposes that "client device" is "a device using a client dedicated operating system and operating in the role of a client by requesting services, functionalities, or resources from servers." Oxylabs seeks a consistent construction of plain and ordinary meaning, or that the "client device" is a device in the role of a client.

As discussed above in Section II.A, the Court construed "client device" in the *Tesonet* case to mean "a device that is operating in the role of a client by requesting services, functionalities, or resources from other devices." The Court's prior Claim Construction Order considered the specification of the '866 patent, of which the '614 patent is a continuation. The Court's earlier construction therefore was based upon the **same patent specification** now at issue and made clear that "the specification explains that being a 'client' is a 'role' assumed by a device." ECF No. 126-7 (Ex. F) at 50 (citing common patent specification).

Other portions of the patent specification support this conclusion. The patent explains that "[t]he terms 'server or 'server computer' relates herein to a device or computer (or a plurali-

ty of computers) connected to the Internet and is used for providing facilities or services to other computers or other devices (referred to in this context as 'clients')," and that "[c]lients commonly initiate connections that a server may accept." '614 pat. at 4:40-61. The patent further explains that a device denoted as a server "may typically function as a server in the meaning of client/server architecture, providing services, functionalities, and resources, to other devices (clients), commonly in response to the clients' request." *Id.* at 118:64-119:3. Also, a client "in the meaning of client/server architecture, commonly initiat[es] requests for receiving services, functionalities, and resources, from other devices (servers or clients)." *Id.* at 119:28-32.

Luminati's proposed construction adds the new limitation that a "client device" uses "a *client dedicated operating system*," which is different from the Court's prior claim construction. Such a construction is plainly contradicted by the patent claims. Claim 1 recites a "client device" without any recitation regarding any operating system. It is improper for Luminati to attempt to write such a limitation into the claims.

Further, asserted claim 9 states, "The method according to claim 1, *wherein the client device is further storing, operating, or using, a client operating system*." Claim 9 therefore adds the limitation regarding a client operating system, which Luminati now attempts to retroactively write into the definition of the "client device" in claim 1. The doctrine of claim differentiation prevents this. *See, e.g.*, *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1369 (Fed. Cir. 2007) (reiterating that claim differentiation is based on "the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope").

Luminati asserts without basis that Oxylabs wishes to "assert that client devices and servers are interchangeable general use computers." Br. at 16. As discussed above in Section II.A,

10

Oxylabs does not take that position, but instead has consistently asserted that "client" and "server" refers to separate roles of a device, just as the Court ruled in its prior Claim Construction Order. "General use computers" (as Luminati states) are described in the patents as performing the roles, but this does not make "clients" and "servers" the same thing, as Luminati implies.

Luminati's quotation from the '614 patent prosecution history (Br. at 16) is unremarkable and does not remotely support Luminati's proposed construction. Instead, the first paragraph of the quotation reflects the fact that the quoted limitations require the "client device"—as opposed to the "first server" that is separately recited in claim 1, or any other device—to perform certain claim steps. Br. at 16. The patentees argued that Sigurdsson did not teach a "client device" that performed the "various recited steps" such as the "determining" or "shifting" steps but instead disclosed a "server device 106" performing the steps. *Id.* This argument says *nothing* about the types of computers or computer devices that may serve in the role of a client, and it says *nothing* about any "client dedicated operating system," which is the extraneous limitation Luminati now seeks to import into the construction of "client device." This argument therefore does not constitute the type of clear and unmistakable disavowal or disclaimer that could be used to alter the definition of a claim term, and certainly not to add the "client dedicated operating system" language that is not discussed in the prosecution history quoted by Luminati. *Schindler Elevator Corp. v. Otis Elevator Co.*, 593 F.3d 1275, 1285 (Fed. Cir. 2010) (disclaimer or disavowal must be done "unequivocally" and must be "clear and unmistakable"; an "unambiguous disavowal" will not suffice).

Further, that prosecution history argument is irrelevant to claim 1 of the '614 patent as issued, which pursuant to its plain language *does not require* the "client device" to perform the "determining" or "shifting" steps, as opposed to the "initiating," "receiving," and "performing"

11

steps that the "client device" performs per the claim language. *See also* '614 pat., claim 2 ("The method according to claim 1, wherein the determining is performed by the client device."). Therefore, the whole point of the patentees' argument regarding the "client device" performing the "determining" and "shifting" steps is not reflected in claim 1 of the '614 patent.

