```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF TEXAS

 3                      MARSHALL DIVISION

 4   LUMINATI NETWORKS LTD.        )(

 5                                 )(      CIVIL ACTION NO.

 6                                 )(      2:19-CV-395-JRG

 7   VS.                           )(      MARSHALL, TEXAS

 8                                 )(

 9   TESO LT, UAB, ET AL.          )(      NOVEMBER 19, 2020

10                                 )(      10:05 A.M.

11                  _____

12   TESO LT, UAB, ET AL.          )(

13                                 )(      CIVIL ACTION NO.

14                                 )(      2:20-CV-73-JRG

15   VS.                           )(      MARSHALL, TEXAS

16                                 )(

17   LUMINATI NETWORKS LTD.,       )(      NOVEMBER 19, 2020

18   ET AL.                        )(      10:05 A.M.

19

20                    MOTION HEARING

21                HELD BY VIDEO CONFERENCE

22    BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

23        UNITED STATES CHIEF DISTRICT JUDGE

24

25
```

```
 1   FOR THE PLAINTIFFS:      Mr. Robert M. Harkins, Jr.
                              Mr. Korula T. Cherian
 2                            RUYAKCHERIAN LLP - BERKELEY
                              1936 University Avenue
 3                            Suite 350
                              Berkeley, California 94704
 4
                              Mr. Ronald Wielkopolski
 5                            RUYAKCHERIAN LLP
                              1700 K Street Northwest
 6                            Suite 810
                              Washington, DC 20006
 7
                              Ms. Elizabeth L. DeRieux
 8                            CAPSHAW DERIEUX LLP
                              114 East Commerce Avenue
 9                            Gladewater, Teas 75647

10                            Mr. James Mark Mann
                              MANN TINDEL & THOMPSON
11                            300 West Main
                              Henderson, Texas 75652

12

13   FOR THE DEFENDANTS:      Mr. Steven Chase Callahan
                              Mr. George T. Scott
14                            Mr. Mitchell Reed Sibley
                              CHARHON, CALLAHAN, ROBSON
15                            & GARZA PLLC
                              3333 Lee Parkway
16                            Suite 460
                              Dallas, Texas 75219
17
                              Mr. Michael Charles Smith
18                            SIEBMAN BURG PHILLIPS & SMITH
                              LLP - MARSHALL
19                            P.O. Box 1556
                              Marshall, Texas 75671-1556
20

21

22

23

24

25
```

1                        I N D E X

2

3   November 19, 2020

4                                                      Page

5          Appearances                                    1

6          Hearing                                        4

7          Court Reporter's Certificate                  91

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      [REPORTER'S NOTE:  During the following

2 proceedings, there were disruptions in the audio as a

3 result of it being held by videoconferencing.  These places

4 are noted in the transcript.]

10:05:35  5                        ***

10:05:35  6      THE COURT:  Good morning, counsel.  This is Judge

10:05:51  7 Gilstrap.  Can everyone see and hear me?

10:05:57  8      MR. MANN:  Yes, Your Honor.

10:05:58  9      MR. SMITH:  Yes, Your Honor.

10:05:59  10      MR. HARKINS:  Yes, Your Honor.

10:06:02  11      THE COURT:  All right.  We're here this morning on

10:06:07  12 matters in Case No. 2:19-CV-395, Luminati versus Teso, et

10:06:14  13 al.  We're also here on matters in Case No. 2:20-CV-0073,

10:06:23  14 Teso versus Luminati.

10:06:28  15      Let me begin by asking for announcements as to who

10:06:31  16 is participating virtually as a part of these motions this

10:06:39  17 morning.

10:06:39  18      Let's begin with Luminati.  Let me ask for

10:06:43  19 announcements one at a time.  And perhaps if there's some

10:06:48  20 counsel who could announce for everybody on the Luminati

10:06:51  21 side, we would avoid the risk of people talking over each

10:06:55  22 other.

10:06:55  23      So with that, let me have announcements of who's

10:07:01  24 present.

10:07:03  25

10:07:06   1                MS. DERIEUX:  Your Honor, this is Elizabeth

10:07:07   2   DeRieux for Luminati --

10:07:07   3                THE COURT:  Ms. DeRieux, I can't -- I can't hear

10:07:08   4   you.  Ms. DeRieux, you're -- you're a faint voice in a

10:07:10   5   distant canyon.  Please speak up.

10:07:14   6                MS. DERIEUX:  Yes, sir.

10:07:15   7        This is Elizabeth DeRieux.  I'm here on behalf of

10:07:18   8   Luminati.  With me today by video is Bob Harkins, and he

10:07:25   9   will be speaking for Luminati in the hearing today.  Also

10:07:27  10   attending by telephone, myself, Sunny Cherian, Ron

10:07:34  11   Wielkopolski, and Mark Mann.  And we are ready to proceed.

10:07:42  12                THE COURT:  All right.  Let me ask for a similar

10:07:45  13   announcement regarding the Teso parties.

10:07:47  14                MR. SMITH:  Your Honor, for the Teso parties,

10:07:50  15   Michael Smith.  And I'd like to defer the full announcement

10:07:53  16   to Mr. Steven Callahan so that he can correctly identify

10:07:56  17   all the people that are on.

10:07:57  18                THE COURT:  All right.  Mr. Callahan.

10:07:59  19                MR. CALLAHAN:  Good morning, Chief -- Good

10:08:04  20   morning, Chief Judge Gilstrap.  Steven Callahan is here,

10:08:04  21   and with me my colleagues, Jorde Scott and Mitchell Sibley,

10:08:11  22   and we're all on the videoconference.

10:08:12  23                THE COURT:  All right.  Are there persons

10:08:14  24   attending by telephone who I don't see on the monitor in

10:08:16  25   front of me?

10:08:17    1        MR. CALLAHAN:  Not from our side, Your Honor.

10:08:21    2        THE COURT:  Ms. DeRieux, I -- I'm going to ask you

10:08:23    3   to run through the people you announced for earlier,

10:08:27    4   because in adjusting the sound on this end, we heard the

10:08:30    5   end of your announcement, but I didn't hear the beginning

10:08:33    6   of your announcement.  So just for my own benefit, would

10:08:37    7   you give me those names and identities again, please?

10:08:42    8        MS. DERIEUX:  Yes, sir.  This is Elizabeth DeRieux

10:08:44    9   for Luminati.  Robert Harkins is appearing by video, and

10:08:50   10   he'll be speaking for Luminati today at the hearing.  Also

10:08:54   11   attending by telephone, Sunny Cherian, Ron Wielkopolski,

10:08:58   12   and Mark Mann.

10:09:01   13        THE COURT:  Thank you.

10:09:02   14        Counsel -- counsel, at the out -- counsel, at the

10:09:08   15   outset, let me tell you that I have my schedule allocated

10:09:15   16   today so that we have two hours to cover what we can on

10:09:18   17   these pending motions.  Anything we don't get covered by

10:09:21   18   way of oral argument by noon Central Time today, I will

10:09:27   19   take up and consider on the briefing and on the papers and

10:09:30   20   get you orders accordingly.

10:09:32   21        We're going to follow this series of arguments or

10:09:38   22   this order of events today.  We're going to start with

10:09:42   23   Luminati's motion to dismiss third amended counterclaims

10:09:47   24   and third amended third-party complaint.  That's Document

10:09:51   25   102 in the 395 case.

| | | |
|---|---|---|
| 10:09:55 | 1 | I'll then hear Luminati's motion in the |
| 10:10:00 | 2 | alternative to sever and stay Defendants' counterclaims, |
| 10:10:05 | 3 | also in the 395 case. |
| 10:10:06 | 4 | Third, we'll take up the motion to compel |
| 10:10:10 | 5 | interrogatory responses, Document 150, in the 395 case. |
| 10:10:15 | 6 | And last on my list today is the motion to dismiss |
| 10:10:23 | 7 | brought by Luminati, Document 20, in the 73 case. |
| 10:10:27 | 8 | So that's the order in which I intend to hear |
| 10:10:32 | 9 | argument this morning. |
| 10:10:40 | 10 | And I'm also, just given that we're doing this |
| 10:10:44 | 11 | virtually, to make sure that we have a clear record, I'm |
| 10:10:47 | 12 | going to ask each person who speaks throughout the process |
| 10:10:51 | 13 | today to begin with identifying yourself by name.  That -- |
| 10:10:56 | 14 | I would much rather have that done more often than needed |
| 10:11:02 | 15 | repetitively than overlook somebody in the record and later |
| 10:11:05 | 16 | not be sure who argued. |
| 10:11:07 | 17 | So with that, let's begin with Luminati's motion |
| 10:11:09 | 18 | to dismiss third-party amended count -- counterclaims and |
| 10:11:15 | 19 | third amended third-party complaint. |
| 10:11:17 | 20 | Let me hear from the moving party, Luminati, |
| 10:11:20 | 21 | first. |
| 10:11:21 | 22 | MR. HARKINS:  Robert Harkins on behalf of |
| 10:11:25 | 23 | Luminati.  Thank you, Your Honor. |
| 10:11:25 | 24 | Your Honor, we have provided the Court and the |
| 10:11:29 | 25 | other side with a set of presentation materials by way of |

10:11:33  1   slides.  And if -- if Your Honor has a copy of those --

10:11:37  2          THE COURT:  I do --

10:11:39  3          MR. HARKINS:  -- it's -- there are two -- two

10:11:42  4   sets, and -- and as Your Honor has -- it's the set of --

10:11:48  5   there is one set that starts off and a cover sheet that

10:11:53  6   says:  Motion to Dismiss Third Amended Counterclaims.  And

10:11:56  7   that set will cover the first three items in the order

10:11:58  8   that -- that Your Honor has listed for today.

10:12:00  9          THE COURT:  I've got them.

10:12:02  10          MR. HARKINS:  The second set of slides is about --

10:12:06  11   is about the fourth.  So we can set that aside.  Thank you.

10:12:08  12          So if -- if Your Honor turns to Slide 2 of that

10:12:11  13   set, it just sets out the -- the ECF numbers that go with

10:12:14  14   the three motions.  And then starting at Slide 3 is the

10:12:17  15   cover page for this first argument we're making about

10:12:21  16   dismissing the counterclaims.

10:12:22  17          On Slide 4, we set out what the scope of the

10:12:27  18   argument is.  And what you will note is that of these

10:12:31  19   counterclaims, there are eight counterclaims that were made

10:12:38  20   by Defendants we refer to as Teso.  And of those, we -- we

10:12:42  21   did not move to dismiss the non-infringement and invalidity

10:12:46  22   counts, which are 6 and 7, but the rest are encompassed by

10:12:50  23   the motion.

10:12:52  24          In -- essentially, these claims, as we note at the

10:12:57  25   bottom, the overall reasons are most of these are -- the

10:13:00   1   first four counts are -- they're monopolization claims,

10:13:07   2   they're antitrust, and they're barred by the

10:13:10   3   Noerr-Pennington Doctrine.

10:13:11   4           And in general, all of these Claims 1 through 5

10:13:14   5   and 8 fail to satisfy pleading requirement under 12(b)(6)

10:13:19   6   at least and others, and -- and that's independent reasons

10:13:22   7   why those -- they should be dismissed.

10:13:25   8           So if we go to our Slide 5, it just sets out the

10:13:31   9   standard under Federal Rule of Civil Procedure 8.  And the

10:13:37  10   citation is from the Iqbal case which Your Honor is very

10:13:40  11   familiar with.  And we need to have plausible claims.

10:13:47  12           We continue to discuss the -- the basic legal

10:13:50  13   setting on Slide 6, saying you have to have facially

10:13:54  14   plausible claims, and you have to have -- if you don't --

10:13:58  15   if you can't show plausibility, including overcoming the

10:14:02  16   Noerr-Pennington Doctrine by proving sufficiently plausible

10:14:11  17   facts that -- which prove sham litigation, then 12(b)(6)

10:14:16  18   dismissal is appropriate.  And that is the -- well, it's

10:14:18  19   the Miller v. BAC Home Loan Servicing case, but also the

10:14:20  20   Industry Models case that we cite on -- at the bottom of

10:14:23  21   Slide 6.

10:14:24  22           As we say on Slide 7, Federal Rule of Civil

10:14:34  23   Procedure 9(b) also applies, and specifically to

10:14:37  24   unenforceability because it is an inequitable conduct claim

10:14:39  25   must be pled with particularity.  And we don't think that

10:14:43   1   that's been met here.

10:14:44   2        So starting at Slide 8, essentially what's going

10:14:47   3   on here, and we wanted Your Honor to understand, that all

10:14:49   4   of the claims about monopolization are basically some

10:14:53   5   version of -- some version of -- that Luminati is enforcing

10:14:58   6   its patent rights.  And as a result of that, the -- the --

10:15:04   7   Teso believes that they're monopolizing them, and that --

10:15:08   8   that's a problem.

10:15:09   9        But, of course, as we all know, patent is a legal

10:15:13   10   monopoly right.  So we run into Noerr-Pennington all the

10:15:15   11   time in these types of cases where parties try to say, oh,

10:15:19   12   you know, enforcing your patent gives you a monopoly so

10:15:23   13   you're a monopolist.

10:15:24   14        But the patent right itself creates a legal

10:15:27   15   monopoly, and that -- that cannot possibly -- that would be

10:15:30   16   an irresolvable conflict in -- in our laws of the United

10:15:34   17   States if we allowed for those two things to -- to co-exist

10:15:37   18   every time someone brings a patent claim.  They're subject

10:15:41   19   to antitrust violation claims if they don't win the case.

10:15:44   20        So the general rule under Noerr-Pennington is you

10:15:47   21   can't do that.  I mean, that's -- it has to be more than

10:15:50   22   you are suing someone, and -- and we disagree with you.  We

10:15:53   23   don't think we infringe.  We think your patent is invalid.

10:15:57   24   And you should know that, and, therefore, you know,

10:15:58   25   that's -- that's our basis for our claim.  That doesn't

10:16:00   1   work.

10:16:01   2        So on Slide 8, we just show that the essence of

10:16:05   3   this claim is just -- it's just in this idea that the

10:16:08   4   patent lawsuits that Luminati is bringing are -- are shams.

10:16:12   5   That -- that is the basis.  That's in Paragraph 127 of the

10:16:17   6   amended -- of the amended counterclaims.

10:16:20   7        And if we go to Slide 9, we just further show that

10:16:26   8   all of the activities that are being alleged to support the

10:16:30   9   antitrust claims are all versions of enforcing patent

10:16:33  10   rights, and -- and specifically enforcing patent rights by

10:16:38  11   the -- the patents that are being asserted in litigation in

10:16:41  12   this court.  And that is the basis of the -- the entire

10:16:45  13   basis of why we got the first four counts of these

10:16:49  14   counterclaims.

10:16:49  15        THE COURT:  Mr. Harkins?

10:16:50  16        MR. HARKINS:  Yes.

10:16:51  17        THE COURT:  And for those present, I've found in

10:16:53  18   these virtual context, if I hold up my hand, you sometimes

10:16:56  19   can see it before you can hear me.  So to avoid talking

10:17:01  20   over each other, if I'm going to interject, I'll try to

10:17:05  21   hold up my hand and let you know that I have a question.

10:17:08  22        At this juncture, let me ask you this,

10:17:11  23   Mr. Harkins.  Isn't Noerr-Pennington an affirmative

10:17:13  24   defense?  And if it is, why is it something that's

10:17:18  25   appropriate to rule on affirmatively at the pleading stage?

10:17:25   1   Said another way, why isn't this -- why isn't your position

10:17:29   2   on this effectively premature?

10:17:31   3            MR. HARKINS:  Thank you, Your Honor.

10:17:32   4            So when -- so the reason for this is -- it's a

10:17:38   5   little bit like an anti-slap situation, which is -- again,

10:17:43   6   that would require -- that would allow every patent

10:17:46   7   Defendant to -- to file an antitrust claim and have -- and

10:17:50   8   take discovery on it and have this ride -- go all the way

10:17:56   9   through the process and then be, you know, subject to

10:17:58  10   dismissal at the summary judgment stage.

10:18:01  11            And we are -- and so that is not -- and so what

10:18:05  12   happens with the Noerr-Pennington defense is Courts will --

10:18:11  13   will dismiss it at this stage unless there are facts, facts

10:18:16  14   that will prove -- plausibly prove that this is a sham

10:18:20  15   litigation.

10:18:21  16            So the difference here is it can be asserted as

10:18:26  17   a -- as an affirmative defense, but it's also been used on

10:18:30  18   motions to dismiss and has been relied upon by Courts to

10:18:34  19   dismiss claims under 12(b)(6).  And I think that was the

10:18:37  20   law that we cited to you earlier on -- that was where I

10:18:43  21   started off on Slide 6 of our materials, which says that

10:18:46  22   this dismissal is appropriate for antitrust under

10:18:49  23   Noerr-Pennington as a 12(b)(6) motion.  And that was the

10:18:52  24   Miller v. BAC Home Loans case and the Industry Models case

10:18:58  25   that are cited on that slide.

