IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| Luminati Networks Ltd., <br><br> Plaintiff, <br><br> v. <br><br> Teso LT, UAB, Oxysales, UAB, and Metacluster LT, UAB, <br><br> Defendants. | Civil Action No. <br> 2:19-cv-00395-JRG <br><br><br> FILED UNDER SEAL |

**OXYLABS' MOTION TO STRIKE
EXPERT OPINIONS OF STEPHEN L. BECKER, PH.D.**

SIEBMAN, FORREST,
BURG & SMITH LLP

MICHAEL C. SMITH

CHARHON CALLAHAN
ROBSON & GARZA, PLLC

STEVEN CALLAHAN
CRAIG TOLLIVER
GEORGE T. "JORDE" SCOTT
MITCHELL SIBLEY

*Counsel for Teso LT, UAB, Oxysales, UAB,
and Metacluster LT, UAB*

January 25, 2021

# **TABLE OF CONTENTS**

I.      Introduction ........................................................................................................ 1

II.     Facts .................................................................................................................... 1

        A.      Lost Profit Facts ...................................................................................... 2

        B.      Reasonable Royalty Facts ........................................................................ 9

III.    *Daubert* Standard ............................................................................................. 10

IV.     The Court Should Strike Dr. Becker's Lost-Profits Opinion ............................ 10

        A.      Lost Profits Standard ............................................................................. 10

        B.      Dr. Becker's Lost-Profits Opinion Is Unreliable And The Court Should
                Strike It .................................................................................................. 12

                1.      Dr. Becker's "No" Acceptable Non-Infringing Alternatives Opinion
                        Is Unreliable .............................................................................. 12

                2.      Dr. Becker's Opinion Contradicts The Law of Demand And Is
                        Thus Unreliable ......................................................................... 14

V.      The Court Should Strike Dr. Becker's Reasonable-Royalty Opinion ............... 16

        A.      Reasonable Royalty Standard ................................................................ 16

        B.      Dr. Becker's Reasonable-Royalty Opinion Is Unreliable And The Court
                Should Strike It ...................................................................................... 17

                1.      Dr. Becker's Royalty Does Not Reflect The Patents' Incremental
                        Value To The Accused Products And Thus Fails To Comply With
                        The Apportionment Requirement ................................................ 17

                2.      Dr. Becker Impermissibly Injects Luminati Into The Bargaining Room ....... 20

                3.      Dr. Becker "Reasonable" Royalty Is Unreliable On Its Face ........................ 21

VI.     Conclusion ........................................................................................................ 22

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*BIC Leisure Products, Inc. v. Windsurfing Int'l, Inc.,*
  1 F.3d 1214 (Fed. Cir. 1993) ................................................................................14, 15

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.,*
  246 F.3d 1336 (Fed. Cir. 2001) ........................................................................11, 12, 15

*Daubert v. Merrel Dow Pharm., Inc.,*
  509 U.S. 579 (1993) ........................................................................................10, 12, 16

*Ericsson, Inc. v. D-Link Sys., Inc.,*
  773 F.3d 1201 (Fed. Cir. 2014) ..............................................................................17, 18

*Exmark Mfg. Co. v. Briggs & Stratton Power Products Group, LLC,*
  879 F.3d 1332 (Fed. Cir. 2018) ..............................................................................17, 22

*Fuji Photo Film Co. v. Jazz Photo Corp.,*
  249 F. Supp. 2d 434 (D.N.J. 2003) ................................................................................14

*Garretson v. Clark,*
  111 U.S. 120 (1884) ........................................................................................................16

*Gen. Elec. Co. v. Joiner,*
  522 U.S. 136 (1997) ........................................................................................................16

*Georgia-Pac. Corp. v. U.S. Plywood Corp.,*
  318 F. Supp. 1116 (S.D.N.Y. 1970) ..............................................................................22

*Grain Processing Corp. v. Am. Maize-Prods. Co.,*
  185 F.3d 1341 (Fed. Cir. 1999) ..............................................................................11, 14

*Hathaway v. Bazany,*
  507 F.3d 312 (5th Cir. 2007) ..............................................................................15, 16

*Mahurkar v. C.R. Bard, Inc.,*
  79 F.3d 1572 (Fed. Cir. 1996) ........................................................................................20

*Mentor Graphics Corp. v. EVE-USA, Inc.,*
  851 F.3d 1275 (Fed. Cir. 2017) ..............................................................................11, 14

*Oracle Am., Inc. v. Google Inc.,*
  798 F. Supp. 2d 1111 (N.D. Cal. 2011) ........................................................................21

*Rite-Hite Corp. v. Kelley Co.,*
  56 F.3d 1538 (Fed. Cir. 1995) (en banc) ..............................................................10, 11