Finally, Luminati's citation to the '614 patent specification does not establish any definition of "client device" different from the Court's prior construction. Br. at 17. Specifically, Luminati's citation to 7:6-9 of the specification discusses what a client device "typically" receives and "uses." The fact that a "client device" may typically "use[]" a "client dedicated or oriented operating system" instead establishes the contrary: the Court should not construe a "client device" to require any operating system because a "client device" may instead separately *typically* (but not always) "use[]" an operating system. Indeed, as noted above, claim 9 separately recites the "client device" "using" a client operating system. Further, the portions of the patent specification quoted by Luminati do not rise to the level of a redefinition of "client device" or disclaimer of scope. *GE Lighting*, 750 F.3d at 1309.

Finally, Luminati concludes by stating that "a POSA would understand that a client device is not interchangeable with a server." Br. at 18. Again, Luminati is not engaging with the true issue, which is that a "client" and "server" define separate roles. Whether they are "interchangeable" is immaterial. However, assuming that Luminati asserts that the same computer device cannot serve as both a "client" and "server" (depending on its current role), Luminati's assertion is flatly contradicted by the '614 patent specification. '614 pat. at 119:50-53 ("Alternatively or in addition, each of the devices that are not denoted herein as servers, may equally function as a server in the meaning of client/server architecture."); *id.* at 119:18-21 ("Alternatively or in addition, each of the devices denoted herein as servers, may equally function as a client in the

meaning of client/server architecture.").

The Court should reject Luminati's attempt to import an unnecessary and improper limitation into "client device."

### E.  First Server ('614 Patent)

Claim 1 of the '614 patent recites steps performed by a "first server," "client device," and "web server," but it does not recite any limitations as to whether the "first server" is "not the client device or web server." That restrictive limitation proposed by Luminati is not necessary.

If Luminati is simply reiterating that claim 1 requires that certain steps specifically involve (as recited in the claim) a "first server," "client device," and/or "web server," Oxylabs agrees. But the claim already specifies such a relationship, so Luminati's proposed construction is unnecessary. It is unclear what else, if anything, Luminati may intend through its attempt to read in a claim limitation. But given the clear disclosure in the '614 patent that (i) "client" and "server" refer to roles, (ii) "each of the devices denoted herein as servers, may equally function as a client in the meaning of client/server architecture," and (iii) "each of the devices that are not denoted herein as servers, may equally function as a server in the meaning of client/server architecture," Luminati's proposed limitation risks jury confusion. *See* Section II.D above; '614 pat. at 119:18-21, 119:50-53.

## III.  INDEFINITENESS

Luminati misapprehends the indefiniteness test. Luminati asserts, among other things, that "[a] claim that is *amenable to construction* is not invalid on the ground of indefiniteness," citing to *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1371 (Fed. Cir. 2006). Br. at 20. Luminati relies on the "amenable to construction" standard four times in its brief. *Id.* at 20, 21, 23, 26. But the "amenable to construction" standard has not been the law in over five years, because the Supreme Court expressly rejected the "amenable to construction" test in *Nau-*

*tilus*, 572 U.S. at 901; *Dow Chem. Co. v. Nova Chemicals Corp. (Canada)*, 803 F.3d 620, 630 (Fed. Cir. 2015). "[T]here can be no serious question that Nautilus changed the law of indefiniteness." *Dow Chem*, 803 F.3d at 630. Luminati made the same error in its claim construction briefing before this Court over a year ago. ECF No. 61 (*Tesonet* case) at 26-27.

Luminati's continued confusion leads it to make the nonsensical argument that "Defendants have not asserted that any of the following claims lack meaning," such that the Court should not find indefiniteness. Br. at 20. Oxylabs does not know what Luminati means by "lack meaning" in this context—particularly given its misstatement of the law noted above—but the test is whether the claims, read in light of the specification and prosecution history, inform a person of skill in the art of the scope of the invention with reasonable certainty. *Nautilus*, 572 U.S. at 901. All of Oxylabs' indefiniteness arguments are unquestionably based on its assertion that the claim limitations at issue fail to inform a POSA of the scope of the invention with reasonable certainty. Luminati's argument that Oxylabs has not argued that the claims "lack meaning," which argument Luminati fails to explain, is thus in error.

A.     **Indefiniteness of "the first IP address" / "the first client IP address"**

Claim 2—of each of the '319 and '510 patents—contains a clear error. But the error is not typographical in nature, and instead causes the claim to lack antecedent basis and any reasonably certain meaning, such that it is indefinite.