10:18:59   1        And there's a good reason for that, because,

10:19:01   2   otherwise, every single case that's a patent case will

10:19:05   3   have -- everybody will say every case is a sham, and the --

10:19:08   4   the Plaintiff should know better than to bring these cases,

10:19:10   5   and we're going to take a bunch of discovery.  And there's

10:19:13   6   no plausible facts that show that this is a sham.

10:19:16   7        And if -- and if they could plead -- meet

10:19:20   8   particularity pleading requirements to indicate that

10:19:23   9   there's a possibility that they're going to win this claim,

10:19:27  10   then that would be different.

10:19:28  11        But we have a facially valid patent -- that is the

10:19:35  12   presumption.  And we have -- are presumed to have a good

10:19:38  13   faith basis to bring the complaint unless it's shown --

10:19:40  14   proved otherwise.

10:19:43  15        A better way of dealing with this kind of a

10:19:45  16   situation is if they win and they show at that time through

10:19:48  17   this litigation we had no basis to ever believe that we

10:19:53  18   could have brought this claim in good faith, they always

10:19:56  19   have the right to bring antitrust claims at that point.

10:20:00  20   And that -- that makes sense.  That order makes sense.  It

10:20:03  21   doesn't clutter every patent case with a -- with a

10:20:05  22   monopoly -- with an antitrust claim.

10:20:06  23        So that doesn't -- you know, dismissing this claim

10:20:10  24   from this -- from this case does not deprive them, if they

10:20:14  25   could somehow actually plead plausible facts later, from

10:20:19  1  bringing these claims.  But if they're going to do it now,

10:20:21  2  they need to state -- come out with those facts now that

10:20:23  3  actually support that this overcomes the presumption that

10:20:26  4  this isn't a sham litigation.  That is -- that is dependent

10:20:29  5  on them.

10:20:30  6       And there are no plausible facts claimed in this

10:20:34  7  complaint.  That is my -- what I'm going to walk through

10:20:38  8  here is the facts are all just the kind of conclusions that

10:20:41  9  you would see in a complaint by anybody who was ever saying

10:20:47  10  that a patent claim should not be brought.

10:20:50  11       And, in fact -- and -- and that's why I cited in

10:20:53  12  the -- in the slides that we have over and over again that

10:20:55  13  they're -- the basis of this complaint isn't something

10:20:58  14  else.  It's just that they think that this is a sham.

10:21:01  15       And in our Slide 8, we've highlighted the text

10:21:05  16  showing that -- and in Slides 9, this is all just -- they

10:21:08  17  say we're doing this in bad faith, and that's the whole

10:21:12  18  point of this claim set.

10:21:13  19       So on our Slide 10, we pointed out that there are

10:21:20  20  two bases that they're using for this.  One is the first

10:21:24  21  lawsuit between Luminati and -- and Tesonet.  And the

10:21:25  22  second is this lawsuit.  And -- and those -- that's it.

10:21:29  23  That's how they're -- that's how they're alleging that --

10:21:33  24  that they have a right for antitrust claims in this case.

10:21:37  25       Well, as we put out in Slide 11, there's no basis

10:21:42  1   for them to claim that the first lawsuit was a sham.  And

10:21:49  2   Your Honor may recall, you know, in this case -- we were at

10:21:52  3   the pre-trial conference in this case with Your Honor, and

10:21:57  4   in that case, there were -- it was a patent claim, and it

10:21:59  5   was based on three parts of the system.

10:22:01  6        There was the originator who was requesting

10:22:05  7   information.  There were these tunnel devices that were

10:22:09  8   intermediaries carrying out -- collect the technology.

10:22:12  9   They were -- they were making -- they were acting as sort

10:22:15  10  of agents for the originator, and then there is the

10:22:19  11  website that is being sought where the information is

10:22:21  12  coming from.

10:22:22  13       The defense here was not really that they didn't

10:22:24  14  do the things in the claim set.  The defenses that were

10:22:28  15  forwarded in this case were purely jurisdictional and --

10:22:33  16  and based on late information that was provided in the case

10:22:35  17  where answers that were provided under oath were changed

10:22:39  18  very late in the case.

10:22:40  19       And, in fact -- at first they said one thing, and

10:22:44  20  then they said something entirely different very late in

10:22:49  21  the case.  And there were -- that -- that was the basis

10:22:51  22  of -- and there was a second set of claims that were about

10:22:54  23  those nodes in the U.S., those tunnel devices, and that one

10:22:57  24  was held indefinite, but Luminati had a good faith basis

10:23:01  25  for why it disagreed with that.

10:23:03   1          And, in fact, has a -- has an appeal pending right

10:23:07   2    now.  There's a notice of appeal they filed on August 20th

10:23:11   3    of -- earlier this year, and it's ECF No. 239-1 in the

10:23:17   4    Luminati versus Tesonet case.

10:23:19   5          So it can't be said that this was a bad -- that

10:23:22   6    that was a bad faith litigation.  It just wasn't.  And, in

10:23:25   7    fact, there wasn't even -- as far as we're concerned, there

10:23:28   8    wasn't even a technical defense to that case.  It was all

10:23:30   9    about -- for the most part, it was about this

10:23:33  10    jurisdictional issue that arose late in the case.

10:23:35  11          So they would have to show that -- that that whole

10:23:38  12    case that I just talked about, that we never thought we had

10:23:41  13    a case.  That -- that's the basis, that that was

10:23:45  14    objectively baseless, and that we knew it, okay.  That's --

10:23:48  15    that's the first case.  That's what it's talking about on

10:23:50  16    Slide 11.

10:23:51  17          And then on Slide 12, the second one is the

10:23:53  18    current case.  And we -- we have no idea why they would say

10:23:58  19    that the current case is a sham brought in bad faith.  We

10:24:01  20    are litigating this actively in the case.  We -- we have no

10:24:05  21    indication that -- that there's any issues.

10:24:08  22          And, in fact, the issue that was raised in the

10:24:10  23    last case about this jurisdictional issue isn't even an

10:24:14  24    issue in this case because the last case was about the

10:24:17  25    originator.  And this case is about these tunnel devices

| | | |
|---|---|---|
| 10:24:22 | 1 | that everybody admits exists in the United States. |
| 10:24:26 | 2 | So we do not have the issues in the last case at |
| 10:24:30 | 3 | all here, and we're pursuing it in good faith.  So -- and |
| 10:24:33 | 4 | there's no real claim.  They can't -- they haven't done |
| 10:24:36 | 5 | anything to prove -- for example, they didn't move to |
| 10:24:38 | 6 | dismiss this case.  They haven't moved for early summary |
| 10:24:41 | 7 | judgment in this case in their paper.  They've done nothing |
| 10:24:44 | 8 | that would allow the Court to have any indication that |
| 10:24:47 | 9 | there's a sham. |
| 10:24:49 | 10 | Okay.  So -- so -- |
| 10:24:53 | 11 | THE COURT:  Well, let's -- let's do this. |
| 10:24:55 | 12 | MR. HARKINS:  Yes. |
| 10:24:55 | 13 | THE COURT:  Let's try to move on, mindful of our |
| 10:24:59 | 14 | time limitations. |
| 10:25:01 | 15 | Talk to me about your motion with regard to |
| 10:25:03 | 16 | monopolization and attempted monopolization. |
| 10:25:06 | 17 | MR. HARKINS:  Okay.  So what I will say is we both |
| 10:25:10 | 18 | agree that those claims are governed -- and basically |
| 10:25:14 | 19 | what's going on is they're saying we're attempting to |
| 10:25:17 | 20 | monopolize by asserting our patents.  That -- that is the |
| 10:25:21 | 21 | basis of the claim -- that's what I already showed you. |
| 10:25:28 | 22 | And (audio drops) Investors versus Columbia Pictures.  We |
| 10:25:31 | 23 | call it the PRE case, the Supreme Court case, 508 U.S. 49. |
| 10:25:37 | 24 | That is the Supreme Court case both sides agree govern the |
| 10:25:42 | 25 | Court's determination over whether that monopolization can |

10:25:47  1    proceed.  And it requires two -- two things to happen to

10:25:50  2    prove the sham litigation, and both sides will cite this,

10:25:54  3    too.

10:25:55  4            And so I actually want to go to -- sorry, Slide 15

10:25:58  5    here.  The first thing is that they -- they have determined

10:26:03  6    this relevant market as residential proxies.  And that's a

10:26:07  7    cite to their complaint at Paragraph 151.  And that is --

10:26:13  8    that is basically the -- what the patents in this case

10:26:16  9    cover.

10:26:16  10           So they're basically just claiming that the market

10:26:19  11   for this monopoly is the patent -- the technology.  That is

10:26:22  12   what's going on here.

10:26:23  13           So there's no other market.  There's nothing else

10:26:26  14   outside of this they're talking about for monopoly.  And

10:26:29  15   then when you go to our Slide 16, you'll see that they have

10:26:32  16   to do two things to overcome this Noerr-Pennington

10:26:37  17   Doctrine.

10:26:37  18           First is it has to be proved -- and first and

10:26:41  19   foremost, it has to be proved objectively baseless.  And

10:26:44  20   that is that no reasonable litigant could realistically

10:26:50  21   expect success on the merits.  It is irrelevant what

10:26:53  22   Luminati thinks or doesn't think.  They would have to show

10:26:56  23   this Court that nobody with -- in their right mind would

10:27:00  24   have brought this case.

10:27:02  25           And I've discussed already why that couldn't be

10:27:04   1   the case with the first litigation which the parties

10:27:08   2   settled, and it's not the case in this litigation which

10:27:11   3   they haven't taken any measures to try to get dismissed.

10:27:12   4        So if you find that they did not plead facts, not

10:27:16   5   just the allegation of objective baselessness but facts

10:27:20   6   that you show -- that you could find that the case was

10:27:23   7   objectively baseless, if they didn't plead those facts, all

10:27:27   8   four of the monopoly claims get dismissed at that point.

10:27:30   9        Only if you find that no reasonable party could

10:27:33  10   have brought the claims that Luminati brought to move the

10:27:37  11   Court to, which is, well, maybe no reasonable party could

10:27:40  12   have thought it but did Luminati think it anyway.  And if

10:27:42  13   you find first that nobody in their right mind would have

10:27:45  14   brought these claims, but, two, Luminati must not be in its

10:27:49  15   right mind because it brought these claims, and there's no

10:27:55  16   evidence that it did it -- yeah.

10:27:58  17        THE COURT:  Mr. Harkins, I'm going to stop you for

10:27:58  18   a second.  We're getting some annoying and interrupting

10:28:03  19   feedback audio-wise on this end.  I don't know if somebody

10:28:04  20   does not have their device on mute and there's some

10:28:08  21   extraneous noise coming through from somewhere other than

10:28:12  22   Mr. Harkins, but everybody please check your devices.  Make

10:28:15  23   sure there's not anything going on.  This would apply to

10:28:18  24   those attending by telephone, as well.

10:28:20  25        It almost sounds like from this end there's a

10:28:32  1  quartz clock next to somebody's microphone, and I'm hearing

10:28:38  2  each tick of the second hand as it goes by.

10:28:38  3       MR. HARKINS:  I think several of us are hearing

10:28:42  4  that, Your Honor, and I -- I've muted my mic a couple of

10:28:46  5  times to make sure it wasn't me.  So I --

10:28:47  6       THE COURT:  Well, it's -- it's annoying, but it

10:28:49  7  doesn't prevent me from hearing your argument.  So -- well,

10:28:53  8  it stopped for whatever reason.  Good.

10:28:55  9       While we're stopped, then let me ask you a

10:29:00  10  question, Mr. Harkins.

10:29:01  11       I'd like to hear your best arguments on the

10:29:05  12  combination and conspiracy theories with regard to the

10:29:11  13  antitrust matters.  This would be Count 3, the combination

10:29:17  14  and conspiracy claim; and Count 4, the conspiracy to

10:29:25  15  monopolize claim.

10:29:28  16       Particularly, I'd like to hear your

10:29:29  17  characterizations with regard to EMK.  And I'm going to

10:29:34  18  call it Hola.  Those of us that live near people who speak

10:29:40  19  Spanish don't pronounce the "H," so I'm going to call it

10:29:44  20  that, even though it starts with an "H."

10:29:46  21       Let me hear your -- let me hear your arguments in

10:29:48  22  that regard, please, sir.

10:29:49  23       MR. HARKINS:  Okay.  Thank you.

10:29:50  24       So the combination of conspiracy discussion in our

10:29:56  25  slide set starts at Slide 34.  And this is -- again, these

10:30:03  1  are all patent enforcement activities that are happening.

10:30:08  2  And what we cite here is Federal Circuit Fernandez-Montes

10:30:13  3  case:  Conclusory allegations or legal conclusions

10:30:14  4  masquerading as factual conclusions will not suffice to

10:30:20  5  prevent a motion to dismiss.

10:30:21  6         And if you look at Slide 35 and 36, you can see

10:30:24  7  this is nothing but a barebones recitation of -- of the

10:30:29  8  type that is conclusory, that -- that Courts will not

10:30:32  9  accept.  And that some of the facts talk about this idea

10:30:36  10  that there's EMK and Hola are -- are made.  So let me

10:30:43  11  address that, please.

10:30:44  12         If you go to Slide 37, as you -- as you see, there

10:30:48  13  are three allegations for a conspiracy claim -- three

10:30:52  14  elements.  In the Ancar case, the Fifth Circuit cites this

10:30:58  15  and there's a U.S. Supreme Court case, as well.  And so you

10:31:02  16  need to show the existence of the conspiracy.  Then you

10:31:05  17  need to show whether it affected interstate commerce and

10:31:08  18  whether you have to show that that includes unreasonable

10:31:08  19  restraint on trade.

10:31:09  20         So you have to show an agreement to commit an

10:31:13  21  offense, all right?  So that's the Ingram case at Page 60,

10:31:20  22  U.S. 72 -- 672, excuse me --

10:31:23  23         THE COURT:  What --

10:31:24  24         MR. HARKINS:  Here in the complaint, these

10:31:26  25  conclusory allegations don't even do that.  They don't --

10:31:28   1   I'm sorry, Your Honor, please.

10:31:30   2          THE COURT:  What -- what I'm more specifically

10:31:32   3   interested in your -- are your arguments about EMK and

10:31:36   4   Hola, and are they or are they not separate decision

10:31:39   5   makers, their relationship to each other --

10:31:47   6          MR. HARKINS:  Yeah, okay.

10:31:48   7          THE COURT:  -- and the parent --

10:31:48   8          MR. HARKINS:  Yes, yes.

10:31:50   9          THE COURT:  In other words, that's -- that's the

10:31:51   10   kind of things I'd like you to focus on.

10:31:53   11          MR. HARKINS:  Okay.  So there are two things

10:31:55   12   happening here.  And one is on that slide I was about to

10:31:58   13   address, which is the one about Hola.

10:31:59   14          So Hola VPN is a -- is a -- its own -- has been

10:32:03   15   its own company.  And it is a free virtual private network

10:32:07   16   service.  We don't -- there's no facts -- it's a separate

10:32:13   17   company, but there's no facts that show there's any

10:32:15   18   agreement between Hola and Luminati to conspire to do

10:32:18   19   anything.  Hola operates as a free VPN service.  It is a --

10:32:24   20   it is a licensed entity that's -- that is just operating on

10:32:28   21   its own.  And there's no facts in the complaint that show

10:32:31   22   that Hola did anything to monopolize anything.

10:32:35   23          Like there's no -- what did Hola -- what is the

10:32:38   24   agreement that Hola made with Luminati?  So to the extent

10:32:40   25   that there's an allegation that Hola is a separate entity,

10:32:43  1  it has been a separate entity.

10:32:45  2      What happened is there was one company, and they

10:32:49  3  spun off.  And -- and Hola is -- became one of the

10:32:52  4  entities, and Luminati became the other.  And there's a

10:32:55  5  license -- there is a license agreement between them.

10:32:59  6      But there's no -- there's no allegations in the

10:33:01  7  complaint about Hola that would allow the Court to allow

10:33:05  8  that claim to continue, even if it found Noerr-Pennington

10:33:09  9  not to -- not to knock it out.  So that's -- that's in

10:33:14  10  Hola.  Okay.  Please.

10:33:16  11      THE COURT:  Well, before we -- before we leave

10:33:18  12  Hola --

10:33:19  13      MR. HARKINS:  Yeah.

10:33:20  14      THE COURT:  -- am I correct it was founded by the

10:33:23  15  two gentlemen who founded Luminati?  Its registered address

10:33:27  16  is at the same address?  These are the same two people that

10:33:31  17  are the inventors of the patents-in-suit?

10:33:35  18      Tell me what is there that would support a

10:33:37  19  conclusion that they're not effectively one and the same.

10:33:43  20      MR. HARKINS:  Well, I -- I -- I think that they

10:33:44  21  are under common -- they are under a certain amount of

10:33:48  22  common control because of, you know, all the things you've

10:33:51  23  said.  And I don't have any facts that would not indicate

10:33:53  24  that they're for the purpose of the monopoly claim one and

10:33:56  25  the same.