*Syneron Med. Ltd. v. Invasix, Inc.*,
  16-CV-00143, 2018 WL 4696969 (C.D. Cal. Aug. 27, 2018) ................................................21

*SynQor, Inc. v. Artesyn Techs., Inc.*,
  709 F.3d 1365 (Fed. Cir. 2013)...................................................................................12, 13, 14

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011)...................................................................................10, 16, 22

*Versata Software, Inc. v. SAP Am., Inc.*,
  717 F.3d 1255 (Fed. Cir. 2013).................................................................................................11

*VirnetX, Inc. v. Cisco Systems, Inc.*,
  767 F.3d 1308 (Fed. Cir. 2014)...................................................................................16, 17, 22

**STATUTES**

35 U.S.C. § 284.................................................................................................................................16

**OTHER AUTHORITIES**

Fed. R. Evid. 702 ...........................................................................................................................10

Defendants Teso LT, UAB, Oxysales, UAB, and Metacluster LT, UAB (collectively, "Oxylabs") file this Motion to Strike Expert Opinions of Stephen L. Becker, Ph.D.:

## I.    INTRODUCTION

Dr. Becker's lost-profits opinion is that Luminati would have captured *all* of Oxylabs' accused traffic ██████████████████████████████████████ ████████████████████. The opinion is unreliable as it (i) is contradicted by the evidence in this case demonstrating that several acceptable non-infringing alternatives exist and (ii) violates the law of demand that holds that, when prices increase, demand decreases.

Dr. Becker's reasonable-royalty opinion—████████████████████████████████ ████████████████████████████████████████████████████ ████████████████—is similarly unreliable. The opinion (i) violates the Federal Circuit's apportionment requirement by, e.g., failing to properly account for the actual incremental value allegedly attributable to the asserted patents, (ii) is premised on the wrong parties being at the hypothetical negotiation, and (iii) impermissibly concludes that Oxylabs would have agreed to pay a royalty ████████████████████████████████████████████ ████████████████████████████████████████████████ ████. The Court should not permit "expert" testimony that contradicts the facts of the case, economic reality, and Federal Circuit precedent.

## II.    FACTS

1.    Luminati's damages expert, Stephen Becker, Ph.D., proffered (i) a lost-profits damages opinion and (ii) a reasonable-royalty damages opinion.

2.    Dr. Becker opines that Oxylabs owes Luminati damages ████████████████ ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████. Ex. 19-A at 34.

**A.**   **Lost Profit Facts**

3.   ████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████ ████████████████

████████████████████████████████████████████████████

4.   ████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████

5.   Dr. Becker did not speak with any Oxylabs customers, nor were any Oxylabs customers deposed in this case. Ex. 3 at 12:2-4. Dr. Becker also did not conduct any surveys—of Oxylabs' customers, competitors, or otherwise—to support his opinions. *Id.* at 12:17-19. Dr.

---

[1]   ████████████████████████████████████████████████████████

[2]   Dr. Becker did not use a "market share" (*Mor-Flo*) approach to determine lost profits. Ex. 1 at ¶ 68; Ex. 3 at 76:2-9.

Becker further did not analyze the prices charged by the third-party competitors in the market-

place. Ex. 3 at 99:23-100:13.

      6.     The evidentiary record is replete with examples of customers in the marketplace

caring about price. For example:



- ▪ Dr. Becker does not disagree with Frost & Sullivan's conclusion that customers in the IP Proxy network space are an 8/10 when it comes to price sensitivity. Ex. 4 at 176:20-177:5; Ex. 15 at 6.

- ▪ Dr. Becker acknowledges that, all things being equal, Oxylabs' and Luminati's customers would prefer paying less for residential IP products. Ex. 3 at 76:16-77:10, 78:2-18.

7. Dr. Becker applied the *Panduit* factors to reach his lost-profits opinion, Ex. 1 at ¶¶ 45-47, 53, 79, 89, 100, which require the patent holder to prove, among other things, that no acceptable non-infringing alternatives exist. *Id.* at 45.

8. There are numerous competitors in the IP proxy marketplace. Dr. Becker relies on a Frost & Sullivan report ███████████████████████ that indicates that there are at least 21 competitors in the IP proxy marketplace. Ex. 1 at ¶ 69; Ex. 15 at 48-49, 74.