Specifically, claim 2 of the '319 patent recites the method of claim 1 wherein "the first client device is identified by a Media Access Control (MAC ) address or a hostname" and then during, as part of, or in response to, a start-up of the first client device, the first client device sends "a first message to the second server , and wherein **the first messages [sic] comprises the first IP address,** the MAC address, or the hostname." Although the claim recites "*the* first IP address," there is no other mention, whether in claim 2 or claim 1, of a "first" or any other IP ad-

14

dress. This lack of antecedent basis in the claim leaves a POSA unable to determine what IP address must be in the "the first messages [sic]" sent by the first client device because it presents two separate and insurmountable problems.

**First**, as Dr. Freedman explains, the primary purpose of an IP address is to identify a network interface of a device connected to a computer network. Freedman Decl., ¶ 49. Claim 1 identifies three separate devices—the first client device, second server, and first server—all of which would presumably have at least one IP address. *Id.* A "first IP address" therefore could refer to the IP address of the first client device, the first server, or the second server—any of which could be included in a message from the first client device. Accordingly, the only way to resolve the scope of "the first IP address" is for claim 1 or claim 2 to identify or define the "first IP address," but neither does. It is possible that "the first IP address" refers to an IP address other than that of any component recited in the claim. In short, a POSA would have no way to understand the scope of "the first IP address" or claim 2 without an antecedent basis for "the first IP address," but there is none. Further, "first IP address" is never used in the patent specification (other than as recited in claim 2).

**Second**, even if one knew the device to which the "the first IP address" corresponded, a POSA would not know whether "the first IP address" may refer to *one of multiple IP addresses* for a device or component. *Id.* at ¶ 52. A POSA would know that an IP address identifies a particular network interface of a device, not the device itself. *Id.* For example, a laptop with both a wireless WiFi interface and wired Ethernet interface would typically have a unique IP address for each interface. Or a network router, such as a DSL or cable modem in a home, typically has a Wide Area Network (WAN) interface with a public IP address that "faces" upstream to the Internet and a Local Area Network (LAN) interface with a private IP address that "faces" down-

stream to the home network. Thus, the usage of "first" in "the first IP address" suggests to a POSA that the "first" IP address could be distinguished from a "second" IP address and could refer to one of multiple IP addresses assigned to a single device. But the patent claims do not provide this information, and a POSA would not understand the scope of "the first IP address" or claim 2. *Id.* at ¶¶ 46-55.

Luminati does not offer any principled way to resolve this claim error, and instead offers the conclusory statement from Dr. Rhyne that a POSA would understand that "the 'first IP address' is the IP address for the first client device." Br. at 21. Luminati never explains how a POSA would know this and can point to nothing that provides a reasonably certain basis to reach such a conclusion. Even if a POSA could somehow guess that "the first IP address" corresponds to the first client device, there is no way for a POSA to determine that the "first" IP address does not distinguish from a "second" IP address for the first client device.

Indeed, the patent specification includes an example of a communication device providing "**all IP addresses**" of "**the interfaces on the communication device 200** having the initializer 222 thereon." '319 pat., 12:1-4. In other words, as Dr. Freedman explains, an IP address corresponds to an interface, and a device may have multiple IP addresses. Therefore, Luminati and Dr. Rhyne are simply incorrect when they assert that "the first IP address" must refer to a single IP address that is "*the* IP address for the first client device." Br. at 21.

Claim 2 of the '510 patent is like claim 2 of the '319 patent, with the exception that it recites "the first client IP address" and is invalid for the same reasons. Claim 2 of the '510 patent does not state that "the first client IP address" concerns the "first client device," as opposed to another device. Further, as discussed above, the claim's lack of antecedent basis fails to allow a POSA to determine how the "first" client IP address (even if it concerns the first client device)

distinguishes from a "second" or other client IP address. Like claim 2 of the '319 patent, the lack of antecedent basis precludes a POSA from understanding the claim scope with reasonable certainty.

The bottom line is that Luminati made a mistake when prosecuting claim 2, leaving a POSA unable to understand the scope of the claim with reasonable certainty. A POSA could guess at the claim scope, but that is not sufficient. Luminati now attempts to rewrite the claim as if "the first IP address" had antecedent support stating that "the first IP address" is "the IP address for the first client device," but the claims do not say that. Luminati prosecuted the patent and filed suit on the patent, and it is Luminati that must bear the burden of this claim mistake.

This is not an error that the Court can fix by rewriting the claims. *See, e.g.*, *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("[C]ourts may not redraft claims, whether to make them operable or to sustain their validity."). Further, Luminati improperly attempts to save "the first IP address" limitations from indefiniteness by arguing again, among other things, that they are "amenable to construction" and therefore not invalid. Br. at 21. This is not the law, as discussed above. *See* Section III. If one applies the actual *Nautilus* test, it is apparent that Luminati's recitations of "first IP address" and "the first client IP address" fail to inform a POSA of the scope of the claims with reasonable certainty, and are therefore invalid.