10:33:57  1            THE COURT:  Okay.

10:33:57  2            MR. HARKINS:  They are in the same building.  They

10:33:59  3   do have common ownership.  It's not -- the difference is --

10:34:03  4   all I'll say is just to be -- full disclosure because I

10:34:06  5   don't want to say anything wrong on the record.  I don't

10:34:09  6   believe EMK has any ownership at all -- that EMK owns Hola

10:34:13  7   or like it has owned Hola.  So that's -- that's where this

10:34:17  8   split came from.

10:34:18  9            But, otherwise, as far as is there any basis to

10:34:21 10   say that they -- they are separate entities for the purpose

10:34:25 11   of a monopoly, I think all the facts that Your Honor has

10:34:28 12   stated are correct as far as the single enterprise law that

10:34:34 13   has been applied by cases like the Copperweld U.S. Supreme

10:34:40 14   Court case, 467 U.S. 752.  I think you could apply that.

10:34:43 15   So --

10:34:43 16            THE COURT:  Talk to me then about EMK.

10:34:45 17            MR. HARKINS:  Okay.  So EMK is definitely not a

10:34:51 18   separate entity for purposes of monopoly claims.  And at

10:34:56 19   Slide 39, we talk about the allegation that has been made

10:34:59 20   that -- that -- about EMK having a controlling interest,

10:35:04 21   and that is correct.  EMK owns most of Luminati.  They have

10:35:08 22   the -- they have the -- it is -- it is actually alleged in

10:35:12 23   the complaint that they have -- they own most of Luminati.

10:35:15 24            As soon as that allegation in Paragraph 132 of

10:35:20 25   the -- of the amended counterclaims was made, as far as I

10:35:22  1  know, that kills the ability to claim a conspiracy between

10:35:28  2  EMK and Luminati for sure.  And that's also supported by

10:35:30  3  that Copperweld case.

10:35:31  4       THE COURT:  All right.  Let's move on and talk

10:35:33  5  about the breach of contract claims.

10:35:34  6       MR. HARKINS:  Okay.  Thank you, Your Honor.

10:35:35  7       So we start talking about them at Slide 40 where

10:35:39  8  we put out the elements of the breach of contract claims,

10:35:44  9  but I think fact -- Your Honor knows the law very well.

10:35:47  10       I'm going to go to Slide 42 where we set out what

10:35:51  11  the two -- two bases of this counterclaim are.

10:35:54  12       There are the two -- the two things that are

10:35:57  13  alleged to support the breach of contract -- and I will say

10:35:59  14  this is one area Noerr-Pennington doesn't -- doesn't apply

10:36:03  15  to.  This is the only one of our claims that we would cite

10:36:06  16  Noerr-Pennington is not an issue for.  But it just does not

10:36:10  17  meet the requirements to plead breach of contract under

10:36:12  18  12(b)(6).

10:36:14  19       So the first of the agreements is this 408

10:36:17  20  agreement, and the second is this sort of vague allegation

10:36:20  21  to Defendants' own general conditions, all right?  And I'd

10:36:24  22  like to take those in turn.

10:36:26  23       On Slide 42, as we note -- so this 408 agreement,

10:36:28  24  as alleged, and there's no allegations to the contrary in

10:36:31  25  the -- in the counterclaims that -- the facts are that --

10:36:35  1   that Teso -- representatives of Teso approached Luminati

10:36:42  2   and asked to have a settlement discussion to see if the --

10:36:45  3   if the parties could resolve the case.

10:36:47  4          The response to that by Luminati was at that time,

10:36:50  5   we're willing to have this meeting with you, but whatever

10:36:53  6   happens at that meeting needs to be covered by 408 in

10:36:57  7   confidentiality.  We don't want whatever contents happen at

10:37:00  8   that meeting to be disclosed, okay?

10:37:03  9          That's what the agreement says.  The agreement --

10:37:07  10  Your Honor sees the agreement.  The actual agreement

10:37:09  11  itself, that's -- it says we're going to have this meeting,

10:37:12  12  and at the meeting, we're going to talk, and we don't want

10:37:15  13  to disclose what happens at the meeting.

10:37:18  14         There are no allegations con -- contrary to the

10:37:20  15  fact that that meeting never even happened.  There was no

10:37:22  16  meeting.  The -- the courts didn't end up getting together.

10:37:26  17  There was no back and forth.  There was no substance

10:37:30  18  because they never met.  So this is a hollow agreement

10:37:33  19  about something that never happened.

10:37:34  20         Now, the -- the basis of the complaint appears to

10:37:38  21  be a statement that was made that -- that -- that Teso

10:37:41  22  approached Luminati about -- about settlement.  That

10:37:45  23  preceded any -- that -- that's what led to negotiations

10:37:49  24  that led to the agreement, but it has nothing to do with

10:37:52  25  what happened or what is covered by the agreement.  There's

10:37:54  1   also no allegations that any confidential information was

10:37:58  2   exchanged or disclosed.

10:38:00  3        So we don't understand how an allegation about

10:38:03  4   something that precedes -- that leads to a negotiation,

10:38:06  5   that leads to an agreement could lead -- and when that --

10:38:10  6   when nothing ever happened and nothing was ever disclosed

10:38:14  7   could ever be the basis for a claim for breach of contract.

10:38:18  8   I mean, it wasn't -- you have to do something to breach the

10:38:21  9   contract.  Did the contract cover the meeting?  That didn't

10:38:21  10  happen.

10:38:23  11       And there's no allegation to the contrary.  It

10:38:25  12  just appears to be that they're trying to say that this

10:38:28  13  subsequent agreement relates back to the fact that they

10:38:31  14  approached us in the first place.  There -- there's no

10:38:33  15  provision in that agreement that says that.

10:38:36  16       And I think if -- if Your Honor looks at the

10:38:38  17  agreement, you'll see there is no provision that says that,

10:38:41  18  and so there cannot be a basis for that claim.  That's --

10:38:44  19  that's the first one.

10:38:45  20       If Your Honor doesn't have any questions, I'll

10:38:47  21  move to the second basis of their claims.

10:38:49  22       THE COURT:  Please do.

10:38:50  23       MR. HARKINS:  That is Slide 43.

10:38:52  24       So they say that we violated their general

10:38:55  25  conditions agreement, and the -- the -- I mean, the -- we

10:38:59  1   don't understand what it is that -- that is the basis of

10:39:02  2   this, but they cannot use that agreement as the basis to

10:39:06  3   bring a suit here because, as we show on Slide 43, the

10:39:10  4   general conditions agreement very clearly establishes a

10:39:15  5   choice of form and a choice of law clause that make --

10:39:18  6   requires any disputes under that agreement to be resolved

10:39:21  7   in Lithuania.

10:39:22  8        So that -- that just simply can't be a basis to

10:39:27  9   bring a claim for breach of contract in Texas.  And so

10:39:31 10   there's no -- there's no basis for this Court to be getting

10:39:34 11   involved in an alleged breach of a general conditions

10:39:38 12   agreement that is in Lithuania and says it needs to be

10:39:41 13   resolved in Lithuania.

10:39:43 14        So that -- that's what I -- if you have questions

10:39:47 15   about breach of contract, I can answer them, or we -- we

10:39:50 16   can move to the next subject.

10:39:51 17        THE COURT:  Let's talk about the inequitable

10:39:53 18   conduct claims.

10:39:53 19        MR. HARKINS:  Okay.  So starting at Slide 44,

10:39:59 20   it's -- it's framed as unenforceability.  But, yes, it's

10:40:04 21   based on inequitable conduct.  I think there's agreement

10:40:07 22   that needs to be pled with specificity.  It needs to have

10:40:10 23   plausible facts showing essentially some kind of fraud on

10:40:13 24   the Patent Office.  They're in violation of the -- of the

10:40:17 25   duty of candor.  And -- and there is only one basis for

10:40:22  1  this.

10:40:22  2          And it -- it can get a little complicated, and I

10:40:27  3  may -- it may be that it's better to hear from the other

10:40:29  4  side, and I can respond to some of this.

10:40:32  5          But basically what it is, is there is a -- they're

10:40:38  6  saying that basically in the '614 patent, there should have

10:40:43  7  been another disclosure, that there should have been a

10:40:47  8  disclosure of the -- the '319 patent.

10:40:53  9          And on Slide 44, that's what it says.  But -- but

10:40:57  10  what happened is the '349 patent extends from the '604

10:41:06  11  patent, and we all agree that the '604 patent was

10:41:10  12  disclosed.

10:41:11  13          And so actually I think the easiest thing to do

10:41:14  14  here is -- I actually want to show you this.  So why don't

10:41:18  15  we go ahead and -- it's Slide 47 that we talk about this

10:41:22  16  issue.  It's -- the '319 was a continuation of the '604.

10:41:27  17  So when they say it was withheld, it has the same exact

10:41:31  18  specification.  It's the actual disclosure was disclosed.

10:41:33  19          Look at Slide 48.  You can see that on the face of

10:41:38  20  the '614 patent -- it's actually on Page 2 -- it cites it

10:41:42  21  right there in black and white that we disclosed -- and

10:41:44  22  it's another patent that the same inventors invented.  So

10:41:47  23  they knew about it, and they disclosed it.  And -- and it's

10:41:50  24  listed right there.

10:41:51  25          So if you look, that's the '604 patent on Slide

10:41:56  1    48.   If you look at Slide 49, you can see that -- that the

10:41:59  2    '319 patent that they're telling -- they're talking about

10:42:03  3    as being the thing we didn't disclose says right on it --

10:42:06  4    it's a continuation of a division of the '604 patent.

10:42:10  5         Well, a continuation of a division means that

10:42:12  6    you're not allowed to add new matter.   There's no

10:42:16  7    disagreement about that, that -- you can't have additional

10:42:19  8    disclosure for this patent over that '604 patent.   The

10:42:25  9    disclosure has to be the same.   And if it -- if we -- if

10:42:26  10   you try to add new matter, that can only be done by a

10:42:30  11   continuation-in-part.   So you cannot -- you can't do it,

10:42:32  12   okay.

10:42:32  13        So -- so there's no obligation to keep disclosing

10:42:36  14   the same specification over and over again to the Patent

10:42:39  15   Office once the -- once the patent was disclosed, you've

10:42:44  16   disclosed it.   And -- so -- so that's basically the -- the

10:42:47  17   gist here.

10:42:48  18        What's going on with this is -- and I think

10:42:54  19   they're going to talk about this needle in a haystack idea,

10:42:59  20   I think, and how they think that what matters in the patent

10:43:02  21   are the claims that were in the '319 patent.

10:43:05  22        So I'm just going to -- I'm going to say this now,

10:43:08  23   and I think it -- once you see the other side's

10:43:10  24   presentation, I'll be glad to address it in more detail.

10:43:13  25        But the '319 -- first of all, claims of a patent

10:43:19  1   are not the disclosure of the patent.  The patent

10:43:23  2   specification discloses what's -- whether something is

10:43:25  3   prior art or not.  You cannot base invalidity of prior art

10:43:30  4   on claims that are in a subsequent application because

10:43:34  5   those claims cannot add matter.  Ever -- all the matter has

10:43:38  6   to be in the original application of the patent.

10:43:40  7            So saying that claims in a later patent

10:43:44  8   application could possibly be relevant or you need to

10:43:47  9   disclose that separately, that -- that's just wrong.  That

10:43:50  10  can't possibly be correct.

10:43:52  11           That, in fact, could be -- you know, they talk

10:43:54  12  about creating this haystack of prior art.  Well, I tell

10:43:58  13  you what would definitely create a haystack of prior art,

10:44:02  14  if you had to disclose the same specification over and over

10:44:05  15  and over again every time you had a continuation or a

10:44:08  16  divisional, the -- the disclosures in these patents would

10:44:11  17  create a flurry of -- of patents that look like they're

10:44:14  18  different, but they're really the same.  And then when you

10:44:16  19  have other art that you disclose, people would say, oh, you

10:44:19  20  buried that in a mountain of art that -- where you just

10:44:22  21  kept telling the Patent Office the same thing over and over

10:44:24  22  again.

10:44:24  23           That's not reasonable as a patentee.  You know,

10:44:27  24  that's inequitable conduct.  So that is cumulative.  It's

10:44:30  25  purely cumulative of -- of that, and there's no dispute

10:44:32  1  that that -- that that entire specification was disclosed

10:44:35  2  and cited in the patent.

10:44:37  3         As far as the claims go, I -- I just want you to

10:44:41  4  know that what they're -- what the allegations are here is

10:44:44  5  that the claims of the '319 patent are related to add --

10:44:51  6  some additional matter that was added to a dependent claim,

10:44:54  7  but there's no allegation of double patenting here.

10:44:58  8  There's no allegation that Luminati tried to sneak through

10:45:02  9  a double patenting situation in the Patent Office.

10:45:04  10        We all agree that the claim that got through the

10:45:06  11 Patent Office on the '614 patent is long and has a lot of

10:45:11  12 elements, and it -- it has many more elements than were

10:45:14  13 ever discussed in that '319 disclosure.

10:45:18  14        I'll leave it there because I think --

10:45:18  15        THE COURT:  All right.

10:45:18  16        MR. HARKINS:  -- Your Honor doesn't have a

10:45:20  17 basis -- you know, you need to see what they're going to

10:45:23  18 say about it, I think, for you to understand why that's

10:45:25  19 relevant.  So that's pretty much -- we cited law about

10:45:29  20 unenforceability.

10:45:29  21        And the only other thing I'll say is everything

10:45:33  22 I've told you, even if you were to disagree with it, it was

10:45:37  23 reasonable for the patentee to understand it that way.  And

10:45:39  24 the law that we cite on Slides 51 through -- through -- I'm

10:45:43  25 sorry, 51 through 54 all indicate that, you know, even if

10:45:49  1  you disagreed with us about it, as long as it was possibly

10:45:54  2  reasonable that we thought that, that that's also a reason

10:45:57  3  it's not inequitable conduct.

10:45:59  4       THE COURT:  All right.  Mr. Harkins, thank you.

10:46:01  5       Is there anything else on this motion to dismiss,

10:46:03  6  Document 102, that you feel is important that we haven't

10:46:08  7  covered you want to touch on briefly before I hear from the

10:46:12  8  other side?

10:46:13  9       MR. HARKINS:  No, I think that covers it, Your

10:46:16 10  Honor.  I mean, I -- I'll reserve any, you know, response

10:46:18 11  based on what I hear from the other side.

10:46:21 12       THE COURT:  Well, given the ground we've got to

10:46:22 13  cover, I don't know how much time we'll have for a response

10:46:25 14  and response again and response after that.

10:46:27 15       So let's move on and let me hear from Teso in

10:46:32 16  response on this motion.

10:46:33 17       MR. CALLAHAN:  Chief Judge Gilstrap, good morning.

10:46:37 18  And may it please the Court.  Steven Callahan.  I will

10:46:40 19  address the majority of the motion to dismiss the antitrust

10:46:47 20  claims, the breach of contract claim, and then my

10:46:51 21  colleague, Mr. Scott, will handle the inequitable conduct

10:46:54 22  claim.

10:46:54 23       First --

10:46:54 24       MR. HARKINS:  I apologize -- I apologize,

10:46:56 25  Mr. Callahan.  I just -- are you going to be using

10:46:59  1  materials that were marked "restricted attorneys' eyes

10:47:03  2  only" in your presentation?

10:47:03  3          MR. CALLAHAN:  So what I've done -- I will not

10:47:05  4  because we're not under seal.  I will just point to the

10:47:08  5  parts of the slide, and I can just direct the Court to it

10:47:14  6  without referencing it.

10:47:16  7          Alternatively, I guess if the Court would like to

10:47:18  8  go into the sealed session, we could do it that way.  But

10:47:22  9  I -- I sent this, Your Honor, to -- my slide deck to the

10:47:26 10  opposing counsel, and I told them the portions in red are

10:47:28 11  the portions that I think disclose their designated

10:47:32 12  information.  So I will -- I will not reference those

10:47:35 13  orally.

10:47:35 14          THE COURT:  All right.  Let's -- let's go forward.

10:47:37 15  If there's a need to get beyond what's publicly disclosed,

10:47:43 16  we can talk about sealing then.  But, otherwise, I'm happy

10:47:46 17  for you just to reference the language in red on the slides

10:47:51 18  that I can see without talking about it precisely in the

10:47:54 19  record.

10:47:55 20          MR. CALLAHAN:  Yes, sir.  So Steven Callahan here.

10:47:59 21          I would like to start by addressing the suggestion

10:48:02 22  that if this motion to dismiss is not granted, then you

10:48:07 23  will see antitrust claims asserted in every patent

10:48:11 24  infringement case.