9. ████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
███████████████████████████████

10. Dr. Becker dismissed NetNut—another major competitor identified in the Frost & Sullivan Report—as an acceptable substitute for *any* of the accused traffic because it also was



accused of infringement by Luminati, and because Dr. Becker believed that NetNut was offering only a "static" residential product. Ex. 1 at ¶ 71; Ex. 3 at 85:7-86:3. But the complaint that Dr. Becker relies on does <u>not</u> allege infringement of any of the asserted patents in this case, nor does it accuse NetNut's residential proxy product of infringement (instead focusing on NetNut's "static" residential proxies).[5] Ex. 16. Indeed, Dr. Becker limited his analysis of whether NetNut is or is not an acceptable alternative to just NetNut's "static" residential product. Ex. 3 at 86:23-87:2.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████ ████████████████████████████████████

████████████████████████████████

11.     Dr. Becker's dismissal of the majority of the proxy market participants in the Frost & Sullivan Report is based on the relatively smaller size of those companies' networks. Ex. 1 at ¶ 69. But Dr. Becker admits that he did not research the minimum number of nodes within a residential proxy network that Oxylabs' customers would find acceptable, nor does he know how many nodes individual Oxylabs customers use on any given day. Ex. 3 at 39:24-40:13, 73:6-10. When asked about the importance of network size to the customer, Dr. Becker testified that he believed size to be an important competitive dynamic, but also admitted that "I haven't spoken to an individual customer, so I can't say for sure that every customer, you know, cares about the size of the network." Ex. 3 at 38:11-39:1.

---

[5]     Dr. Rhyne did not opine that "static" residential proxies infringe the asserted patents. Ex. 17 at 178:24-181:8. And Dr. Becker admits that "static" residential proxies are not accused in this case. Ex. 3 at 34:23-35:14.

█ ███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

12.    Oxylabs identified *forty-one* competitors in the residential proxy marketplace. Ex. 19-A at 67. Dr. Becker admitted that he did not consider—at all—many of the identified residential proxy competitors in his lost-profits analysis, including Shifter, Soax, and Xverum. Ex. 3 at 79:1-80:20. Dr. Ugone (Oxylabs' damages expert), on the other hand, identified each of Shifter, Soax, and Xverum as being residential proxy providers with comparable pricing, millions of available residential peers, and as covering similar use cases compared to Oxylabs and Luminati. Ex. 19-A at 67; Ex. 19-B at Exhibit 8.

13.    Dr. Rhyne did not opine that any third-party competitor infringes the asserted patents, including but not limited to BI Science (Geosurf) and NetNut. Ex. 17 at 173:19-174:3.

14.    ███████████████████████████████████████████████████ ██████████████████.[7] But Dr. Becker did not consider whether any of Oxylabs' customers were already Luminati customers, ██████████████████████████████████████ ███████████████████████████████████████████████.

15.    Dr. Becker admits that at least the following products in the marketplace are non-infringing and/or non-accused alternatives: (i) data center proxies, (ii) "static" residential IPs, and (iii) sending residential proxy traffic through non-U.S. exit nodes. Ex. 1 at ¶¶ 56, 66; Ex. 3 at 33:12-18, 34:23-35:14, 92:6-11.

---

[7]   Ex. 4 at 70:7-15; Ex. 7 at 29:2-12 ███████████████████████████



████████████████████████████████████   Ex. 20 at LUM-00048622 ███████████████████████████████████); Ex. 21 at LUMTES-0094817 (███████████████████████████████████████");

16.  The evidence shows that data center proxies (an admitted non-infringing alterna-

tive) represent an acceptable non-infringing alternative. For example:

- 

- Luminati's website recommends to its customers, as a "bottom line," that they "[t]ry using data center IPs first and the more expensive alternative of residential IPs as a fallback option, that way you can reduce the costs of your operation and still get great success rate." Ex. 25.

- 

- [8]

17.  Dr. Becker agrees that some proxy customers use both data center and residential

proxy products, some switch back and forth between the two products, and some find data center

proxies to be perfectly capable of satisfying their data collection needs. Ex. 3 at 63:16-64:5. Yet

Dr. Becker failed to analyze what percentage of Oxylabs' residential proxy customers have (or

---

[8]



could have, in the lost-profits world) shifted some or all of their residential proxy traffic to data center proxies. Ex. 3 at 64:6-10.

18.     Despite all of the foregoing, it is Dr. Becker's lost-profits opinion that not a single one of Oxylabs' customers would have shifted *any* of the accused traffic—not a single gigabyte—to any of the available alternatives. Ex. 3 at 87:5-16. For Dr. Becker's lost-profits opinion to be correct, *none* of the Oxylabs customers-at-issue would have:

- Shifted *any* accused traffic to a third-party residential proxy competitor, Ex. 3 at 89:4-17;
- Split *any* accused traffic between Luminati and another residential competitor, Ex. 4 at 70:7-15, Ex. 3 at 87:5-16;
- Shifted *any* accused traffic to a data center product (whether to Oxylabs' data center proxy product or anyone else's), Ex. 3 at 89:18-90:4;
- Shifted *any* accused traffic to a "static" residential proxy product,[9] Ex. 3 at 89:18-90:7;
- Shifted *any* accused traffic to an in-house solution,[10] Ex. 3 at 90:13-17;
- Shifted *any* accused traffic to non-U.S. residential proxy nodes,[11] Ex. 3 at 92:2-11;

---

[9]   Dr. Becker treats "static" residential IPs similarly to data center proxies. Ex. 1 at ¶ 19.