## B.    Indefiniteness of "determining, by the first client device, that the received first content, is valid"

Claim 14 of the '319 patent and claim 10 of the '510 patent each recite "determining, by the first client device, that the received first content, is valid." The problem is that the claim does not inform a POSA what is meant by "valid" in this context.

This is not only a problem in the context of computer science, the Internet, or the claimed invention, although it certainly is such a problem (as discussed below). But even a non-POSA

17

can readily see the problem with this claim. If one were to pick a car at random from a highway and ask simply whether the car is "valid," that question would be ridiculous without context. Does it refer to whether the car has a current registration? Whether the car has a license plate? Whether the car is proceeding in the correct lane and not against traffic on the highway? Whether the car has four wheels, qualifying it as a "car"? Whether the car has a windshield or other necessary components allowing it to be street legal? One could proceed with such questions ad infinitum without getting closer to resolution, because proper resolution would require knowing the criteria by which to judge the term "valid."

As Dr. Freedman explains, a substantially similar issue exists for the patent claims. Content is "valid" (or not) compared with something else. Content could be "valid" by, among many other possibilities: (i) being generated by certain trusted origins compared to content generated by untrusted origins, e.g., by validating a digital signature on the content from a set of trusted origins; (ii) demonstrating that the content generated by an origin has not been modified while in transit, e.g., using cryptographic techniques to ensure the data's integrity and prevent "man-in-the-middle" attacks; (iii) demonstrating that the content has not been accidently corrupted, either in-transit over the network or while maintained by a client device; (iv) not including malicious code such as worms, viruses, or trojan horses, compared to content which includes malicious code; (v) passing certain protection rules, such as it does not include any illicit or indecent materials; (vi) being truthful. Freedman Decl., ¶ 57.

The above potential determinations of whether content is "valid" are wildly different. For example, determining whether content is truthful or not indecent is quite different from determining whether content is corrupted. But the claims fail to advise a POSA what it means, in the context of the patent claims, to determine whether content is "valid." *Id.* at ¶ 58.

Luminati's attempt to save the claim from indefiniteness relies on a sleight of hand. Luminati quotes several portions of the specification for an example of determining whether content stored in the memory of a device "still mirrors" the content in the web server. Br. at 22-23. But the portions of the specification concerning whether data "mirrors" server content, as discussed by Dr. Freedman, relate to *cached* data. *Id.* at ¶ 59. In other words, if a device holds web content in its cache (such as if it has previously retrieved certain content from a web server), a device can determine whether the content is still "valid" or "fresh" in view of the original content on the web server. *Id.*

The patent claims, however, do not recite the determination of whether cached data is valid because it mirrors web server data, but instead recite determining whether content is "valid," without any guidance to a POSA as to the context for determining how content is "valid." Luminati has not stated—but it should state—whether it contends that "determining, by the first client device, that the received first content, is valid" would be understood by a POSA to refer to whether cached data is still fresh or still "mirrors" web server data as discussed in the specification at 16:12-46, and whether the Court should construe "determining . . . valid" as limited to such. Luminati should not be permitted to assert that "valid" would be understood by a POSA to have a very narrow meaning as discussed in the patent specification, and yet refuse to seek such a construction. *See, e.g.*, *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341, 1345 (Fed. Cir. 2015) (determining whether term with multiple potential meanings should be held indefinite or construed to have *one particular meaning*, and concluding that term was not reasonably certain and indefinite).

Is sum, claim 14 of the '319 patent and claim 10 of the '510 patent are invalid as indefinite because a POSA would not understand the scope of determining whether content is "valid"

19

with reasonable certainty. Freedman Decl., ¶¶ 56-60.

**C.      Indefiniteness of "the determining is based on the received HTTP header according to, or based on, IETF RFC 2616"**

Claim 15 of the '319 patent and claim 11 of the '510 patent depend from the claims discussed above in Section III.B concerning determination of whether content is "valid," and add the limitation that "the determining is based on the received HTTP header according to, or based on, IETF RFC 2616." While the claims recite that "the determining is based on *the received HTTP header* according to, or based on, IETF RFC 2616," there is no antecedent basis in any claim for any "HTTP header" that is received by the first client device or any other device. There is no reference in any claim to any "header" aside from the reference to "the received HTTP header" in the above identified claims.