10:48:12 25          With respect, we disagree.  We think this case is

10:48:15  1   relatively unique.  And there are two critical things here
10:48:19  2   that we think puts it -- put -- puts this case in a unique
10:48:25  3   bucket.
10:48:25  4        Number one, it's the facts that we have pled in
10:48:28  5   our complaint, and these include a substantial number of
10:48:31  6   facts that were unearthed from the earlier Tesonet case.
10:48:35  7   And we set those out in great detail, and we quote from
10:48:39  8   them in our complaint or our counter -- counter-complaint.
10:48:44  9        And then the second fact is you can't allege an
10:48:48 10   antitrust violation if you simply think the other side has
10:48:52 11   brought a sham patent case.  You have to do more than that.
10:48:55 12   You actually have to establish the monopolization and the
10:48:58 13   antitrust elements.
10:49:00 14        And so in the vast majority of cases where
10:49:04 15   somebody thinks, oh, this claim is frivolous, they're not
10:49:07 16   going to be able to assert an antitrust claim because the
10:49:11 17   other side did not have monopoly power.
10:49:14 18        So those are two reasons why we think this case
10:49:16 19   is -- is certainly distinguishable.
10:49:18 20        So, Your Honor, looking at our slide deck, which
10:49:21 21   we submitted to you, the first several pages are just
10:49:23 22   background about the elements.
10:49:24 23        I'll go to Slide 6, Your Honor, to talk about some
10:49:27 24   of the facts that we plead that make this case quite
10:49:31 25   unique, in our opinion.

10:49:32   1           The first is that Luminati's majority owner, prior
10:49:38   2   to the first lawsuit, reached out and attempted to acquire
10:49:41   3   us.  Mr. Harkins called us Teso or Tesonet.  We'll call
10:49:45   4   ourselves Oxylabs, but they're -- they're all the same for
10:49:49   5   purposes of this motion.
10:49:49   6           They attempted to acquire us.  That acquisition
10:49:54   7   attempt went nowhere.  And then Luminati filed the first
10:49:57   8   lawsuit that we plead, supported by facts, was a meritless
10:50:02   9   patent infringement lawsuit.  That lawsuit obviously was
10:50:07  10   resolved by a settlement, as Mr. Harkins noted and which we
10:50:11  11   also note.  And then what happened -- well, actually right
10:50:15  12   before the settlement, maybe a month before, we've been
10:50:18  13   sued another time.  So that's a second one.  That's the
10:50:21  14   case we're in here.  And then we were sued in a third case,
10:50:24  15   as well.
10:50:24  16           So in these three lawsuits, Luminati -- Luminati
10:50:27  17   asserts seven patents.  We plead that Luminati has declared
10:50:35  18   a self-described, quote, unquote, war on Oxylabs.  And that
10:50:40  19   war is designed to weaken us so that we would either be
10:50:41  20   acquired at a favorable price or to force us out of
10:50:44  21   business.
10:50:44  22           On Slide 6, I would direct Your Honor to Paragraph
10:50:48  23   4 -- 142 of our counterclaims.  And we cite Luminati's
10:50:55  24   internal documents.
10:50:56  25           We also have additional facts that relate to our

10:51:01  1  monopolization and attempted monopolization claim that also

10:51:03  2  come from the internal documents, and those are on the last

10:51:06  3  two bullet points of Slide 6.

10:51:08  4       Additional facts that we believe plausibly suggest

10:51:15  5  that what's going on here is sham patent litigation is

10:51:21  6  these cases -- now three cases filed against us.  You look

10:51:24  7  to the damages prayer, or what would potentially be the

10:51:28  8  damages prayer.  We know the prayer from the first case.

10:51:31  9  These are tiny cases, especially compared to the cases that

10:51:36  10  Your Honor sees before him regularly.

10:51:38  11       In the first case, the damages prayer did not

10:51:41  12  exceed the cost of defense.  We plead that that would be

10:51:43  13  the case in this case and the next case, as well.  And we

10:51:47  14  plead that the reason why we're here is to force us to

10:51:53  15  spend millions of dollars and numerous years essentially

10:51:58  16  litigating.

10:51:59  17       In the Tesonet case, we think this is quite

10:52:01  18  important.  Luminati moved to vacate and extend its own

10:52:03  19  trial setting.  That, to us, at least suggests that they

10:52:06  20  didn't care about the merits of the case, or at least

10:52:09  21  didn't care that much.

10:52:10  22       We -- we talk about the settlement, and we plead

10:52:13  23  that they made some arguments that suggests that they were

10:52:17  24  just trying to keep their case alive.

10:52:19  25       Your Honor, we talk about non-patent claims.

10:52:20  1   These are claims that were asserted against us in the
10:52:25  2   Tesonet case, four causes of action.  We went through the
10:52:28  3   case.  We conducted discovery on them.  We plead in our
10:52:31  4   counterclaims that the claims were meritless, that
10:52:35  5   discovery showed them to be meritless.
10:52:38  6          Luminati dismissed those claims without prejudice.
10:52:41  7   No doubt, it was without prejudice.  But, again, they
10:52:43  8   brought them back in this case.
10:52:46  9          So we're now having to deal with these claims that
10:52:49  10  one could plausibly believe if they were important enough,
10:52:53  11  they wouldn't have been dismissed without prejudice.
10:52:57  12         We also claim that we've been sued on a patent
10:53:01  13  obtained by inequitable conduct.  That's the '614 patent.
10:53:05  14         Further, we talk about -- now I'm on Slide 8 -- we
10:53:09  15  talk about what Luminati has done in the marketplace and
10:53:12  16  their threats to our customers, our potential customers,
10:53:14  17  and our business partners.  They tell -- they tell
10:53:16  18  people -- they tell them:  You must stop doing business
10:53:19  19  with -- with Oxylabs.  You must remove their SDK.  They
10:53:23  20  tell them that our products are illegal to use.  They've
10:53:28  21  made communications about what the prior lawsuit settlement
10:53:32  22  allegedly means and what Luminati is -- is the only party
10:53:36  23  who can use servers or residential proxy (beeping) in the
10:53:40  24  United States.
10:53:42  25         We think that this is -- you know, all of these

10:53:44   1   facts together show what's really going on, and that's what

10:53:47   2   we plead.

10:53:48   3            And then with respect to whether Luminati knows

10:53:53   4   that its -- that its claims are sham, obviously, state of

10:53:57   5   mind on a Rule 8 motion -- you know, even 9(b), you can

10:54:01   6   allege it generally, but certainly here we're not on 9(b)

10:54:05   7   for the antitrust claims.

10:54:06   8            But we -- we -- we give objective facts.  We plead

10:54:11   9   them that -- that we think overcomes the pleading standard

10:54:14  10   to suggest that they do have knowledge.  And that would

10:54:18  11   include in the first lawsuit, one of the three independent

10:54:21  12   claims was declared invalid.  And Oxylabs has repeatedly

10:54:25  13   placed Luminati on notice.  We sent letters (beeping)

10:54:30  14   reports.  We filed summary judgment motion.  We filed Alice

10:54:34  15   motions, et cetera.

10:54:35  16            Nevertheless, we're still here.  We're still

10:54:38  17   hearing about the patents in the marketplace and our

10:54:41  18   customers, et cetera.

10:54:41  19            We also plead that as part of their strategy, not

10:54:45  20   simply Oxylabs has been involved but other players in the

10:54:50  21   marketplace, including IP Ninja and BI Science, have been

10:54:55  22   sued, and both of those entities we plead on account of the

10:55:00  23   lawsuit have gone out of business.  So we think that the --

10:55:03  24   the -- the strategy has been successful.

10:55:04  25            So in summary, on the sham patent litigation, we

10:55:08  1  think it's well pled that the claims are objectively

10:55:12  2  baseless, especially on a motion to dismiss, and they were

10:55:15  3  brought to interfere with our business.

10:55:17  4       Moving to the monopolization claims, we also have

10:55:20  5  to hit a few other elements.  The first is monopoly power.

10:55:24  6  We plead that there's a highly concentrated market for

10:55:27  7  residential proxies in the United States, that Luminati has

10:55:29  8  the power to control price or exclude competition.

10:55:32  9       And we cite to a market report that shows that

10:55:35  10 Luminati has 53.1 percent of the market -- the proxy market

10:55:39  11 generally.  We plead that they actually have more of the

10:55:42  12 residential U.S. proxy market.

10:55:44  13      So we're -- we're above 53 percent which the cases

10:55:47  14 say that more than 50 percent can generally establish a

10:55:50  15 monopoly.

10:55:50  16      I'll also note, Your Honor, that with BI Science

10:55:54  17 out of the market, that Frost & Sullivan report says that

10:55:58  18 BI Science has a 10.6 percent share.  And as part of their

10:56:01  19 settlement, as -- as we understood, as publicly announced,

10:56:05  20 BI Science will be leaving the marketplace and -- and

10:56:09  21 transitioning folks over to Luminati.

10:56:10  22      So market share is even higher.  We plead

10:56:10  23 substantial barriers to entering the market.  We require

10:56:10  24 this critical mass of residential proxies that would take

10:56:20  25 millions of -- yes, sir, sorry.

| | | |
|---|---|---|
| 10:56:24 | 1 | THE COURT:  Mr. Callahan, talk to me about the |
| 10:56:29 | 2 | conspiracy claims under Counts 3 and 4, please. |
| 10:56:29 | 3 | MR. CALLAHAN:  Yes, sir.  So with respect to the |
| 10:56:31 | 4 | conspiracy, we'll go to Slide 12. |
| 10:56:32 | 5 | We do plead that a conspiracy exists.  I think |
| 10:56:37 | 6 | that the pleading is -- is quite clear with respect to EMK, |
| 10:56:42 | 7 | that EMK is a separate entity for purposes of the -- the |
| 10:56:48 | 8 | antitrust claims.  Mr. Harkins did reference a -- a case |
| 10:56:53 | 9 | that I believe he suggested would show that it's a single |
| 10:56:57 | 10 | enterprise.  And that case, as I recall, deals with a |
| 10:57:01 | 11 | parent and a subsidiary.  And in that case, I believe it |
| 10:57:05 | 12 | was a hundred percent owned subsidiary. |
| 10:57:07 | 13 | Here, we're not talking about a hundred percent |
| 10:57:10 | 14 | owned subsidiary.  There is a majority ownership.  And so |
| 10:57:14 | 15 | if Your Honor found that the majority ownership was enough |
| 10:57:17 | 16 | to extinguish the claim, that claim would be extinguished. |
| 10:57:21 | 17 | But we're not aware of any case that would suggest that a |
| 10:57:24 | 18 | mere majority owner is sufficient to cause it to be one |
| 10:57:29 | 19 | enterprise. |
| 10:57:29 | 20 | So with respect to -- yes, sir. |
| 10:57:32 | 21 | THE COURT:  How do you respond to the American |
| 10:57:37 | 22 | Needle/National Football League case which effectively |
| 10:57:42 | 23 | says -- or the Supreme Court effectively says the real |
| 10:57:45 | 24 | question is whether it joins together separate decision |
| 10:57:50 | 25 | makers?  How -- how -- how can you convince me that EMK and |

10:57:55  1   Hola are separate decision makers in this context?

10:57:58  2        MR. CALLAHAN:  So we -- well, I'll say this, and I

10:58:04  3   do -- we do plead that -- that EMK controls Luminati.  And,

10:58:09  4   again, I think that the -- the separate decision maker fact

10:58:12  5   is that EMK does -- you know, is a separate entity, it does

10:58:18  6   have majority ownership.  You know, certainly, the

10:58:22  7   day-to-day business decisions have separate decision makers

10:58:24  8   between the entities.

10:58:26  9        Luminati is -- is not just a mere puppet company

10:58:31 10   or a shell company or anything like that.  They -- they

10:58:33 11   have, as I understand, over a hundred employees, CEOs,

10:58:33 12   et cetera.

10:58:38 13        But there is -- there are overlapping decision

10:58:43 14   makers both between EMK and Hola, no doubt.  And that's

10:58:45 15   part of the reason for the conspiracy that we allege.

10:58:47 16        And so, again, if Your Honor finds that these

10:58:50 17   entities are essentially one entity, then the conspiracy

10:58:56 18   claim no doubt would go away, admittedly.

10:58:58 19        But we -- we think -- and we haven't seen the law,

10:59:01 20   at least, that would suggest that some sort of related

10:59:05 21   companies, Hola and Luminati, are a single entity for

10:59:10 22   antitrust purposes.  And also EMK, which is a more related

10:59:13 23   company, I'll say, based on its ownership interest, could

10:59:17 24   not be subject to the claims.

10:59:19 25        THE COURT:  All right.  Let's talk about -- let's

10:59:22   1   talk about the breach of contract claims, please.

10:59:25   2          MR. CALLAHAN:  Yes, sir.

10:59:25   3          So we have two breach of contract claims.  The

10:59:29   4   Rule 408 agreement, I'd like to address first.  And I'm on

10:59:33   5   Slide 19, Your Honor.

10:59:34   6          That precludes -- so we entered into this Rule 408

10:59:39   7   agreement on February 25, 2020.  Then -- this is important

10:59:44   8   because of the timing, and I'll -- I'll try to make this

10:59:46   9   clear because this is what we're -- we're pleading.  We

10:59:50   10  entered into the Rule 408 agreement on February 25.  Then

10:59:50   11  there were discussions between the parties about engaging

10:59:57   12  in settlement.  Let's set up a meeting.  Can we set up a

10:59:59   13  meeting?  Can we try to get this case resolved?

11:00:02   14         That meeting indisputably did not happen.  There

11:00:07   15  was no ultimate meeting.  And as Mr. Harkins notes, and we

11:00:10   16  agree, there was no confidential information disclosed but

11:00:13   17  for the confidential settlement communications about

11:00:16   18  getting the meeting up and going.

11:00:18   19         But the agreement itself is -- is quite broad.  It

11:00:22   20  precludes Luminati from publicly disclosing any

11:00:25   21  communications relating to settlement discussions.  So it

11:00:29   22  doesn't have -- the communication doesn't have to happen at

11:00:32   23  a formal meeting.  It's anything about settlement

11:00:34   24  discussions.

11:00:34   25         And Luminati violated that Rule 408 agreement,

11:00:38  1  according to our pleading, by publicly disclosing details

11:00:43  2  concerning the parties' settlement communications.  They

11:00:46  3  told the world in a press release that we contacted them,

11:00:49  4  and we basically asked, begged, whatever, to settle.  We

11:00:53  5  went to them saying:  Please settle our case.  And that, to

11:00:56  6  us, is a violation of the Rule 408 agreement.

11:00:59  7        Now, with respect to the general conditions, we

11:01:04  8  have general conditions that apply to all of our customers

11:01:09  9  and those using our service, and we claim that -- that

11:01:11 10  Luminati has -- has violated those general conditions.  You

11:01:16 11  know, discovery, I've got -- I've got a red bullet point on

11:01:19 12  Slide 19 that talks about it.

11:01:20 13        But I want to talk about the -- the venue clause

11:01:24 14  that Mr. Harkins pointed to.  That venue clause is clearly

11:01:30 15  permissive.  It says that venue may be brought.  Either

11:01:34 16  party may bring a case in Lithuania.  And to us, that is a

11:01:38 17  permissive venue clause.

11:01:41 18        In our briefing, we cite authority that suggests

11:01:44 19  that you actually have to have an exclusive venue to be

11:01:48 20  kicked out.  And then I'll also note, Your Honor, we're

11:01:50 21  here on a motion to dismiss for failure to state a claim

11:01:54 22  under Rule 8 on this contract claim.  Luminati has not

11:01:57 23  filed a motion to dismiss for improper venue.

11:02:01 24        So that's what I would say about the -- the breach

11:02:06 25  of contract.  And unless Your Honor has any questions, I

11:02:08  1  can turn it over to Mr. Scott to address inequitable

11:02:12  2  conduct.

11:02:12  3         THE COURT:  That'd be appropriate.  Let me hear

11:02:14  4  from Mr. Scott.

11:02:15  5         MR. CALLAHAN:  Thank you, sir.

11:02:17  6         MR. SCOTT:  Thank you, Mr. Callahan.

11:02:19  7         Good morning, Chief Judge Gilstrap.  May it please

11:02:23  8  the Court.  I'm -- I'm George Scott for the Defendants in

11:02:32  9  this case.

11:02:32 10         So if you turn to Slide 20, please.

11:02:34 11         As Mr. Callahan noted, this is a -- this is a

11:02:38 12  motion to dismiss.  This isn't a motion for summary

11:02:40 13  judgment.  This isn't trial right now.  And the pleading

11:02:44 14  standard (audio skips) is significantly lower than some of

11:02:52 15  the cases that Luminati has cited in their briefing.

11:02:54 16         You know, the pleading standard here is that

11:02:58 17  Defendants need to simply recite facts from which the Court

11:03:02 18  may reasonably infer that a specific individual knew both

11:03:06 19  invalidating information was withheld from the PTO and that

11:03:12 20  information was withheld with a specific intent.  And,

11:03:14 21  importantly, it just -- the Court just needs to be able to

11:03:17 22  draw an inference that the intent to deceive is plausible

11:03:20 23  and that it flows logically from the facts.