*see also* Ex. 23 at 3-4.

- ▪ ████████████████ Ex. 3 at 87: 5-16, 96:7-15; or

- ▪ Decided not to use Luminati at all,[12] Ex. 3 at 90:19-24, 100:14-101:15.

**B.    Reasonable Royalty Facts**

19. ████████████████████████████████

████████████████████████████████

████████████████████  ████████████

██ Ex. 2 at SLB-1C. ████████████████

████████████ Ex. 2 at SLB-6.

20. ████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████ Ex. 1 at ¶ 184; Ex. 2 at SLB-4A, SLB-4B. ██████

████████████████████████████████

███—i.e., Dr. Becker does not conduct <u>any</u> apportionment analysis to determine what features

of Luminati's residential proxy product are not tied to the asserted patents and what the value of

---

[11]    The evidence indicates that at least a portion of the accused traffic need not have utilized a US residential proxy exit node. Ex. 19-A at 59.

[12] ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

such features are. Ex. 3 at 107:7-108:2. Nor does Dr. Becker ever attempt to perform an appor-

tionment analysis of Oxylabs' accused products (e.g., to determine what features of Oxylabs'

products are unrelated to the asserted patents). *Id.* at 106:2-7, 107:7-108:2.



21.

Ex. 1 at ¶ 186; Ex. 3 at 116:6-19.

## III.   *DAUBERT* STANDARD

Expert testimony is permissible only when it helps the trier of fact, is based on sufficient

facts or data, and is the product of reliable principles and methods. Fed. R. Evid. 702. Courts act

as "gatekeepers" to ensure that expert testimony is "not only relevant, but reliable." *Daubert v.*

*Merrel Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). "[O]ne major determinant of whether an

expert should be excluded under *Daubert* is whether he has justified the application of a general

theory to the facts of the case." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1316 (Fed.

Cir. 2011).

## IV.   THE COURT SHOULD STRIKE DR. BECKER'S LOST-PROFITS OPINION

### A.   Lost Profits Standard

To recover lost profits, Luminati must prove that, "but for" the alleged infringement,

Luminati would have made Oxylabs' accused sales. *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538,

1545 (Fed. Cir. 1995) (en banc). The but-for analysis "requires a reconstruction of the market, as it would have developed absent the infringing product[.]" *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999). "To prevent the hypothetical from lapsing into purse speculation," Luminati must provide "sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture." *Id.*

The four-factor *Panduit* test establishes causation for lost-profit claims. *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1264 (Fed. Cir. 2013). *Panduit* requires the patentee to show: (i) demand for the patented product; (ii) absence of acceptable non-infringing substitutes; (iii) capability to exploit the demand; and (iv) the amount of the lost profit. *Rite-Hite*, 56 F.3d at 1545. The second *Panduit* factor "often proves the most difficult obstacle for patent holders." *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1286 (Fed. Cir. 2017). "Under this factor, if there is a noninfringing alternative which any given purchaser would have found acceptable and bought, then the patentee cannot obtain lost profits for that particular sale." *Id.* Patentees also regularly fail to account for foreseeable, "alternative actions" that a purported infringer would take to avoid "surrender[ing] its complete market share[.]" *Grain Processing*, 185 F.3d at 1350-51.[13]

Price erosion is a species of lost profits. *See Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1357 (Fed. Cir. 2001). Luminati must show that, "but for" the infringement, it would have sold its product at higher prices. *Id.* at 1357. To meet its burden, Luminati cannot simply speculate that it would have charged Oxylabs' customers more

---

[13]   A "rational would-be infringer is likely to offer an acceptable noninfringing alternative, if available . . . rather than leave the market altogether." *Grain Processing*, 185 F.3d at 1350-51. As a result, to accurately reconstruct the market, patentees must "account [for] any alternatives available to the infringer." *Id.*

absent the alleged infringement. Instead, as with lost profits, Luminati must reconstruct the market, and (at a minimum) show how Oxylabs' customers would have reacted to Luminati's higher prices. *Id.* For example, a "credible" economic analysis "cannot show entitlement to a higher price divorced from the effect of that higher price on demand." *Id.* "In other words, the patentee must also present evidence of the (presumably reduced) amount of product the patentee would have sold at the higher price. Thus . . . the patentee's price erosion theory must account for the nature, or definition, of the market, similarities between any benchmark market and the market in which price erosion is alleged, and the effect of the hypothetically increased price on the likely number of sales at that price in that market." *Id.* Luminati's analysis must also account for how non-infringing alternatives would limit Luminati's ability to raise prices. *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1381 (Fed. Cir. 2013).