Without a proper antecedent basis for the "HTTP header" that was allegedly received, a POSA could not determine what header is "received" or used for any determination of validity. While the above claims recite that the "received HTTP header" is "according to, or based on, IETF RFC 2616," a POSA would understand that there are many headers defined in RFC 2616. Freedman Decl., ¶ 65. A search for "header" in RFC 2616 returns 646 hits, and sections 4.5, 5.3, 6.2, and 7.1 of RFC 2616 define many different HTTP headers. *Id.*; Ex. 2 (RFC 2616).

As Dr. Freedman states, one cannot simply refer to an "HTTP header" in general and expect a POSA to know which one of the many HTTP headers defined in RFC 2616 has been identified. *Id.* As Dr. Freedman further opines, *even if* the determination of validity is construed to refer to cached data that mirrors web server data (*see* Section III.B above), it is unclear whether the limitation refers to an HTTP request-header received from the second server (such as If-Match, If-Modified-Since, If-None-Match, If-Range, If-Unmodified-Since, Cache-Control, Pragma, etc.) or the HTTP response-header received from the first server (e.g., Last-Modified,

ETag, Expires, Cache-Control, Pragma, etc.). *Id.* at ¶ 66.

Luminati has no effective response to the ambiguity created by the lack of antecedent basis, other than to attempt to change the claim language. Luminati states that "a POSA would understand that the term '*received HTTP header*' refers to a HTTP header *associated with the 'first content,'* which is consistent with the disclosure in the shared specification." Br. at 23. This is unpersuasive for several reasons. First, the patent claims do not recite an HTTP header "associated with the first content," but instead recite "the received HTTP header." Luminati cannot identify any "received" HTTP header that the claim references. Second, even with its change to the claim language, Luminati makes no attempt to identify any specific header "associated with the first content" that a POSA allegedly would understand to define the claim scope.

Finally, Luminati once again attempts to fall back on its assertion that the claim is "amenable to construction" and therefore not invalid. Br. at 23. As discussed above, this is not the proper standard after *Nautilus*. Luminati cannot meet the actual *Nautilus* standard, because Luminati's lack of antecedent basis prevents a POSA from understanding with reasonable certainty the scope of how the determination of content validity is "based on the received HTTP header" according to, or based on, IETF RFC 2616.

### D.     Indefiniteness of "periodically communicating"

Claim 17 of the '319 patent recites: "The method according to claim 1, further comprising *periodically communicating* between the second server and the first client device." Claim 8 of the '510 patent recites: "The method according to claim 1, further comprising *periodically communicating* over the TCP connection between the second server and the first client device."

The parties do not seem to dispute that the above claims, as dependent claims, must be narrower than the independent claim 1 from which each depends. Br. at 24 (discussing narrower scope of dependent claims). The issue is that a POSA would not understand how, if at all, the

term "periodically communicating" limits the scope of claim 1 because claim 1 (of each patent) already recites that the second server and first client device communicate at least two times. In claim 1 of the '319 patent, the first client device receives from the second server the first content identifier, and the first client device sends the first content to the second server in response to receiving the first content identifier. In claim 1 of the '510 patent, the first client device establishes a TCP connection with the second server, and the first client device sends "the received first content" to the second server.

As Dr. Freedman explains, the "periodically communicating" claims are indefinite because a POSA would not understand what other communications, *beyond the at least two communications between the first client device and second server already recited in claim 1*, are required for the first client device and second server to "periodically communicat[e]" within the meaning of claim 17 ('319 patent) and claim 8 ('510 patent). Freedman Decl., ¶ 70. In other words, a POSA would not understand what (if anything) "periodically communicating" adds to the claims, and thus would not understand the scope of the claims.

The patent specification, other than the claims, never uses the term "periodically." Therefore, the patents provide no context as to whether "periodically communicating" means "from time to time," or the like, or whether "periodically communicating" is referring to set or regular intervals of time. *Id.*, ¶ 70. Those varying definitions are all recognized by Luminati as potential meanings for "periodically communicating" in its Patent L.R. 4-2 disclosures. Ex. 1 at 8.

Luminati states that the "periodically communicating" claims above would be "broader than the scope of dependent claim 18 of the '319 Patent and claim 8 of the '510 Patent" that incorporate the "'keep alive' messages" recitation. Br. at 24. But this misses the point—the issue is not whether the "periodically communicating" claims are broader than *their dependents* but, ra-

22

ther, that *the "periodically communicating" claims are narrower than claim 1*. Luminati ignores

this key issue, and therefore makes no effort to explain how a POSA would understand "periodi-

cally communicating" to be different from the multiple communications between the first client

device and the second server already recited in claim 1. For example, are additional communica-

tions beyond those in claim 1 required for the devices to "periodically communicate"? Instead,

Luminati makes the conclusory and unsupported statement that a POSA would understand "peri-

odically communicating" to have "the plain and ordinary meaning"—whatever that may be.