11:03:22 24         And certainly later on in the case, we are going

11:03:25 25  to be able to be required to show that that inference is

11:03:29  1  the sole inference or the most reasonable inference.  But

11:03:34  2  at this point, it just has to be that it is an inference

11:03:37  3  that can be reasonably drawn from the pleadings.

11:03:42  4        THE COURT:  Let me -- let me stop you, counsel.

11:03:44  5  What I heard from Mr. --

11:03:45  6        MR. SCOTT:  Yes, Your Honor.

11:03:46  7        THE COURT:  What I heard from Mr. Harkins was

11:03:48  8  effectively there's no duty to disclose, therefore, we

11:03:53  9  can't have acted -- you know, there can't be an inequitable

11:03:56  10 conduct.

11:03:56  11       Can you address the duty to disclose issue?

11:04:02  12       MR. SCOTT:  Yes, Your Honor.

11:04:03  13       I think -- you know, Slide 23 is probably the most

11:04:08  14 on-point on this.  You know, I think that Mr. Harkins and I

11:04:13  15 just have a fundamental disagreement as opposed to what the

11:04:17  16 duty to disclose related family patent applications is to

11:04:24  17 an examiner who isn't aware of those applications.

11:04:28  18       As -- as you can see -- actually, I think moving

11:04:31  19 back up to Slide 22 is probably better.  This is a very

11:04:35  20 large family in the '319 patent here.  That red line there

11:04:40  21 signifies the patent applications that were filed before

11:04:47  22 the '614 patent issued.

11:04:51  23       Examiner Scott -- no relation to myself -- but the

11:04:54  24 examiner of -- at least not that I'm aware -- the examiner

11:04:57  25 of the '614 patent is not the examiner on any of those

11:05:02  1   applications.  Only one of those applications was disclosed

11:05:05  2   to him.

11:05:06  3            Luminati's position is, is that Examiner Scott

11:05:12  4   effectively is supposed to be aware of everything going on

11:05:15  5   in every one of those other prosecutions.

11:05:17  6            My practice -- what Mr. Harkins thinks and what I

11:05:23  7   think isn't necessarily relevant, but based on dedicating

11:05:27  8   roughly a fifth or a quarter of my career to patent

11:05:32  9   prosecution, my practice has been -- and everyone I know

11:05:34  10  who prosecutes, their practice has been that you cross-cite

11:05:38  11  every single application in a situation like this.

11:05:41  12           And the reason for that is on Slide 23.  It's

11:05:45  13  not -- it's not that, you know, we all just are afraid of

11:05:50  14  our own shadow and we want to make sure that we don't

11:05:53  15  commit inequitable conduct.  It's the MPEP Section 2001.06,

11:05:59  16  Subsection (b), specifically states that a person with a

11:06:03  17  duty of candor, and in this situation, that's going to

11:06:07  18  include Luminati and Luminati's patent prosecutor, cannot

11:06:12  19  assume that the patent -- that the patent examiner,

11:06:16  20  Examiner Scott here, is going to be aware of other

11:06:19  21  applications that are material (audio skips).

11:06:22  22           And so this rule applies when we've got a

11:06:26  23  situation where you've got two examiners -- or let me back

11:06:30  24  up a little bit.

11:06:31  25           You've got two patent families.  You have the

11:06:33  1  exact same patent prosecutor on both patent families.

11:06:38  2  You've got the exact same co-inventors of both patent

11:06:42  3  families, but you have an examiner for one family -- that's

11:06:43  4  Examiner Nguyen in the '319 family, and then you have

11:06:48  5  Examiner Scott in the '614 family.

11:06:51  6       And (audio skips) this position was the correct

11:06:57  7  position, and Examiner Scott has to be aware in constantly

11:07:03  8  monitoring everything that's going on in the '319 family.

11:07:03  9  And while this rule applies when there's just two or three

11:07:06  10  patents in each family, if you move on to Slide 24, please,

11:07:11  11  you're going to see that this isn't a situation where

11:07:15  12  Examiner Scott could reasonably follow everything that's

11:07:18  13  going on.

11:07:20  14       You know, the -- the -- the green box there at the

11:07:22  15  top is the '604 patent.  That's what's important.  That

11:07:30  16  patent, I want to say, issued some time in 2010 or maybe

11:07:33  17  2013.  Everything below there, if you look down to the --

11:07:36  18  I'll call it the fourth layer where you have the '484

11:07:40  19  patent and the '319 patent and so on, every single patent

11:07:45  20  application there and below was filed after -- on or after

11:07:47  21  April 20th of 2018.  That is, I want to say 18 different

11:07:52  22  patent applications that were -- that all were filed some

11:07:54  23  time between three months before the first litigation when

11:07:58  24  Luminati filed lawsuits against Oxylabs's predecessors

11:08:03  25  and -- and the day that the '614 patent issued.

11:08:06  1          If you slide down to Slide 25, you'll see present
11:08:11  2  day, they've added quite a few more.
11:08:13  3          But the issue here is that Examiner Scott cannot
11:08:17  4  be reasonably expected to keep track of every claim
11:08:21  5  amendment, every Office Action, every Office Action
11:08:24  6  response, keep track of every position that Luminati takes
11:08:28  7  in all of these co-pending applications which, you know, it
11:08:32  8  is a needle in a haystack, but it's an ever growing needle
11:08:37  9  in a haystack because these -- these additional patents and
11:08:40 10  after these additional applications are being filed on on
11:08:43 11  almost a quarterly basis.
11:08:45 12          And so the issue here is that you can't expect a
11:08:48 13  patent examiner who's already overworked and already has
11:08:54 14  hundreds of cases before him that he has to examine to keep
11:08:58 15  track of everything that Luminati is doing.  The people
11:08:58 16  that are in the best position to keep track of what
11:09:01 17  Luminati is doing are Luminati's patent prosecution counsel
11:09:03 18  and Luminati's inventors.
11:09:05 19          And that's why MPEP 2006 -- sorry, 2001.06,
11:09:13 20  Subsection (e), actually exists is that you need to put
11:09:18 21  this information in front of the examiner so that he knows
11:09:20 22  that he's got to go look over at these additional
11:09:24 23  applications and see what's going on there.
11:09:26 24          THE COURT:  All right.  All right.  Thank you for
11:09:29 25  that argument.

11:09:33  1          Counsel, we've used half of our time, and we've

11:09:36  2  just covered the first motion.  I think I've heard the

11:09:39  3  kinds of arguments targeted based on my questions that I

11:09:43  4  needed to hear.

11:09:44  5          Let's move on to the second motion set for today,

11:09:49  6  and that's Luminati's motion in the alternative to sever

11:09:54  7  and stay Defendants' counterclaims, Document 125.

11:09:59  8          Let me hear from Luminati briefly on this, please.

11:10:03  9          MR. HARKINS:  Robert Harkins for Luminati.  Thank

11:10:08  10  you, Your Honor.

11:10:08  11          Our -- our slide presentation regarding this

11:10:12  12  starts at Slide 61 of the same set that Your Honor has.

11:10:16  13  Really, I think this comes down to, for the most part,

11:10:20  14  Slide -- Slide 62.

11:10:22  15          So this is -- you know, were these claims to go

11:10:27  16  on, it's just gotten very, very late in the day.  The --

11:10:31  17  there were -- you know, this is not Luminati's decision,

11:10:35  18  but the Defendants here have filed counterclaims and

11:10:41  19  amended the counterclaims and amended them, and now they're

11:10:45  20  on the their third amended set of counterclaims.  They have

11:10:49  21  not -- yes.

11:10:50  22          THE COURT:  Would you agree that the Court's

11:10:51  23  decision here is purely one within the Court's discretion,

11:10:54  24  or what standard of review do you think is applicable, if

11:10:58  25  not abuse of discretion?

11:11:00  1            MR. HARKINS:  No, that's the correct standard,

11:11:02  2  Your Honor.  It is your discretion and your ability --

11:11:05  3            THE COURT:  This is purely a --

11:11:05  4            MR. HARKINS:  Sorry.

11:11:06  5            THE COURT:  -- case management decision, as I see

11:11:10  6  it.

11:11:10  7            MR. HARKINS:  I fully agree with you.

11:11:12  8            THE COURT:  Okay.

11:11:12  9            MR. HARKINS:  And the issue here is -- yeah,

11:11:15  10  absolutely.

11:11:16  11            And the issue here is that this set of

11:11:18  12  counterclaims with these additional parties hasn't even

11:11:21  13  been served, even today.  And we are less than 30 days away

11:11:26  14  from the close of discovery in this case.

11:11:27  15            So even if -- and we've -- I can go through the

11:11:30  16  slides, but I -- for -- for efficiency purpose, I'll

11:11:35  17  just -- if Your Honor could review those, if you've got

11:11:35  18  questions, I would answer them.

11:11:37  19            But the reality here is we've got no indication as

11:11:40  20  to when or even whether service will ever be effectuated.

11:11:45  21  And even if they came in today and said you've got service

11:11:49  22  effectuated today, it is too late for any of the parties to

11:11:53  23  serve discovery on those claims because you have 30 days to

11:11:56  24  respond, and -- and we're less than 30 days from the close

11:11:58  25  of discovery.

| | | |
|---|---|---|
| 11:11:59 | 1 | And these are international parties with |
| 11:12:02 | 2 | international cases.  We've set depositions in this case |
| 11:12:05 | 3 | because discovery closes on December 14th.  We're booked -- |
| 11:12:08 | 4 | we're booked on the patent claims right now already, almost |
| 11:12:11 | 5 | every day starting at the end of next -- at the end of next |
| 11:12:15 | 6 | week through the end of the schedule to deal with the |
| 11:12:18 | 7 | patent case. |
| 11:12:18 | 8 | So if, you know, yes, they're asking Your Honor in |
| 11:12:23 | 9 | your discretion at this point since they haven't served |
| 11:12:26 | 10 | the com -- the amended complaint -- the complaint that |
| 11:12:28 | 11 | they've got or the counterclaims, and we don't have any |
| 11:12:31 | 12 | time in the schedule, it would be appropriate to set those |
| 11:12:34 | 13 | aside if -- if they, you know, exist past the motion to |
| 11:12:38 | 14 | dismiss. |
| 11:12:39 | 15 | THE COURT:  All right.  What's Teso's position? |
| 11:12:43 | 16 | MR. CALLAHAN:  Yes, sir, Chief Judge Gilstrap, |
| 11:12:47 | 17 | Steven Callahan here. |
| 11:12:47 | 18 | Let me start by saying I agree with Mr. Harkins |
| 11:12:50 | 19 | that this is Your Honor's call.  Clearly Your Honor |
| 11:12:55 | 20 | possessed -- possesses discretion -- |
| 11:12:55 | 21 | THE COURT:  Mr. Callahan? |
| 11:12:59 | 22 | MR. CALLAHAN:  -- and Your Honor can do -- |
| 11:13:01 | 23 | THE COURT:  Mr. Callahan? |
| 11:13:02 | 24 | MR. CALLAHAN:  Yes, sir. |
| 11:13:02 | 25 | THE COURT:  We've lost your video.  I don't know |

11:13:04  1  why.  I'm looking at a black box.  I hear you, but I don't

11:13:09  2  see you, just so you'll know.

11:13:11  3            MR. CALLAHAN:  Can you see me now, Your Honor?

11:13:13  4            THE COURT:  I can now.  Thank you.

11:13:14  5            MR. CALLAHAN:  Thank you, Your Honor.  Sorry about

11:13:18  6  that.

11:13:18  7            So, yes, we agree completely.  Your Honor has

11:13:21  8  probably nearly unfettered discretion here and can do as

11:13:25  9  Your Honor wishes.

11:13:27  10            I also agree that we -- we do have a -- a service

11:13:31  11  issue in terms of at least one Defendant, that's EMK.

11:13:34  12  There is a disagreement about whether Hola is or is not

11:13:38  13  effectively served.  That -- that relates to whether we

11:13:44  14  could serve them with an earlier version of the complaint.

11:13:46  15            So let me just say -- Slide 32 for Your Honor,

11:13:49  16  that sets forth the chronology of the counterclaims and

11:13:53  17  what we were trying to do in terms of getting people served

11:13:56  18  and how we find ourselves here on our third amended

11:13:59  19  counterclaims.

11:14:00  20            But in terms of severance, we think that, again,

11:14:04  21  you know, bifurcation is not the usual course.  Your Honor

11:14:07  22  has discretion.  Single trial is usually more expedient and

11:14:13  23  efficient.  And severance here is not appropriate.

11:14:15  24            Slide 34, we talk about the parties' claims and

11:14:18  25  counterclaims, and they are related -- undoubtedly related.

11:14:23  1  So we think that Luminati's argument boils down to sort of

11:14:28  2  speculation.  It's if you sever and if we win on the patent

11:14:34  3  claims, then there -- there may not be another trial

11:14:38  4  needed.

11:14:38  5       At the same time, Luminati may be wrong, and

11:14:43  6  obviously two trials with the same witnesses, the same

11:14:47  7  overlapping evidence would not promote judicial economy,

11:14:52  8  especially here where the parties and party witnesses are

11:14:55  9  overseas to trial puts more burden on the Court and -- and

11:14:59  10  the jury, as well.

11:14:59  11       The only last point that I want to make besides --

11:15:03  12  well, let me make just a few more quick points.

11:15:06  13       We do think that we would suffer prejudice by a

11:15:11  14  severance, and here's why.  Luminati does have these

11:15:13  15  non-patent claims for trade secret misappropriation,

11:15:19  16  computer fraud and abuse act, tortious interference and

11:15:22  17  false advertising.  And so if those claims are going to get

11:15:25  18  to a jury, we do think that we should be allowed to bring

11:15:28  19  our antitrust counterclaims, sort of present the full

11:15:32  20  picture of what's going on here.

11:15:33  21       Slide 37, Courts do regularly deny bifurcation

11:15:38  22  requests.  No doubt Luminati has cases going the other way,

11:15:43  23  admittedly.

11:15:43  24       And the last point I want to make on this is -- is

11:15:46  25  if Your Honor was inclined to sever these counterclaims,

11:15:50  1  which, again, we suggest Your Honor should not, but if Your

11:15:54  2  Honor was inclined, Luminati has an alternative request

11:15:59  3  which we would agree with, and that's that their non-patent

11:16:04  4  claims also be severed and stayed.

11:16:06  5       So we think that if Your Honor is going to

11:16:08  6  sever -- sever and stay anything, it should be all

11:16:13  7  non-patent claims so that the first trial in this case

11:16:16  8  would focus on the patent infringement claims and the

11:16:19  9  patent infringement claims only.

11:16:22  10       As support for that position, we do note that

11:16:25  11  those -- those non-patent claims of Luminati's were

11:16:28  12  previously asserted and dismissed without prejudice, and

11:16:31  13  that those non-patent claims are not only related to the

11:16:34  14  patent claims, involve different facts and law and would

11:16:40  15  prejudice us, we believe, before a patent infringement

11:16:42  16  jury.

11:16:42  17       THE COURT:  All right.

11:16:43  18       MR. CALLAHAN:  So I'll -- I'll do that portion

11:16:45  19  hopefully quickly, and I'll -- I'll be quiet now.

11:16:48  20       THE COURT:  All right.  Thank you for that.

11:16:49  21       Mr. Harkins, I'll give you a very brief response

11:16:56  22  if you want one.  Otherwise, we'll move on.

11:16:58  23       MR. HARKINS:  Thank you, Your Honor.  This is

11:16:59  24  Robert Harkins.

11:17:00  25       Very brief response.  Just really, that when we

| 11:17:05 | 1 | discuss the monopolization and the sham litigation, you |

11:17:05  1   discuss the monopolization and the sham litigation, you

11:17:11  2   know, discovery hasn't happened on that yet.  And it's not

11:17:14  3   just a matter of proving that we -- that we win or lose the

11:17:16  4   case.  If that case comes out and it turns out that, you

11:17:20  5   know, there's a basis, we've survived summary judgment,

11:17:24  6   then it probably means those monopoly claims are gone

11:17:26  7   because that's a very high bar on the sham.  So it's a

11:17:31  8   further reason why (audio skips).

11:17:34  9        As to our non-patent claims, discovery has --

11:17:36  10   those were served a long, long time ago.  We have been

11:17:40  11   conducting discovery on those.  We'll leave that to Your

11:17:42  12   Honor's obvious discretion as to how to handle those.

11:17:47  13        Thank you.

11:17:47  14        THE COURT:  Okay.  Let's move on, counsel, and

11:17:49  15   take up next Teso's motion to compel interrogatory

11:17:52  16   responses.  That's Document 150 in the 395 case.

11:17:56  17        Let me hear from Teso on this, please.

11:18:04  18        MR. SCOTT:  Yes, Your Honor.  Again, this is

11:18:06  19   George Scott for Teso.  May it please the Court.

11:18:07  20        Teso seeks to compel responses to seven -- seven

11:18:15  21   interrogatories but also to really, I think, find out a

11:18:20  22   pretty simple question to -- to answer about whether or not

11:18:25  23   responsive information is being withheld pursuant to (audio

11:18:30  24   drops) and then also to have some discrete subpart

11:18:34  25   objections over a rule that we just think are just

11:18:36  1  overzealous, to be completely honest.