**B.    Dr. Becker's Lost-Profits Opinion Is Unreliable And The Court Should Strike It**

1.    Dr. Becker's "No" Acceptable Non-Infringing Alternatives Opinion Is Unreliable

Dr. Becker's opinion that there are "no" acceptable non-infringing alternatives is unreliable and thus inadmissible under *Daubert*. As shown herein, at least five categories of acceptable non-infringing alternatives exist. Any one of such alternatives alone, for any portion of the accused traffic, is enough to render Dr. Becker's lost-profits opinion unreliable.

*First*, numerous third parties compete with Oxylabs and Luminati in the residential proxy marketplace. Fact Nos. 8-14, above. Dr. Becker, a damages expert, is not competent to opine on whether any third party infringes, and Dr. Rhyne (Luminati's technical expert) does not opine as to any third-party infringement. Fact No. 13. Accordingly, the Court should conclude that Dr. Becker's opinion as to any purported infringers in the marketplace—including BI Science (GeoSurf) and NetNut—is not reliable and strike it.

The Court should also strike Dr. Becker's opinion that not a single GB of accused traffic would have been serviced by any of the dozens of other competitors in the residential proxy marketplace as it is unreliable. The only purported basis for Dr. Becker's opinion that several of the other market participants would not have captured any amount of the accused traffic is that they allegedly have "smaller" residential networks. Fact No. 11. But Dr. Becker admitted that he did not research the minimum number of nodes within a residential proxy network that Oxylabs' customers would find acceptable, nor does the know how many nodes individual Oxylabs customers use. *Id.* Thus, Dr. Becker has no basis to conclude that third-party competitor networks would not capture any amount of the accused traffic. Worse, Dr. Becker admits that he did not even consider multiple third-party residential proxy providers in his analysis, further demonstrating the unreliable nature of his analysis. Fact No. 12.

*Second*, Dr. Becker's opinion is unreliable because data center proxies constitute an acceptable non-infringing alternative. Fact Nos. 15-17. Numerous competitors in the marketplace, including Luminati and Oxylabs, offer data center proxies, ███████████████████████████. *Id.* █████████████ ████████████████████████████████████████ Yet Dr. Becker opines that not a *single* Oxylabs customer would have used a data center proxy for *any* amount of accused traffic— ███████████████████████████████████.

*Third*, "static" residential proxies constitute an admitted non-infringing alternative, and the evidence demonstrates that it is an acceptable alternative. Fact Nos. 15, 18. This alternative renders Dr. Becker's opinion that there are "no" non-infringing alternatives—such that Luminati would purportedly capture *all* of Oxylabs' accused traffic—unreliable.

*Fourth*, Dr. Becker fails to consider that Oxylabs could have sent at least a portion of the accused traffic through non-U.S. exit nodes. Fact Nos. 15, 18. Instead, he simply assumes that all of the accused traffic would have gone to Luminati ███████████████████████████████ rather than simply being re-directed to a non-US node. *Id.*

*Fifth*, in-house solutions constitute a non-infringing alternative that Dr. Becker does not even address in his report, ███████████████████████████████ ███████████████████████. Fact No. 18. Dr. Becker's opinion that not a single GB of accused traffic would have been switched to an in-house solution—especially in the face of Luminati's substantially higher prices—is thus unreliable.

In sum, where acceptable non-infringing alternatives exist, as is the case here (for any or all of the reasons discussed above), the Court should not allow Dr. Becker to opine that Luminati would have captured *all* of Oxylabs' accused sales.[14]

        2.     <u>Dr. Becker's Opinion Contradicts The Law of Demand And Is Thus Unreliable</u>

> *All markets must respect the law of demand.* According to the law of demand, consumers will almost always purchase fewer units of a product at a higher price than at a lower price, possibly substituting other products. . . .
>
> Thus, in a competitive market, *sales quantity reacts to price changes*. The record shows that the PC CODEC market was competitive. Therefore, according

---

[14] *See, e.g.*, *Grain Processing*, 185 F.3d at 1352 ("market sales of an acceptable noninfringing substitute often suffice alone to defeat a case for lost profits") (citing cases); *BIC Leisure Products, Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1218-19 (Fed. Cir. 1993) (rejecting lost-profits claim where "at least fourteen competitors vied for sales in the sailboard market" at varying prices); *Fuji Photo Film Co. v. Jazz Photo Corp.*, 249 F. Supp. 2d 434, 454 (D.N.J. 2003) ("As an initial matter, the presumption that all of the infringer's sales would have accrued to the patentee absent the infringement is unreasonable in the multi-competitor landscape, where presumably some portion of the infringer's sales would have accrued to competitors other than the patent holder itself."); *Mentor Graphics*, 851 F.3d at 1288-89 (non-infringing alternatives that "could have been made available" preclude lost profits on such sales and a patentee "cannot obtain lost profits unless it and only it could have made the sale").

to basic tenets of economics, because Crystal is in a competitive market, *if Crystal raised prices, Crystal's sales would have fallen*.