The "periodically communicating" claims are indefinite because they do not inform a

POSA, with reasonable certainty, of the scope of the claim. Freedman Decl., ¶¶ 68-71.

### E.   Indefiniteness of "in response to the receiving of the first content identifier"

Claim 1 of the '510 patent includes an important claim error that the Court cannot reme-

dy because the patentees, as a result of the error, improperly omitted key antecedent basis from

the claims. Specifically, the last claim step of claim 1 of the '510 patent recites, "sending the re-

ceived first content, to the second server over the established TCP connection, *in response to* **the**

**receiving** *of the first content identifier*." The last phrase "in response to the receiving of the first

content identifier" uses the word "the" and appears to refer to an antecedent claim usage of the

first content identifier being received by a particular device. There is no such antecedent basis for

this phrase, and a POSA would thus not understand the scope of the claim with reasonable cer-

tainty. Freedman Decl., ¶¶ 72-78.

The above failure of claim 1 ('510 patent) is made clearer by comparison with claim 1 of

the '319 patent. Claim 1 of the '319 patent includes an initial method step by the first client de-

vice: "receiving, from the second server, the first content identifier." That claim step, however, is

not included in claim 1 of the '510 patent, even though both claims conclude with identical lan-

guage reciting that the first content is sent "in response to the receiving of the first content identi-

fier." The patentees therefore failed to include in claim 1 of the '510 patent any antecedent basis for "in response to the receiving of the first content identifier" because there is no recitation of the first client device ever receiving any first content identifier.

The Court can see, from a careful reading of page 25 of Luminati's brief, that Luminati is playing word games and has no answer as to what "the receiving" is referring to, or even what device is allegedly receiving the first content identifier so that the "sending" step may be "in response" to such receiving. For example, Luminati concludes that "[t]he claim also clearly states that the received first content is sent "in response to the receiving of the first content identifier" and that, per Dr. Rhyne, "this claim only requires that the sending of the received first content occur 'in response to the receiving of the first content identifier.'" Br. at 25. That is just a truism—Luminati has simply requoted the very claim limitation that Oxylabs challenges. What device allegedly received the first content identifier, in response to which the content is sent? Luminati's hand-waving demonstrates that Luminati cannot answer the question.

As Dr. Freedman opines, the confusion is exacerbated by dependent claim 15 reciting, "The method according to claim 1, further comprising receiving, by the first client device from the second server over the established TCP connection, the first content identifier." Freedman Decl., ¶ 74. Therefore, even though claim 1 concludes with a recitation that the first client device sends the first content "in response to the receiving of the first content identifier," and even though claim 1 of the '319 patent *does* provide antecedent basis that the first client device receives the first content identifier from the second server, dependent claim 15 of the '510 patent indicates through claim differentiation that the first content identifier of claim 1 may be received by a device or component other than the first client device. *Id.*

Therefore, a POSA must guess at which device allegedly receives the first content identi-

fier (i.e., "in response to" which the first content must be sent by the first client device per claim 1). *Id.*, ¶¶ 72-78. Claim 1 refers to two components in addition to the first client device: the web server and the second server. Even if the first client device is not the component that received the first content identifier, in response to which the first content is sent, a POSA would not know which (if any) of the web server or second server received the first content identifier.

For example, claim 1 of the '510 Patent recites that the first client device "send[s], to the web server over an Internet, the first content identifier." A POSA would understand that the web server would therefore likely receive the first content identifier per the claim, so any such receipt of the first content identifier by the web server could potentially be the "recei[pt] of the first content identifier" referenced in the last step of claim 1. *Id.,* ¶ 76.

It is also possible that the second server possesses the first content identifier. Indeed, in claim 1 of the '319 Patent, the second server sends the first content identifier to the first client device. If the second server possesses the first content identifier, it may have received the first content identifier. Therefore, a POSA would understand that any such receipt of the first content identifier by the second server could potentially be the "recei[pt]" of the first content identifier referenced in the last step of claim 1. *Id.,* ¶ 77.

A POSA could simply guess at the answer to the above questions and thereby guess at the claim scope, but that does not satisfy *Nautilus.* Luminati failed to provide antecedent basis in claim 1 of the '510 patent and failed to clearly define the claim scope. Luminati must bear the burden of this mistake, not Oxylabs. Nor can (or should) the Court rewrite Luminati's improperly drafted claims. Claim 1 of the '510 patent is indefinite for failure to define the scope of the claim with reasonable certainty, as are all of the claims that depend from claim 1 because none of the dependent claims clarify the error.