11:18:39  2       You know, really this comes down to -- moving on

11:18:42  3  to Slide 43 -- you know, what is the purpose of discovery?

11:18:46  4  And as the Court knows, it's -- it's to resolve some of the

11:18:49  5  issues and narrow the issues beforehand, before trial, and

11:18:53  6  to also prevent surprise at trial.

11:18:56  7       And so we have some issues here where some of

11:18:59  8  these interrogatories, I think we'd be fine with the

11:19:02  9  responses so long as once we get to trial, we don't then

11:19:07  10 later hear something completely different.

11:19:09  11      Now, moving on to -- I'll just in the interest of

11:19:17  12 time, jumping over to Slide 44, you know, we have a -- we

11:19:22  13 have a pattern here that we feel is stifling our ability to

11:19:27  14 figure out some of these issues.

11:19:29  15      You know, we've got on the one hand Luminati is --

11:19:31  16 is contending that Oxylabs can't take discovery on issues

11:19:37  17 for which it bears the burden of proof, basically

11:19:39  18 invalidity.  But, on the other hand, Luminati is seeking

11:19:42  19 discovery on those exact types of issues, including damages

11:19:46  20 and infringement.

11:19:47  21      And these aren't issues like -- with respect to

11:19:54  22 damages, let's say, it's not that Luminati is asking

11:19:57  23 interrogatories like how many widgets or how much of the

11:20:00  24 service did you sell so that we can apply a reasonable

11:20:03  25 royalty to it.  They're interrogatories that are literally

| | | |
|---|---|---|
| 11:20:08 | 1 | as broad as tell us any reason that you contend we aren't |
| 11:20:10 | 2 | entitled to damages.  And -- and we just -- we don't think |
| 11:20:14 | 3 | that -- that one of those interrogatories can be allowed |
| 11:20:17 | 4 | while the other is disallowed. |
| 11:20:19 | 5 | And then to compound these issues, we have what we |
| 11:20:23 | 6 | feel is an improper use of Rule 33(d) to answer as many |
| 11:20:29 | 7 | interrogatories as possible by reference to documents, but |
| 11:20:33 | 8 | the -- the documents are non-responsive.  You know, the |
| 11:20:37 | 9 | burden wouldn't be the same for us to gather the |
| 11:20:42 | 10 | information, to the extent it was in there.  And, you know, |
| 11:20:44 | 11 | in some of these instances, we're talking about thousands |
| 11:20:47 | 12 | of pages. |
| 11:20:47 | 13 | And then, finally, it's these -- these subpart |
| 11:20:51 | 14 | objections that kind of cause an issue where, you know, for |
| 11:20:57 | 15 | the seven interrogatories before the Court today, the issue |
| 11:21:00 | 16 | that it causes is Luminati hasn't provided a substantive |
| 11:21:02 | 17 | response to those seven interrogatories but they also at |
| 11:21:06 | 18 | the same time contend that they count as 13 |
| 11:21:08 | 19 | interrogatories. |
| 11:21:08 | 20 | So, you know, we're not getting responses, but |
| 11:21:11 | 21 | we're also -- our -- our ability to take additional |
| 11:21:14 | 22 | discovery is also being stifled. |
| 11:21:16 | 23 | I -- for Slide 45, I don't -- I don't think that I |
| 11:21:21 | 24 | need to provide the Court information on the bounds of |
| 11:21:25 | 25 | contention interrogatories.  I -- I would just note that -- |

| | | |
|---|---|---|
| 11:21:30 | 1 | that Rule 33(a)(2) specifies that, you know, the Court can |
| 11:21:35 | 2 | delay a response to a contention interrogatory if the time |
| 11:21:39 | 3 | to respond to an interrogatory like that isn't -- isn't -- |
| 11:21:43 | 4 | you know, isn't ripe yet. |
| 11:21:45 | 5 | But these aren't interrogatories that we filed on |
| 11:21:47 | 6 | the first day of open -- opening discovery.  We're in a |
| 11:21:50 | 7 | situation now where we are, I want to say, three and a half |
| 11:21:54 | 8 | weeks away from the close of fact discovery, less than two |
| 11:21:58 | 9 | weeks away from depositions, and less than a month away |
| 11:22:01 | 10 | from opening expert reports.  And the interrogatories that |
| 11:22:04 | 11 | we seek are relevant to that -- that exact issue. |
| 11:22:07 | 12 | So I'll move -- I'll move straight into the |
| 11:22:12 | 13 | interrogatories now. |
| 11:22:15 | 14 | Slide 47, Interrogatory No. 4.  For Interrogatory |
| 11:22:20 | 15 | No. 4, we are -- this is -- this is a standard |
| 11:22:27 | 16 | interrogatory where you ask the patentee, you know: |
| 11:22:29 | 17 | Describe to me your conception and your reduction to |
| 11:22:31 | 18 | practice.  Effectively, we want to know the -- we want to |
| 11:22:34 | 19 | know your conception story.  We want to know your |
| 11:22:37 | 20 | pre-filing history. |
| 11:22:39 | 21 | You know, there -- there's two reasons to have an |
| 11:22:42 | 22 | interrogatory like this.  One is to see if there's any |
| 11:22:45 | 23 | issues with, you know, on-sale bars, statutory bars, things |
| 11:22:53 | 24 | like that, you know, and to see if they are at least for |
| 11:22:56 | 25 | the pre-AIA patents claiming an earlier invention date than |

11:23:01  1  the priority date on the face of the patent.

11:23:05  2        But another reason is that, you know, Luminati is

11:23:09  3  going to come to trial, we would expect, and try to present

11:23:13  4  a very rosy and thorough and detailed story of all the

11:23:19  5  things that they did to come up with these -- these

11:23:22  6  inventions that are claimed.

11:23:23  7        And the issue we have here is that -- we'll get to

11:23:29  8  with one of the other interrogatories -- is that we don't

11:23:32  9  think there's any written description support for the

11:23:34  10 claims at issue -- you know, specific parts of them -- but

11:23:41  11 at least for this -- this whole server -- this purportedly

11:23:43  12 novel server-client-server structure for surfing the

11:23:48  13 Internet anonymously.

11:23:49  14       And what we would like to find out is what is the

11:23:52  15 story?  What -- what evidence do you have besides the

11:23:56  16 specification of the patent itself that the patentee was

11:24:00  17 actually in possession of the claimed invention in 2009 and

11:24:05  18 then again in 2013 for the '614 patent.

11:24:08  19       And so, we want to find that information out.

11:24:12  20       If the answer is simply we don't have anything to

11:24:16  21 say other than, you know, we -- we conceived of and reduced

11:24:20  22 the patent to -- or the invention to practice no later than

11:24:24  23 the day we filed our patent application, I think that Teso

11:24:29  24 can live with that answer.

11:24:30  25       What we don't want to have happen is to have a

11:24:32  1  completely different answer at trial.  And I think

11:24:36  2  Luminati's caselaw is on point there where they say, you

11:24:40  3  know, a -- a -- you know, a party can't be compelled to

11:24:44  4  remember something that it doesn't remember.  That's fine.

11:24:47  5        We just don't want there to be some fortunate

11:24:52  6  flashback of information once we get to trial, whenever

11:24:55  7  that may be.  That -- that's -- that's really, you know,

11:24:58  8  the issue with interrogatory --

11:25:02  9        THE COURT:  All right.  Let's go on to 12 through

11:25:05 10  13.

11:25:05 11        MR. SCOTT:  Moving on to -- the next group is --

11:25:10 12  it really is a group.  It's Interrogatories No. 12, 13, and

11:25:16 13  14.

11:25:16 14        And here, you know, what we're asking for, we are

11:25:18 15  asking for responses to our invalidity contentions.

11:25:22 16        And, you know, we -- we've broken this up into

11:25:30 17  four -- three separate interrogatories.  Luminati counts

11:25:33 18  them as four separate interrogatories but largely provides

11:25:35 19  no response to any of them.

11:25:37 20        And we have one interrogatory that asks for, you

11:25:41 21  know, a response to our contentions with respect to

11:25:45 22  anticipation and obviousness.  Luminati counts that as two

11:25:48 23  interrogatories.

11:25:48 24        We have another interrogatory that asks for a

11:25:52 25  response to our contentions with respect to written

11:25:55  1  description.  And then another one with respect to, you

11:25:59  2  know, subject matter eligibility.

11:26:00  3       With respect to each of these, you know,

11:26:05  4  Luminati's response is effectively -- and you can see an

11:26:10  5  example of it on Slide 49 -- it's that the patent claims

11:26:13  6  are presumed valid.  The PTO went through a process to

11:26:17  7  confirm that they satisfy whatever the relevant statute is

11:26:20  8  for that interrogatory.  And this is Defendants' burden to

11:26:23  9  prove.

11:26:25  10       And then for -- for each of these interrogatories,

11:26:27  11  they provide, you know, a very vague response of something

11:26:32  12  to the effect of for prior art that to do with our claim

11:26:37  13  construction positions.

11:26:38  14       For -- for the interrogatory with respect to

11:26:40  15  written description, they respond that, you know, using

11:26:44  16  Rule 33(d), take a look at the -- you know, the

11:26:47  17  specifications of the patents-in-suit.

11:26:50  18       You know, we think that that's a misapplication of

11:26:52  19  Rule 33(d) because we -- we're asking them to specifically

11:26:57  20  tell us what is your -- your specification support for

11:27:01  21  these very specific written description issues that we have

11:27:06  22  raised.

11:27:09  23       And then for -- for patent eligibility, the

11:27:13  24  response is, you know, read our briefs on the 12(b)(6)

11:27:16  25  motion to dismiss, which notably didn't involve facts

11:27:20   1   beyond those in the pleadings and our interrogatory

11:27:25   2   specifically requests to -- you know, to have them tell us,

11:27:30   3   you know, what component and what order of claims in your

11:27:35   4   claims is -- is something that wasn't understood and

11:27:38   5   routine and conventional at the time.

11:27:42   6         And, you know, because we're in a situation here

11:27:43   7   where we think that these -- these claims really read on,

11:27:49   8   you know, the HTTP standard at a very high level, and it's

11:27:53   9   just the standard sending and receiving of information

11:27:57  10   between, you know, standard components like a client and a

11:27:59  11   server, we just -- we want to know what their contention

11:28:02  12   is.

11:28:03  13         Luminati's response or position is really that

11:28:07  14   it's our burden to prove these things, and so they

11:28:10  15   shouldn't have to provide a response until their rebuttal

11:28:13  16   expert report.

11:28:14  17         But as you see in Slide 54, they take a different

11:28:19  18   position when it comes to their own interrogatories.  The

11:28:22  19   first one, you know:  Tell us every basis you have that you

11:28:25  20   aren't liable for infringement.

11:28:27  21         And the second is:  Tell us every basis that you

11:28:31  22   aren't liable for damages.

11:28:33  23         Now, Luminati has found some caselaw on this -- on

11:28:36  24   this issue of these contention interrogatories for which --

11:28:39  25   for issues that the propounding party has the burden to

11:28:43  1  prove.

11:28:46  2        You know, the -- the first -- and we think -- we

11:28:48  3  think these cases are distinguishable but also kind of

11:28:53  4  highlight the issue here.

11:28:53  5        The first one is a case from former Chief Judge

11:28:58  6  Davis, this SFA -- SFA System versus Amazon case.  And --

11:29:04  7  and if you look at that interrogatory -- and this -- this

11:29:08  8  is a case that came out before Rule 26(b) was amended, I

11:29:08  9  believe.

11:29:12  10        And if you look at that interrogatory, I think

11:29:17  11  that that really indicates why the case went the way it did

11:29:22  12  because if you read Judge Davis's opinion on this, he

11:29:25  13  doesn't cite any authority for the position that a -- that

11:29:28  14  a party with a burden of proof can't get a response to

11:29:31  15  their contentions.  He just -- he cites caselaw that says

11:29:35  16  that the party -- you know, that the Defendant has the

11:29:39  17  burden of proof on invalidity.

11:29:41  18        And -- but then, you know, he -- he looks at this

11:29:45  19  interrogatory, and I believe this is just an exercise of

11:29:47  20  discretion against a -- an extremely overbroad

11:29:52  21  interrogatory, asking the patentee, you know, for every

11:29:55  22  single patent-in-suit on an element-by-element basis, tell

11:29:59  23  us what your spec support -- your specification is, how

11:30:03  24  it's enabled, and what the best mode is.

11:30:05  25        That's -- that's different from the interrogatory

11:30:07   1   that we've asked, Your Honor.

11:30:08   2         If you -- if you move back to Slide 50, you will

11:30:12   3   see that what we're asking for is a description of where in

11:30:18   4   the patent they contend the claim limitations that we have

11:30:26   5   taken issue with are supported.

11:30:28   6         And I mean, quite literally, I think that an

11:30:31   7   adequate response to this interrogatory would be to take

11:30:33   8   each of our written description defenses that we've

11:30:36   9   outlined in our -- in our invalidity contentions and simply

11:30:40   10  provide column and line numbers of what the specification

11:30:42   11  support is.

11:30:43   12        I certainly respect Luminati's right to have their

11:30:49   13  expert respond to our invalidity expert's opinion on

11:30:54   14  written description, but Luminati shouldn't be able to

11:30:57   15  withhold, you know, what it -- what it -- where in the

11:31:02   16  specification they even claim or they -- they contend these

11:31:05   17  claims are supported.  That's something that we don't think

11:31:11   18  is necessarily pure expert opinion type of -- type of

11:31:15   19  information.

11:31:15   20        So -- and the -- the other case relates more to --

11:31:21   21  the other case that Luminati relies on is this -- is the

11:31:23   22  Mirror Worlds Technology versus Apple case.

11:31:28   23        And this one is more pertinent to -- to Teso's

11:31:33   24  interrogatory asking for Luminati's contention -- or

11:31:36   25  contentions in response to our prior art base invalidity

11:31:40   1   contentions, anticipation and obviousness.

11:31:44   2          And in this case, again, I believe that Mirror --

11:31:47   3   or, I'm sorry, it's versus Apple, but I think Microsoft is

11:31:50   4   actually the propounding party of this interrogatory.

11:31:53   5          In this particular case, we -- we, again, think

11:31:56   6   that this is a much broader interrogatory to what we've

11:32:00   7   propounded.

11:32:01   8          But if you move on to Slide 57, there's a couple

11:32:05   9   of interesting notes.  I want to say this is another Judge

11:32:08   10  Davis case.

11:32:08   11         THE COURT:  Let me --

11:32:12   12         MR. SCOTT:  You know, in Footnote 2 of that

11:32:13   13  case --

11:32:13   14         THE COURT:  Let me stop you, Mr. Scott.

11:32:15   15         MR. SCOTT:  -- the -- the Court notes that Mirror

11:32:15   16  World --

11:32:15   17         THE COURT:  Mr. Scott?

11:32:19   18         MR. SCOTT:  -- explains that Interrogatory No. 7

11:32:21   19  asks them to respond to 24 charts which identify 221 --

11:32:21   20         THE COURT:  Mr. Scott?

11:32:28   21         MR. SCOTT:  -- prior art references and --

11:32:29   22         THE COURT:  Mr. Scott, let me stop you for a

11:32:33   23  minute.  Let's -- let's move on in the interest of time --

11:32:33   24         MR. SCOTT:  I'm sorry, Your Honor, I cannot hear

11:32:35   25  anything that is being said.  Oh, no.

| | | |
|---|---|---|
| 11:32:39 | 1 | THE COURT:  Well, that's apparent. |
| 11:32:48 | 2 | MR. SCOTT:  It appears that I have lost all audio. |
| 11:32:51 | 3 | Can the Court hear me? |
| 11:32:54 | 4 | THE COURT:  Yes.  I'll give you a hand signal. |
| 11:32:57 | 5 | MR. SCOTT:  All right.  Well, that -- that, I |
| 11:33:00 | 6 | guess, is half the battle.  I -- would you prefer me to log |
| 11:33:03 | 7 | in and try to log back -- or try to log back in? |
| 11:33:08 | 8 | THE COURT:  Well, if you can't hear me, how am I |
| 11:33:10 | 9 | supposed to give you instructions? |
| 11:33:19 | 10 | MR. SCOTT:  I can't hear anything.  I see lots of |
| 11:33:23 | 11 | laughing at me. |
| 11:33:23 | 12 | THE COURT:  Mr. Callahan? |
| 11:33:23 | 13 | MR. SCOTT:  I can't hear anything. |
| 11:33:24 | 14 | THE COURT:  Do you want to take over, |
| 11:33:26 | 15 | Mr. Callahan?  Hello?  Can you hear me? |
| 11:33:36 | 16 | MR. SCOTT:  Can you hear me now? |
| 11:33:39 | 17 | THE COURT:  Yes. |
| 11:33:39 | 18 | MR. SCOTT:  Okay. |
| 11:33:41 | 19 | THE COURT:  Can you hear me? |
| 11:33:43 | 20 | MR. SCOTT:  What about now? |
| 11:33:44 | 21 | THE COURT:  Can you hear me? |
| 11:33:45 | 22 | MR. SCOTT:  Yes, Your Honor, I can. |
| 11:33:47 | 23 | THE COURT:  All right.  Let's move on to |
| 11:33:51 | 24 | Interrogatory 16 and 17, please. |
| 11:33:54 | 25 | MR. SCOTT:  Okay.  Yes.  So Interrogatory 16 and |

11:34:04  1  17, you know, we're really -- 16, I guess Luminati has kind

11:34:08  2  of grouped these together, but we -- we do see them as a

11:34:12  3  little bit different.