—*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1359 (Fed. Cir. 2001) (emphasis added).

The unreliableness of Dr. Becker's lost-profits opinion is conclusively demonstrated by the fact that he opines that not only would Luminati have captured *all* of Oxylabs' accused traffic. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ The IP proxy network (including residential proxy market) is highly competitive, and it is undisputed that customers in the market care about price. Fact Nos. 4-6, 8-12. "Economists can define hypothetical markets, derive a demand curve, and make price erosion approximations without relying on inapposite benchmarks." *Crystal Semiconductor*, 246 F.3d at 1359.

Yet Dr. Becker simply assumed that Luminati would have captured all of Oxylabs' accused traffic ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ This he cannot do, as nothing in economics generally nor this case in particular supports such an opinion.[15] *See, e.g.*, *Crystal Semiconductor*, 246 F.3d at 1360 ("Crystal did not present any evidence of how a hypothetical increase in price would have affected Crystal's profits due to lost sales. Lost sales and price erosion damages are inextricably linked. To prevent inconsistent results, this court will not venture to evaluate price erosion and lost profits damages separately."); *BIC Leisure*, 1 F.3d at 1218 ("By purchasing BIC sailboards, BIC's customers demonstrated a preference for sailboards priced around $350, rather than One-Design boards priced around $600. Therefore, without BIC in the

---

[15]  "Trial courts are to consider the extent to which a given technique can be tested, whether the technique is subject to peer review and publication, any known potential rate of error, the existence and maintenance of standards governing operation of the technique, and, finally, whether the method has been generally accepted in the relevant scientific community." *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007). ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ without Luminati losing a single sale or the customer purchasing less traffic from Luminati.

market, BIC's customers would have likely sought boards in the same price range.").

Because Dr. Becker's *ipse dixit* opinion is the sole piece of purported evidence that Lu-

minati would have captured all of Oxylabs' accused traffic ███████████████████

████  the Court should preclude presentation of that opinion to the jury.[16]

## V.  THE COURT SHOULD STRIKE DR. BECKER'S REASONABLE-ROYALTY OPINION

### A.  Reasonable Royalty Standard

"Upon finding for the claimant the court shall award the claimant damages adequate to

compensate for the infringement, but in no event less than a reasonable royalty for the use made

of the invention by the infringer." 35 U.S.C. § 284. In calculating a reasonable royalty, "a patent-

ee must take care to seek only those damages attributable to the infringing features." *VirnetX,*

*Inc. v. Cisco Systems, Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014). In other words, "[t]o be admis-

sible, expert testimony opining on a reasonable royalty rate must 'carefully tie proof of damages

to the claimed inventions footprint in the market place.'" *Uniloc*, 632 F.3d at 1317. This derives

from Supreme Court precedent requiring that "the patentee . . . must in every case give evidence

tending to separate or apportion the defendant's profits and the patentee's damages between the

patented feature and the unpatented features, and such evidence must be reliable and tangible,

and not conjectural or speculative." *Garretson v. Clark*, 111 U.S. 120, 121 (1884). Consequently,

to be admissible, all expert damages opinions must separate (i.e., apportion) the value of the al-

---

[16]  *See, e.g.*, *Hathaway*, 507 F.3d at 318 ("[T]he existence of sufficient facts and a reliable methodology is in all instances mandatory. [W]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so; is not admissible.") (citation and quotations omitted); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

legedly infringing features from the value of all other features. *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014).

### B.      Dr. Becker's Reasonable-Royalty Opinion Is Unreliable And The Court Should Strike It

#### 1.      Dr. Becker's Royalty Does Not Reflect The Patents' Incremental Value To The Accused Products And Thus Fails To Comply With The Apportionment Requirement

Dr. Becker's reasonable-royalty opinion is unreliable because he does not conduct a proper apportionment analysis.[17] *First*, his entire analysis is premised on the asserted patents' alleged contribution to *Luminati's* allegedly embodying products—not the asserted patents' contribution to *Oxylabs'* accused products or profits. Fact No. 20. This is improper. *See, e.g., Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) ("When the *accused infringing products* have both patented and unpatented features, measuring this value requires a determination of the value added by such features. . . . [A] jury must ultimately apportion *the defendant's profits* and the patentee's damages between the patented feature and the unpatented features using reliable and tangible evidence.") (emphases added) (quotation omitted).[18] Because Dr. Becker conducted no apportionment analysis of the alleged value added by the asserted patents to Oxylabs' accused products, his reasonable-royalty opinion is unreliable.