F.      **Indefiniteness of claim 13 of the '510 patent**

The theme regarding Luminati's lack of antecedent basis continues—in triplicate—with claim 13 of the '510 patent. Claim 13 recites in part:

> The method according to claim 1, for use with a software application that includes computer instructions that, when executed by a computer processor, cause the processor to perform *the sending of the Hypertext Transfer Protocol (HTTP) request*, *the receiving and storing of the first content*, the receiving of the first content identifier, and *the sending of the part of, or the whole of, the stored first content* . . .

The problematic parts of claim 13 are italicized above. Although all three italicized parts above purport to have antecedent basis for "the" steps they recite, in actuality all three lack antecedent basis. Oxylabs addresses them below in order.

**First**, there is no "sending of the Hypertext Transfer Protocol (HTTP) request" recited in claim 1. A POSA accordingly would not know what sending of an HTTP request claim 13 is referencing. Nor would a POSA know which device or component sent the unidentified request. A POSA would also not know which device or component received the unidentified request. In sum, a POSA would not have any way of knowing what "the sending of the Hypertext Transfer Protocol (HTTP) request" is supposed to reference. Freedman Decl., ¶¶ 91-94.

The resulting confusion is demonstrated by Luminati's argument that the Court should interpret "sending of the Hypertext Transfer Protocol (HTTP) request" to mean "sending, to the web server over an Internet, the first content identifier." Br. at 26-27. But that is nothing more than a wholesale redrafting of the claim. Claim 1 already, and separately, recites "sending, to the web server over an Internet, the first content identifier." If that is what the patentee intended, claim 13 would have recited precisely that. It does not. Instead, it recites that the processor performs the "sending of the Hypertext Transfer Protocol (HTTP) request," a limitation for which there is no antecedent basis and no identification of any device that sends or receives such an

26

HTTP request.

**Second**, the phrase "the receiving and storing of the first content" does not have any antecedent basis. Claim 1 does not recite any device or component "receiving and storing" the first content. Claim 1 recites that the first client device receives the first content from the web server, but does not recite that the first client device stores the first content. Similarly, the preamble of claim 1 recites that the web server "stores a first content" but does not recite any claim step where the web server receives the first content.

Claim 1 accordingly recites one component, the web server, that stores the first content and a component, the first client device, that receives the first content. Further, claim 1 recites that the first content is sent to the second server, so the second server also presumably receives the first content. A POSA would not know what "receiving and storing of the first content" is referenced by claim 13. *Id.*, ¶¶ 95-99. Per claim 13, the "receiving and storing" are performed by "a computer processor." Because at least the web server (per claim 1) stores the first content and at least the first client device (a different component) receives the first content, Dr. Freedman opines that a POSA would not understand how "a computer processor" could perform the storing by the web server and separately the receiving by the first client device—even if those steps were deemed to constitute the "receiving and storing of the first content" recited in claim 13. *Id.*, ¶ 99.

Once again, Luminati's brief amplifies the confusion resulting from the lack of antecedent basis. Apparently intent on reinterpreting the claim to recite a single device receiving and storing content, Luminati now argues that "the [] storing of the first content" allegedly refers to "storing" by the first client device "in its cache" (which is nowhere recited), and not to the only "stor[ing]" recited anywhere in claim 1—by the web server. Br. at 27. Oxylabs understands that claim 13 is nonsensical, but claims are drafted during prosecution, not during a lawsuit.

**Third**, claim 13 recites that the processor performs the "the sending of the part of, or the whole of, the stored first content." Once again, there is no antecedent basis. Claim 1 does <u>not</u> recite any device or component sending "the part of, or the whole of" the stored first content. Claim 1 does <u>not</u> recite any step whereby any device or component stores and sends first content. Claim 1 does recite that the web server "stores a first content" but there is no step wherein the web server sends the stored first content. Claim 1 also recites that the first client device "send[s] the received first content" but there is no step wherein the first client device stores the first content. Further, there is no recitation of any device or component sending "the part of, or the whole of" the stored first content. Indeed, there is no reference in claim 1 to a "part" or "whole" of stored first content.

As Dr. Freedman opines, a POSA would have no way to determine what device or component is allegedly "sending . . . the stored first content." Freedman Decl., ¶ 104. Even if a POSA knew the answer to that question, a POSA would have no way to know what sending of "part" of content may be performed by "a computer processor" in this claim. *Id.*

Luminati avoids identifying any device that allegedly performs the recited sending of "the part of, or the whole of, the stored first content." Br. at 27. Luminati earlier argued that the recited processor in claim 13 is allegedly causing the *client device* to perform the steps. *Id.* at 26-27. Yet Luminati's citation to 14:62-15:6 of the '510 patent (Br. at 27) for this claim limitation refers to chunks of data sent by an "agent" that is responding to a "requesting client." '319 pat. at 14:62-15:6. Luminati's citation therefore suggests that a processor in something other than the "client" is allegedly performing the sending of "the part of, or the whole of, the stored first content," while the processor in the client device performs other parts of claim 13. This makes little sense.