11:34:13  4        16 -- you know, we're simply asking:  What prior

11:34:17  5  art are you aware of that you have decided not to disclose

11:34:20  6  to the Patent and Trademark Office?

11:34:23  7        If -- if the answer is none, then -- then I think

11:34:25  8  we can move on.  But Luminati has taken this position that,

11:34:30  9  you know, that we think is at odds with certain rules of

11:34:36  10  the manual patent examination and procedure that if they

11:34:38  11  subjectively determine that something is duplicative or

11:34:42  12  immaterial, that they don't have to -- to cite it.

11:34:47  13        And -- and we just want to know what material

11:34:49  14  hasn't been disclosed other than obviously I have a feeling

11:34:53  15  that the now something like 28 additional family members in

11:34:59  16  the '319 patent family probably have still not been

11:35:03  17  disclosed in the '614 prosecution.  Maybe -- maybe that's

11:35:06  18  changed.

11:35:07  19        But that's -- that's Interrogatory No. 16.

11:35:10  20        THE COURT:  17?

11:35:11  21        MR. SCOTT:  Interrogatory No. 17, this goes

11:35:16  22  directly towards our inequitable conduct claim.  We -- you

11:35:19  23  know, we have a burden of showing what -- you know, most

11:35:23  24  likely, like most inequitable conduct claims is going to

11:35:27  25  be, circumstantial evidence that supports a reasonable

| | | |
|---|---|---|
| 11:35:30 | 1 | inference that -- that there was a specific intent to |
| 11:35:33 | 2 | deceive. |
| 11:35:34 | 3 | What we need to know -- I -- I think without |
| 11:35:40 | 4 | saying it, Luminati has basically told us that they did not |
| 11:35:43 | 5 | cite the '319 patent to the examiner.  But what we want to |
| 11:35:47 | 6 | know is what -- what's the reason?  If the reason is they |
| 11:35:50 | 7 | think it's immaterial, all right, we can work with that. |
| 11:35:54 | 8 | If the reason is that they don't think that the MPEP |
| 11:35:57 | 9 | applies on this issue, we can go with that. |
| 11:36:00 | 10 | But I think what we need is a sworn interrogatory |
| 11:36:03 | 11 | response that provides us this information, because, quite |
| 11:36:07 | 12 | frankly, I don't know where else we're going to get it |
| 11:36:09 | 13 | other than trying to depose the patent examiner who's in |
| 11:36:16 | 14 | Israel. |
| 11:36:16 | 15 | And on that note, you know, this isn't something |
| 11:36:21 | 16 | we've discussed with opposing counsel.  We'd commit to put |
| 11:36:24 | 17 | that examiner up for a one-hour deposition.  I could get |
| 11:36:27 | 18 | the information that way.  There -- there's a lot of ways |
| 11:36:27 | 19 | to get this information.  We just -- we just need a |
| 11:36:27 | 20 | response. |
| 11:36:31 | 21 | You know, Your Honor, just -- if I could have 30 |
| 11:36:33 | 22 | more seconds on Interrogatory 12 -- |
| 11:36:34 | 23 | THE COURT:  Why don't you cover -- |
| 11:36:36 | 24 | MR. SCOTT:  -- on that -- on that -- |
| 11:36:36 | 25 | THE COURT:  Why don't you cover 24, and then I'll |

11:36:38   1   give you 30 seconds after that on 12.

11:36:41   2          MR. SCOTT:   Thank you, Your Honor.

11:36:43   3          Thank you, Your Honor.

11:36:46   4          On 24, you know, Luminati -- Luminati tells the

11:36:49   5   world effectively, you know, we're -- we're in this market,

11:36:53   6   and Luminati and Teso are the two big -- biggest players in

11:36:57   7   this market.

11:36:58   8          And Luminati tells the world that they have this

11:37:01   9   hundred percent opt-in network, and they, you know,

11:37:04  10   insinuate that they're the only ones that have it and that

11:37:08  11   that makes their product better than ours.

11:37:11  12          So the information sought here goes directly to

11:37:15  13   lost profits, we think, and whether or not Luminati's

11:37:19  14   network really complies with this purported hundred percent

11:37:22  15   opt-in.

11:37:25  16          And we've highlighted incidences where basically

11:37:31  17   individuals with cell phones and laptops and stuff like

11:37:35  18   that that use Luminati's apps aren't actually provided an

11:37:39  19   instance where they have to consent to being made an exit

11:37:43  20   node in the network.

11:37:44  21          And so, what we're asking for is, you know, where

11:37:46  22   is it in your SK's terms of service, your software

11:37:55  23   development terms of service that actually requires

11:37:57  24   somebody to do this?

11:37:58  25          And what they've provided is they provided

11:38:01  1  information that says, you know, that -- where they require

11:38:04  2  their SDK partner to do so.

11:38:07  3       But what we have a problem with is we think it's

11:38:11  4  not being policed.  And we would like to know what is being

11:38:15  5  done to actually confirm that this statement is true.

11:38:18  6       THE COURT:  All right.  I'll give you your 30

11:38:21  7  seconds extra on Interrogatory 12 now.

11:38:26  8       MR. SCOTT:  Thank you, Your Honor.

11:38:26  9       So the point being when I lost audio was that in

11:38:30  10  the Mirror Worlds case, they had 24 charts with 221

11:38:34  11  references.  In this case, we have 13 charts with six

11:38:37  12  references.

11:38:37  13       Luminati is counting the interrogatory as two

11:38:40  14  interrogatories to begin with.  And all we're asking -- we

11:38:44  15  think that we're within the bounds of what they should

11:38:49  16  respond to.

11:38:51  17       The Mirror Worlds case, the way it was resolved is

11:38:55  18  the parties agreed that the Plaintiff would agree to

11:38:56  19  respond to five of the charts.

11:38:58  20       If Luminati would agree to that and we could pick

11:39:01  21  which five charts, I think we could resolve that issue.

11:39:05  22       THE COURT:  All right.

11:39:06  23       MR. SCOTT:  Did I stay under my 30 seconds?

11:39:11  24       THE COURT:  Pretty close.  All right.

11:39:12  25       MR. SCOTT:  Thank you, Your Honor.

11:39:12    1            THE COURT:  Counsel, before I hear a response from

11:39:14    2   Luminati, we're going to take about a five-minute recess,

11:39:17    3   and then we'll come back, and then I'll hear from Luminati

11:39:20    4   in response.

11:39:20    5            The Court stands in recess.

11:39:24    6            MR. CALLAHAN:  Thank you, Your Honor.

11:39:26    7            MR. HARKINS:  Thank you, Your Honor.

11:48:14    8            (Recess.)

11:48:14    9            THE COURT:  Welcome back.  Do we have everybody so

11:48:17   10   we can proceed?

11:48:17   11            All right.  Then let's return to Teso's motion to

11:48:22   12   compel interrogatory responses, Document 150 in the 395

11:48:25   13   case, and let me ask for a response from Luminati.

11:48:29   14            MR. HARKINS:  Robert Harkins on behalf of

11:48:34   15   Luminati.  Thank you, Your Honor.

11:48:35   16            In our slide set that we've been using today, our

11:48:39   17   response really starts at Slide 79.  I -- as a -- this sort

11:48:43   18   of has an overview of the -- the interrogatories they

11:48:49   19   complained about.

11:48:49   20            So to just frame -- frame this discussion quickly,

11:48:53   21   you heard a lot about the fact that we objected to subparts

11:48:56   22   and what we're not doing.

11:48:57   23            And just to be clear about this, there's no

11:49:00   24   dispute here.  Luminati did not refuse to answer an

11:49:03   25   interrogatory.  We -- we did provide answers to every

11:49:05  1   single interrogatory and every single subpart.

11:49:09  2          And at this point, it's less than 30 days from the

11:49:11  3   close of discovery, and no more interrogatories have been

11:49:14  4   presented.

11:49:16  5          So the subpart issue, we think, is just mooted

11:49:19  6   anyway.  But we think we did this appropriate, but we're

11:49:22  7   past the date we could receive any more interrogatories, so

11:49:26  8   we don't think that's an issue.

11:49:28  9          So we did answer the interrogatories, and we did

11:49:31  10  not withhold information on the basis that there were too

11:49:34  11  many or anything like that.

11:49:35  12         Going to -- if we look at that first one,

11:49:41  13  Interrogatory No. 4, this is -- this is just an

11:49:44  14  interrogatory asking about conception and reduction to

11:49:46  15  practice.  We provided the dates for that.

11:49:48  16         If you go to Slide 80, you'll see we said at least

11:49:52  17  as early as October 8th, 2009, that is the filing date with

11:49:56  18  the provisional for that patent.  And so, we weren't (audio

11:49:56  19  drops) --

11:49:56  20         THE COURT:  We lost you, Mr. Harkins.

11:50:10  21         MR. HARKINS:  -- not claiming an earlier date, so

11:50:13  22  as -- as far as --

11:50:15  23         THE COURT:  I lost you -- I lost you --

11:50:18  24         MR. HARKINS:  Hello?

11:50:18  25         THE COURT:  I lost you on my end for about 10 or

11:50:21   1   12 seconds.

11:50:22   2           MR. HARKINS:  Oh, okay.

11:50:22   3           THE COURT:  Start over on Interrogatory 4, please.

11:50:26   4           MR. HARKINS:  Right.  We -- we provided an answer

11:50:32   5   that gave the dates for the conception and reduction to

11:50:35   6   practice.  As to the one date, it was October 8th, 2009,

11:50:40   7   which is the filing date of the provisional.

11:50:43   8           And the other date we gave the best information we

11:50:47   9   had, and we cite this -- the Beasley case as showing that

11:51:00  10   that -- that type of answer is appropriate (audio drops) --

11:51:07  11           THE COURT:  Let me stop you, Mr. Harkins.

11:51:09  12   You're -- I'm not -- I'm not hearing you.

11:51:11  13           I did hear somebody's dog bark, but you are

11:51:16  14   stopping for segments of seven, eight seconds, and then I

11:51:20  15   hear a little garbled sound, and then there's silence for

11:51:24  16   another seven or eight seconds.

11:51:26  17           MR. HARKINS:  Okay.  I apologize, Your Honor.

11:51:31  18   Maybe what would be best is for me to just call in very

11:51:34  19   quickly to establish a different audio.

11:51:36  20           THE COURT:  That'd be fine.  Why don't you do

11:51:39  21   that.

11:52:13  22           All right.  We're off the record waiting for

11:52:15  23   Mr. Harkins to join us back in some form or another.

11:52:23  24           The wonderful world of virtual hearings.

11:52:28  25           Mr. Scott, while we're off the record, tell me

11:52:31   1   what that is on your wall.  Are those mountains or

11:52:34   2   pyramids?  I've been trying to figure it out for the last

11:52:37   3   hour.

11:52:38   4           MR. SCOTT:  I'm sorry, Your Honor.  These are

11:52:40   5   mountains.  This is a mural that a friend painted.  This

11:52:47   6   used to be my -- my son's nursery.

11:52:47   7           THE COURT:  Okay.

11:52:50   8           MR. SCOTT:  So as the family has grown, we've

11:52:54   9   played some roulette in this house.

11:52:56   10          THE COURT:  Mr. Harkins, are you back with us?

11:52:57   11          MR. HARKINS:  This is Mr. Harkins.  I'm back on.

11:52:59   12  Hopefully you can hear me now.

11:53:00   13          THE COURT:  I can hear you.  And for some reason

11:53:03   14  we've got a frozen picture of your smiling face, so we'll

11:53:06   15  go back on the record.  Why don't you continue,

11:53:08   16  Mr. Harkins.

11:53:10   17          MR. HARKINS:  All right.  Thank you, Your Honor.

11:53:12   18          So for Interrogatory No. 4, we provided the

11:53:15   19  conception and reduction to practice dates that we have.

11:53:19   20          For one patent set, we -- we are relying on the

11:53:22   21  filing date of October 8th, 2009.  And based on input that

11:53:29   22  we have on the second one, we -- we provided the best

11:53:34   23  estimate of conception and reduction of practice in

11:53:38   24  mid-2012.

11:53:38   25          You know, so as far as being able to determine

11:53:40   1   what is relevant or not relevant prior art based on our

11:53:43   2   (beeping), we provided -- we provided that.

11:53:45   3          We cited the case Beasley versus Avery Dennison as

11:53:50   4   showing that that is an appropriate way to go about

11:53:55   5   responding to this -- this type of request.

11:53:57   6          And I will say further, to the extent that there

11:53:59   7   was a discussion of wanting to get a fuller story about the

11:54:03   8   invention, in this instance, we have also agreed to be able

11:54:09   9   to rely on depositions that were provided in the last case.

11:54:15  10   And those inventors -- named inventors of the patents in

11:54:17  11   this case were deposed in the last case.

11:54:22  12          So it's not like they are lacking for information

11:54:25  13   about -- about the invention story and what was done that

11:54:29  14   led to the '614 patent, for example.

11:54:32  15          And the -- and they're going to have an

11:54:34  16   opportunity in a couple weeks here to talk to these

11:54:36  17   inventors again and -- and fill in whatever they think they

11:54:39  18   need to fill in as far as the invention story regarding the

11:54:42  19   earlier patents.

11:54:43  20          And I will note that the earlier patents were

11:54:45  21   discussed even in the depositions that were previously

11:54:48  22   taken because that was asserted as prior art in the last

11:54:51  23   case.

11:54:51  24          THE COURT:  Let's -- let's go on -- let's go on --

11:54:54  25          MR. HARKINS:  We think that --

11:54:55   1          THE COURT:  -- let's go on to Interrogatories 12

11:54:57   2   through 14, please.

11:54:58   3          MR. HARKINS:  Okay.  So, you know, these are --

11:55:02   4   these are situations in which we -- you know, everybody --

11:55:06   5   I've been involved in many of these -- many patent cases,

11:55:10   6   and everybody always asks people to provide information to

11:55:14   7   respond to things they're required to do under the patent

11:55:16   8   rules.

11:55:16   9          And people give some response, and it's usually a

11:55:20  10   version of, you know, it's your burden of proof, and you

11:55:23  11   need to -- we don't think you've met it, and you need to do

11:55:25  12   a better -- you need to do better or more.

11:55:28  13          And -- and in that instance -- you know, so let's,

11:55:33  14   for example, discuss that we, Luminati, have made a request

11:55:35  15   for them to tell us why we don't -- why -- why -- you know,

11:55:44  16   they (beeping) -- well, the response that we got for why

11:55:47  17   they don't infringe was a version of because we think your

11:55:50  18   patent claims are invalid and because you didn't meet your

11:55:56  19   burden of proving that we infringe.  There was no charging

11:55:59  20   done or anything like that.  That is -- this happens in

11:56:04  21   every patent case.

11:56:05  22          You'll -- you'll note that -- you'll note that --

11:56:08  23   that Mr. Scott didn't say they have any law to support

11:56:11  24   their position that we need to respond or give more

11:56:15  25   information than we provided.

11:56:16   1          Instead, we cited the only law cited as to this

11:56:19   2   issue, and it in both cases went our way, and -- and

11:56:22   3   Mr. Scott was trying to distinguish those cases.

11:56:23   4          But the reality is that the -- the type of

11:56:26   5   responses that we've given, given that we don't have the

11:56:30   6   burden of proof, and -- and we disagree with the assessment

11:56:32   7   that has been made, are appropriate.

11:56:34   8          The -- the other thing I will say here is that --

11:56:38   9   and if we -- and do we have Slides 81 through 86 that --

11:56:47   10   that deal with these issues.

11:56:48   11          But really this is premature, and we heard about

11:56:52   12   these charts -- we heard about these charts that have --

11:56:55   13   that have been served on us.

11:56:57   14          We received 791 pages of invalidity contentions in

11:57:00   15   this case.  So we don't know what they're going to end up

11:57:05   16   relying on.  There was a funnel process that we're all

11:57:08   17   familiar with.

11:57:09   18          We think that the attacks would force us to give

11:57:12   19   them more information about things that they have a burden

11:57:15   20   on is premature and not supported by the practice in really

11:57:19   21   any of the courts that I practice any patent law in.

11:57:21   22          With response to the eligibility issue, they --

11:57:21   23   that has been briefed in this -- in this court.