*Second*, even his purported "apportionment" analysis of Luminati's allegedly embodying product is fundamentally flawed, as Dr. Becker simply assumes that the entire difference in "val-

---

[17]   Dr. Becker does not opine that the "entire market value rule" is satisfied in this case.

[18]   *See also Exmark Mfg. Co. v. Briggs & Stratton Power Products Group, LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018) ("Exmark adequately and reliably apportions between the improved and conventional features of the *accused mower*[.]") (emphasis added); *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014) ("In calculating the royalty base, Weinstein did not even try to link demand for the accused device to the patented feature, and failed to apportion value between the patented features and the vast number of non-patented features contained in the *accused products*.") (emphasis added).

ue" between Luminati's residential proxy product and data center proxy product is attributable to the asserted patents. In other words, Dr. Becker conducts no apportionment analysis of the features of Luminati's residential proxy product that are unrelated to the asserted patents. This renders his opinions unreliable, as there are many features of residential proxies (including when compared to data center proxies) that do not relate to, and are not enabled by, the asserted patents. For example, Dr. Ugone, Oxylabs' damages expert, identified twenty-five features of residential proxy products—none of which relate to the asserted patents. Ex. 19-B at Exhibit 12. Dr. Becker fails to apportion the value of any of these features out of his reasonable-royalty calculation.

Additionally, Dr. Becker attributes "value" to certain features that Luminati admits are not enabled by the asserted patents. For example, Dr. Becker opines that residential proxies provide a superior "level of anonymity" as compared to data center proxies, and that is one reason why customers choose residential proxies over data center proxies. Ex. 3 at 65:3-66:8. But Dr. Rhyne (Luminati's technical expert) admits that "anonymity" is not a feature or claim element of any asserted claim in this case. Ex. 17 at 50:13-17. Dr. Becker similarly opines that residential proxies allow for a larger sized network as compared to data center proxies, and that a larger network is attractive to customers. Ex. 3 at 70:7-10, 72:12-73:4. But Dr. Becker does not analyze the value between, for example, having 72 million nodes in a residential proxy network versus 35 million nodes. Ex. 3 at 39:2-9. And, in any event, Dr. Rhyne, at deposition, admitted that the number of client devices (i.e., the number of nodes in a residential network) is not a claim element or limitation of the asserted claims. Ex. 17 at 54:6-18. By relying on the full amount of profit between residential and data center proxies to form the basis of his royalty, Dr. Becker failed to account for, and apportion out, the superior "level of anonymity" and "network size"

which are admittedly not covered by the asserted patents. *See Ericsson, Inc.*, 773 F.3d at 1226.

*Third*, Dr. Becker's choice of data center proxies as the "closest non-infringing alterna-tive"[19]—the basis for his only purported apportionment step—does not go nearly far enough to apportion his "reasonable" royalty to only the value added by the allegedly patented features. To begin with, there is no testimony or evidence that data center proxies are the "closest non-infringing alternative" such that the alleged incremental value between data center proxies and residential proxies is coextensive with the "value" of the asserted patents. Dr. Becker relied on Luminati's technical expert, Dr. Rhyne, for his understanding as to how and to what extent the patents-in-suit relate to data center proxy networks. Ex. 3 at 33:7-11. But Dr. Rhyne offered no opinion on whether data center proxies infringe the asserted patents, or what portion of the pur-ported difference between data center proxies and residential proxies is allegedly attributable to the asserted patents. Ex. 17 at 43:5-44:5. Instead, Dr. Becker simply assumes that 100% of the difference in profits between Luminati's data center proxy product and Luminati's residential proxy product is attributable to the patents-in-suit. Ex. 3 at 107:14-108:2.

Dr. Becker also does not explain why data center proxies are a closer non-infringing al-ternative than "static" residential proxies (another admitted non-infringing alternative). █████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████  *Compare* Ex. 1 at ¶ 145 *with* Ex. 18 at LUMTES-0124541 & Ex. 23 at 4.

---

[19]   Dr. Becker opines that "[s]ince a proxy service that uses the data center IPPN is the clos-est non-infringing alternative, comparison of the price of searches conducted through Luminati's patented residential IPPN to the price of the data center IPPN provides a means to isolate the value added by the Patents-in-Suit from the value of proxy servers in general and the value of using a form of proxy network that was in the prior art (namely the data center IPPN)." Ex. 1 at ¶ 159.

███████████████████████████████████████████████████████

█████████████████████████████████ [20] Ex. 18 at LUMTES-0124542. Accord-

ingly, Dr. Becker's opinion is unreliable for failing to analyze the "static" residential proxy alter-

native.