The bottom line is that Luminati cited to nonexistent antecedent support three separate times in claim 13, such that a POSA must guess at the claim's meaning three separate times. The Court should not redraft the claim, but instead hold the claim indefinite and invalid.

### G.     Indefiniteness of "the steps are sequentially executed"

Claim 7 of the '614 patent recites that the steps of claim 1 "are sequentially executed." Ordinarily, such a "sequential" execution claim limitation is straightforward. However, the structure of claim 1 of the '614 patent renders the "sequential" limitation indefinite. Claim 1 does not have a list of method steps in order but instead breaks up claim 1 into two parts.

The first set of steps in claim 1 is introduced by the preamble, "A method for use with a resource associated with a criterion in a client device that communicates with a first server over the Internet, the client device is identified in the Internet using a first identifier and is associated with first and second state according to a utilization of the resource, the method comprising . . ." Claim 1 then includes a separate set of steps introduced by a separate preamble, which reads, "wherein the method is further configured for fetching over the Internet a first content identified by a first content identifier from a web server that is distinct from the first server, and the task comprising:"

The second set of steps therefore recite the way the method is "further configured," and, by reciting "the task comprising," the following steps define the "task." But the last step of the first set of method steps ends with the method step beginning "performing a task." Therefore, according to the first set of method steps, the "task" is "perform[ed]," yet the second set of method steps recite a series of "receiving" and "sending" steps that comprise the "task."

As Dr. Freedman opines, a POSA would not understand which method steps are executed "sequentially." Freedman Decl., ¶¶ 106-112. Assuming that all the method steps are executed sequentially, then the first set of method steps must be performed sequentially, concluding with

the performance of the task. Then, the "task" (comprising the "sending" and "receiving" steps) must be performed *again*, given the second set of steps.

Luminati apparently recognizes the confusion—and the problem with the repeat performances of the "task"—because its answer is to remove the "performing a task" step from those that must be performed sequentially and otherwise pick and choose which claim steps must be performed sequentially. Luminati states that the "above bracketed steps" are performed sequentially, and then numbers certain steps [A]-[E]. Br. at 28-29. The problem is that there are at least ten method steps recited in claim 1, yet Luminati inexplicably has chosen five of the ten steps—half the steps—and awarded them a bracketed letter [A]-[E]. *Id.* at 28. Luminati therefore rewrites the claim so that the steps to be performed sequentially are step 1, step 7, step 8, step 9, and step 10. Luminati leaves out method steps 2-6 (those falling between [A] and [B]) and apparently does not assert that those are subject to the "sequential" execution of claim 7. *Id.* Luminati's own brief thereby highlights the very confusion inherent in claim 7.

Once again, Luminati does not have a license to rewrite its indefinite claims now, during litigation. As Luminati's own brief demonstrates, claim 7 fails to define its scope with reasonable certainty, and the Court should hold it invalid as indefinite.

## IV.   CONCLUSION

Oxylabs respectfully requests that the Court find indefiniteness and construe the claims as discussed above.

30

Dated: October 13, 2020

Respectfully submitted,

MICHAEL C. SMITH
  Texas State Bar No. 18650410
  michaelsmith@siebman.com
SIEBMAN, FORREST,
BURG & SMITH LLP
113 East Austin Street
Marshall, Texas 75671
Telephone: (903) 938-8900
Telecopier: (972) 767-4620

STEVEN CALLAHAN
  Texas State Bar No. 24053122
  scallahan@ccrglaw.com
CRAIG TOLLIVER
  Texas State Bar No. 24028049
  ctolliver@ccrglaw.com
GEORGE T. "JORDE" SCOTT
  Texas State Bar No. 24061276
  jscott@ccrglaw.com
MITCHELL SIBLEY
  Texas State Bar No. 24073097
  msibley@ccrglaw.com
CHARHON CALLAHAN
ROBSON & GARZA, PLLC
3333 Lee Parkway, Suite 460
Dallas, Texas 75219
Telephone: (214) 521-6400
Telecopier: (214) 764-8392

*Counsel for Teso LT, UAB, Oxysales, UAB,
and Metacluster LT, UAB*

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on October 13, 2020. As such, this document was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(a)(3)(A).

STEVEN CALLAHAN