11:57:30   24          You know, that -- that is already -- we -- we

11:57:30   25   stated our position.  These are not facts that the company

11:57:33  1  has.   These are legal positions.

11:57:35  2       And in this case, because of the Court's rules

11:57:41  3  regarding the situation, we've already briefed this issue.

11:57:43  4       Not only that, but as far as other issues

11:57:45  5  regarding support for the claims and what they mean, we

11:57:48  6  just did a Markman hearing two days ago where all of that

11:57:53  7  was briefed and set out.

11:57:53  8       And I -- Mr. Toliver from -- from Mr. Scott's firm

11:57:56  9  and I spent the better part of three hours and maybe more

11:58:00 10  with Magistrate Judge Payne talking about these issues

11:58:00 11  and -- and setting out our legal positions.

11:58:02 12       So in that situation, we don't understand why

11:58:06 13  there would be an obligation for us to do any more than

11:58:09 14  we've done as far as responding to these interrogatories.

11:58:12 15       And we're -- we're sort of nearing the -- the end

11:58:15 16  of discovery, and we're going to be issuing expert reports,

11:58:18 17  and -- and we're going to be rebutting them.

11:58:19 18       And once we know what it is they're really relying

11:58:22 19  on out of that 791 pages, you know, we will be responding

11:58:26 20  accordingly.

11:58:27 21       And that's what we expect them to do with -- with

11:58:30 22  response to our infringement contentions.  And that's why

11:58:34 23  we're not moving to compel their response, even though they

11:58:37 24  didn't chart responses.

11:58:38 25       We know the patent rules don't require charting

11:58:42  1  and don't require that level of specificity for the party

11:58:45  2  that doesn't have the burden of proof.

11:58:46  3            THE COURT:  All right.  How about Interrogatory 16

11:58:48  4  and 17?

11:58:49  5            MR. HARKINS:  Okay.  For 16 and 17, they just --

11:58:52  6  16 -- this is Slide 87 of our set.

11:58:56  7            It just asked when -- when we knew about the prior

11:58:59  8  art references and whether they were disclosed and what --

11:59:02  9  and we're relying on the disclosures that we made.  We

11:59:05  10  don't have independent -- like recollection.

11:59:07  11            Mr. Scott pointed out -- or in the last

11:59:10  12  presentation that there is a lot of patent activity going

11:59:14  13  on with Luminati.

11:59:15  14            He -- he showed -- I think some of the slides

11:59:18  15  showed 20 or even 30 different applications pending at

11:59:22  16  various points related to one family that -- that was

11:59:26  17  discussed here.

11:59:27  18            So we've -- we've -- you know, our people at the

11:59:29  19  company, they rely on their patent attorneys.  They send

11:59:32  20  the information out, the information gets disclosed, it

11:59:35  21  becomes a matter of the record, and -- and we're relying on

11:59:38  22  that record in response to 16 and 17.

11:59:42  23            Like that is what we did.  We -- we -- we

11:59:45  24  disclosed what we disclosed in the record.  And if it

11:59:49  25  wasn't in the record, then it was -- then it wasn't --

11:59:50  1  obviously, wasn't disclosed.

11:59:52  2          So I'm not sure what else there is to be said in

11:59:55  3  response to that -- those -- those interrogatories.

12:00:00  4          There was no decision made to withhold anything.

12:00:03  5  It's just what was disclosed was disclosed.  And so, that

12:00:07  6  was the answers for 16 and 17.

12:00:09  7          THE COURT:  All right.  How about 24, what's your

12:00:11  8  position?

12:00:12  9          MR. HARKINS:  Yes.  So 24, if you look at the

12:00:15  10  interrogatory, this is on Slide 89.  It says:  Describe

12:00:18  11  with particularity whether your residential network is

12:00:21  12  100 percent opt-in, complying with all laws and

12:00:27  13  regulations, and include in your answer an identification

12:00:29  14  of all apps or programs that you have included your SDK --

12:00:37  15  and -- that have included your SDK and identify where in

12:00:37  16  such apps or programs terms or conditions or similar terms

12:00:41  17  or conditions have included an opt-in provision.

12:00:41  18          So we -- we have a lot of -- so what we did -- we

12:00:46  19  were talking about a very large set of documents.

12:00:48  20          They want us to prove everything we've ever done

12:00:51  21  complies with laws and regulations.  And so, what we did

12:00:54  22  was we provided information showing our user and license

12:00:59  23  agreement that has opt-in compliance.

12:01:03  24          We've identified the apps or programs that include

12:01:05  25  our SDK and provided copies of those.  And we identified

12:01:11  1    terms and conditions that show that there's opt-in.

12:01:15  2            And -- and we've given -- you know, we cited 33(d)

12:01:20  3    for a lot documents that relate to this because it's such a

12:01:21  4    broad and encompassing interrogatory.

12:01:23  5            But it's not like we refused to answer the

12:01:26  6    interrogatory.  We -- we absolutely answered the

12:01:29  7    interrogatory.

12:01:29  8            THE COURT:  All right.  Mr. Scott, do you have a

12:01:36  9    brief reply?

12:01:38 10            MR. SCOTT:  Yes, Your Honor, a brief reply.

12:01:44 11            Honestly, I think I'll just limit the brief reply

12:01:50 12    to Interrogatories 12 through 14, and then just one quick

12:01:54 13    point on the protective order and confidential (beeping).

12:01:59 14            With respect to 12 and 14, we -- we disagree that

12:02:02 15    the Mirror Worlds case went their way.  Like I said, it was

12:02:05 16    resolved in -- with the Plaintiff agreeing to provide

12:02:11 17    responses to five charts.

12:02:12 18            And other than that, we just -- we don't think

12:02:16 19    that they have caselaw that provides a basis other than --

12:02:20 20    other than the one -- Judge Davis's decision which very

12:02:25 21    much appears to be a discretionary decision, so we would

12:02:31 22    say it's within Your Honor's discretion to -- whether or

12:02:35 23    not to compel a response to these interrogatories.

12:02:37 24            But we -- we do think there should be at least

12:02:38 25    some sort of middle ground and get some type of response.

12:02:42   1          But to the extent that we aren't required -- or

12:02:45   2     that they aren't required to respond to 12 -- to

12:02:48   3     Interrogatories 12 and 14, I think what I'm hearing from

12:02:52   4     Mr. Harkins is that they aren't expecting a response from

12:02:56   5     us to Interrogatories 13 and 15 either.

12:02:58   6          I -- I guess if that's -- if that's the way the

12:03:01   7     Court rules, then that -- that would be the way to handle

12:03:05   8     it.

12:03:05   9          In terms of -- just real quickly on the protective

12:03:12  10     order and confidentiality objections -- this is my

12:03:15  11     Slide 64 -- you know, we've -- we've -- we've received --

12:03:21  12     we think we've received the information from them, but --

12:03:25  13     but, you know, they -- they make this statement in the

12:03:27  14     joint -- in the joint report we sent to the Court, Luminati

12:03:30  15     has represented that it is withholding relevant

12:03:34  16     information, including this BI Science material.

12:03:37  17          And really we're just wondering, you know, what

12:03:40  18     other relevant information is Luminati withholding.  And if

12:03:43  19     it isn't, can it just say so, and then we can put that

12:03:47  20     issue to bed.

12:03:48  21          Thank you, Your Honor.

12:03:49  22          THE COURT:  All right.  Thank you, counsel.

12:03:50  23          We're at 12:00 o'clock, counsel, but let me ask

12:03:59  24     this.  We've not taken up Luminati's motion to dismiss

12:04:04  25     Teso's amended complaint, Document 20, on the 73 case.

12:04:08   1          It's apparent to the Court that a lot of the

12:04:12   2   arguments here are going to be duplicative of the arguments

12:04:19   3   that I heard on the first motion that we began with,

12:04:24   4   Luminati's motion to dismiss.

12:04:28   5          I'm happy to address this on the papers unless

12:04:32   6   anybody feels there's something very unique and very

12:04:34   7   important that's buried in this motion that we haven't

12:04:37   8   touched on otherwise and you want to take a minute apiece

12:04:44   9   or two minutes apiece and touch on it.

12:04:46  10          Is everyone satisfied that this is effectively

12:04:49  11   subsumed in our earlier arguments, or does anybody contend

12:04:53  12   there's something unique and not otherwise addressed that

12:04:55  13   the Court needs to hear from you on very briefly on this

12:04:59  14   motion?

12:04:59  15          MR. HARKINS:  So this is Robert Harkins on behalf

12:05:04  16   of Luminati, the movant on this.

12:05:07  17          We would agree that the entire discussion of

12:05:11  18   Noerr-Pennington and sham, it relates here.  The claims are

12:05:14  19   still based on patent enforcement activities.  So that is

12:05:18  20   an overlap.

12:05:21  21          We have made arguments obviously in the briefs,

12:05:24  22   and we have put them in our slide set -- the second slide

12:05:29  23   set, at Slides 26 through 33 as to why independently of

12:05:34  24   Noerr-Pennington, those types of claims like Lanham Act,

12:05:38  25   patent false marking, tortious interference, that there's

12:05:42  1  no claim -- business disparagement and defamation that they

12:05:47  2  failed to make a claim.

12:05:48  3          We -- the discussion about those claims, if Your

12:05:50  4  Honor would like to review those slides and their competing

12:05:54  5  slides and -- and rule on the papers, we would be willing

12:05:57  6  to do that.

12:05:57  7          THE COURT:  I've -- I've made a note of those

12:05:59  8  particular slides you mentioned.

12:06:00  9          Anything from Teso on this?

12:06:03  10         MR. SIBLEY:  This is Mitchell Sibley from Teso,

12:06:03  11  Your Honor.

12:06:08  12         We're satisfied the briefing -- we have slides, as

12:06:13  13  well, that discuss -- that counter the argument that

12:06:15  14  Luminati just made that provides support and citations to

12:06:18  15  where we -- where we cite facts in our complaint.  And we

12:06:22  16  would rest on our briefing and on those slides, as well.

12:06:25  17         THE COURT:  All right.  Thank you, Mr. Sibley.

12:06:27  18         Counsel, my inclination is to go back and give you

12:06:32  19  some high-level guidance verbally and on the record just

12:06:36  20  because I think both parties would benefit from that at

12:06:42  21  this juncture without a delay.

12:06:44  22         My intention, however, lest there be -- lest there

12:06:48  23  be any doubt, is to follow today's hearing with a written

12:06:52  24  order memorializing the precise nature and basis for the

12:06:56  25  rulings that I'm going to give you.

12:06:57  1         You should take both what I'm telling you now on

12:07:01  2    the record and what you see in my following written order

12:07:04  3    as the Court's complete guidance on these issues, but I

12:07:08  4    don't see any merit to making you wait.

12:07:13  5         And I'm not purporting that this will be

12:07:15  6    absolutely everything you'll see in the written order.  But

12:07:18  7    as I say, I want to give you high-level, broad-based

12:07:21  8    guidance at this point.

12:07:23  9         So with that, on -- on Luminati's motion to

12:07:29  10   dismiss third amended counterclaims and third amended

12:07:33  11   third-party complaint, Document 102 in the 395 case, I'm

12:07:38  12   going to deny Luminati's motion based on Noerr-Pennington

12:07:42  13   immunity.

12:07:44  14        I think whether or not this is a sham patent

12:07:49  15   litigation at this pleading stage is premature.

12:07:54  16        I'm going to deny Luminati's motion with regard to

12:07:57  17   the monopolization and attempted monopolization claims.

12:08:02  18        However, I'm going to grant Luminati's motion with

12:08:06  19   regard to the combination and conspiracy claims in Count 3

12:08:10  20   and the conspiracy to monopolize claims in Count 4,

12:08:14  21   primarily because I -- I do not find that there are

12:08:18  22   separate decision makers involved.  It appears to be one --

12:08:22  23   in reality one combined actor.

12:08:27  24        I'm going to deny the motion on the breach of

12:08:31  25   contract counterclaim.  I think Teso, Oxy -- Oxylabs,

12:08:37  1   whoever we want to call them, has pled sufficient facts to

12:08:41  2   meet the Twombly standard at this juncture.

12:08:45  3           And I'm going to deny the motion on the

12:08:47  4   inequitable conduct counterclaim.  I think there have been

12:08:52  5   sufficient facts pled to support at least a reasonable

12:08:56  6   inference of the intent necessary -- intent to deceive

12:09:00  7   necessary here.

12:09:01  8           On Luminati's motion in the alternative to sever

12:09:08  9   and stay, Document 125 in the 395 case, I'm going to deny

12:09:12 10   that motion within the Court's discretion as a matter of

12:09:18 11   case management.

12:09:18 12           With regard to the motion to compel, Document 150,

12:09:24 13   in the 395 case, with regard to Interrogatory 4, in a

12:09:33 14   general sense I'm going to deny this, but I want to make it

12:09:36 15   clear Luminati cannot rely on its "at least as early as"

12:09:43 16   answer as a basis to later claim an earlier date for

12:09:49 17   conception and reduction to practice.

12:09:51 18           If you're going to claim an earlier date for

12:09:54 19   conception and reduction to practice, you're going to have

12:09:57 20   to say so specifically.  This kind of general disclaimer of

12:10:01 21   "at least as early as" does not open the door to that in

12:10:03 22   the Court's view.

12:10:04 23           Regarding Interrogatories 12 through 14, I'm

12:10:07 24   aware -- I'm aware that on Tuesday of this week, the

12:10:12 25   parties argued claim construction to Magistrate Judge

12:10:16  1   Payne.

12:10:16  2           I would simply say that I think there is a good

12:10:19  3   chance, based on the resulting claim construction order

12:10:24  4   that he will put out, that there'll be a need to supplement

12:10:27  5   here, and I expect the parties to supplement as mandated or

12:10:30  6   necessitated by the claim construction order.

12:10:34  7           On 16, I -- I believe -- I'm persuaded that this

12:10:41  8   request is overbroad.  I'm going to deny the motion.

12:10:47  9           With regard to 17, I really don't see that there's

12:10:51  10  any reason to believe Luminati has more information than it

12:10:55  11  has disclosed with the answer it's given.

12:10:59  12          But I want to make it clear to Luminati, if that's

12:11:02  13  not the case, you have a duty to supplement.  And I'm going

12:11:04  14  to enforce that duty to supplement, both now and as

12:11:07  15  additional information may come to light going forward.

12:11:09  16          And with regard to Interrogatory 24, essentially,

12:11:17  17  I'm going to deny this. But to the extent there are any

12:11:20  18  opt-in provisions presented to users as opposed to SDK

12:11:27  19  partners, Luminati has got to produce those and disclose

12:11:30  20  all that.

12:11:30  21          With regard to the dispute about confidential

12:11:42  22  information, it's unclear to me from the responses given

12:11:45  23  what remaining responses might be prohibited by the BI

12:11:50  24  Science or BI Science protective order.

12:11:56  25          Here, again, there's a continuing obligation to

12:11:58  1    supplement.  And to the extent that there are -- there are

12:12:03  2    other responses necessary, I'll expect those to be

12:12:05  3    supplemented.

12:12:07  4         I think the discrete subpart issue may well be

12:12:11  5    moot given where we are, but to the extent it's not, I

12:12:17  6    don't find that any of the interrogatories objected to

12:12:21  7    contain discrete subparts.  It's my belief that all the

12:12:26  8    subparts were related, if that guidance is helpful to you.

12:12:30  9         With regard to the motion to dismiss in

12:12:33  10   the 73 case, I think you will probably have a good idea

12:12:38  11   from what I've already told you where my ultimate rulings

12:12:42  12   will be there.

12:12:42  13        But given that I'm going to review further and

12:12:45  14   take up this motion on the papers, you should look to my

12:12:49  15   written order for precise guidance in this regard.

12:12:52  16        With that, counsel, that should be hopefully some

12:12:59  17   high-level guidance that will allow you to move forward

12:13:02  18   immediately without any delays waiting on the Court to

12:13:05  19   provide you a written order, although you can look for a

12:13:08  20   written order with these and additional details laid out as

12:13:11  21   soon as I can feasibly get to it and get it out the door.

12:13:15  22        Unless there's something further, that will

12:13:17  23   complete the hearing before the Court this morning.

12:13:21  24        Despite the glitches, we were able to get through

12:13:26  25   everything.  I thank you for your argument, and you are

12:13:29  1  excused.

12:13:31  2              MR. HARKINS:  Thank you, Your Honor.

12:13:32  3              MR. CALLAHAN:  Thank you, Your Honor.

12:13:33  4              MR. SCOTT:  Thank you, Your Honor.

12:13:39  5              MR. SIBLEY:  Thank you, Your Honor.

          6              (Hearing concluded.)

          7

          8

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

1                      <u>CERTIFICATION</u>

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9     /S/ Shelly Holmes_____          11/20/2020_
      SHELLY HOLMES, CSR, TCRR            Date
10    OFFICIAL REPORTER
      State of Texas No.: 7804
11    Expiration Date: 12/31/20

12

13

14

15

16

17

18

19

20

21

22

23

24

25