          2.       <u>Dr. Becker Impermissibly Injects Luminati Into The Bargaining Room</u>

A hypothetical negotiation is "between the patentee and infringer . . . at the time in-

fringement began." *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1579 (Fed. Cir. 1996). Dr. Beck-

er correctly acknowledges that the hypothetical negotiation would have taken place ███████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████ ["][22] *Id.* at ¶ 27. But Dr. Becker's admissions are

lip-service only—his analysis quickly pivots, stating that because "at the time of the hypothetical

negotiation, ████████████████████████████████████████████████████████

----

[20]   Dr. Becker presumably ignored the "static" residential proxy product when conducting his analysis because Luminati charges the same (or similar) prices per GB for "static" residential proxies as for residential proxies. Ex. 39; *see also* ███████████████████████████
█████████████████████████████████████████████████████

[21] █████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

[22] █████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████



The result of this sleight of hand is enormous, as it skews Dr. Becker's *Georgia-Pacific* analysis beyond repair.

*Id.* at ¶ 186; Ex. 3 at 115:6-116:19.

Where, as here, a damages expert's opinion is based on the wrong party being at the hypothetical negotiation, it is not reliable.[25]

       3.   <u>Dr. Becker "Reasonable" Royalty Is Unreliable On Its Face</u>

Dr. Becker concludes that, at the hypothetical negotiation,

. Ex. 2 at SLB-1C.

---

23

24

[25]  *See, e.g.*, *Syneron Med. Ltd. v. Invasix, Inc.*, 16-CV-00143, 2018 WL 4696969, at *9-10 (C.D. Cal. Aug. 27, 2018) ("Mr. Weinstein's failure to include the proper party in the hypothetical negotiation drastically inflates the resulting reasonable royalty . . . . [and] renders his damages analysis unreliable."); *Oracle Am., Inc. v. Google Inc.*, 798 F. Supp. 2d 1111, 1117 (N.D. Cal. 2011) ("At the time the alleged infringement began, Sun was the patentee, not Oracle. Dr. Cockburn erred in hypothesizing a negotiation between Google and Oracle, instead of one between Google and Sun. Oracle and Sun were different companies with different interests. Injecting Oracle into the bargaining room was wrong.").



*Id.* at SLB-6.

Ex. 3 at 117:3-16.

Finally, Dr. Becker's reasonable royalty "negotiation" is not a negotiation at all.

## VI.   CONCLUSION

For these reasons, the Court should strike Dr. Becker's lost-profits and reasonable-royalty opinions.

---

26

*Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) (emphasis added).

27   *See, e.g.*, *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011) (impermissible for damages expert to rely on 25% "rule of thumb"); *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1332-34 (Fed. Cir. 2014) (impermissible for damages expert to rely on Nash Bargaining's 50/50 profit split of value of asserted patent as starting point for hypothetical negotiation); *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Products Group, LLC*, 879 F.3d 1332, 1351 (Fed. Cir. 2018) (improper for damages expert to "address[] the *Georgia-Pacific* factors in light of the facts and then pluck[] [a] 5% royalty rate out of nowhere").

Dated: January 25, 2021

Respectfully submitted,

MICHAEL C. SMITH
  Texas State Bar No. 18650410
  michaelsmith@siebman.com
**SIEBMAN, FORREST,**
**BURG & SMITH LLP**
113 East Austin Street
Marshall, Texas 75671
Telephone: (903) 938-8900
Telecopier: (972) 767-4620

STEVEN CALLAHAN
  Texas State Bar No. 24053122
  scallahan@ccrglaw.com
CRAIG TOLLIVER
  Texas State Bar No. 24028049
  ctolliver@ccrglaw.com
GEORGE T. "JORDE" SCOTT
  Texas State Bar No. 24061276
  jscott@ccrglaw.com
MITCHELL SIBLEY
  Texas State Bar No. 24073097
  msibley@ccrglaw.com
**CHARHON CALLAHAN**
**ROBSON & GARZA, PLLC**
3333 Lee Parkway, Suite 460
Dallas, Texas 75219
Telephone: (214) 521-6400
Telecopier: (214) 764-8392

*Counsel for Teso LT, UAB, Oxysales, UAB,*
*and Metacluster LT, UAB*

23

## CERTIFICATE OF CONFERENCE

The undersigned certifies that, on January 25, 2021, he met and conferred with counsel for Luminati, Robert Harkins, Esq. by telephone, and that Luminati has advised that it is opposed to the request for relief in the foregoing motion.

STEVEN CALLAHAN

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on January 25, 2021. As such, this document was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(a)(3)(A). The foregoing document has also been served on Luminati's counsel, Sunny Cherian, Esq., by e-mail on January 25, 2021.

STEVEN CALLAHAN

## CERTIFICATE OF AUTHORIZATION TO SEAL

The undersigned certifies that the foregoing pleading is filed under seal pursuant to the Court's Protective Order.

STEVEN CALLAHAN

24